No. 25-5856

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

TERRANCE MOSS, individually, on behalf of all others similarly situated, and on behalf of the general public,

*Plaintiff-Appellee*,

v.

CLEO AI INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Washington
No. 2:25-cv-00879-MLP (Hon. Michelle L. Peterson)

## APPELLANT'S OPENING BRIEF

| | |
|---|---|
| John S. Devlin, III | Benjamin W. Snyder |
| Erin Wilson | Allyson B. Baker |
| BALLARD SPAHR, LLP | Meredith Boylan |
| 1301 Second Avenue, Suite 2800 | PAUL HASTINGS LLP |
| Seattle, WA 98101 | 2050 M Street, NW |
| (206) 223-7000 | Washington, DC 20036 |
| | (202) 551-1700 |
| Derek Wetmore | |
| PAUL HASTINGS LLP | Ben Gifford |
| 101 California Street, 48th Floor | Margaret Shields |
| San Francisco, CA 94111 | PAUL HASTINGS LLP |
| (415) 856-7000 | 200 Park Avenue |
| | New York, NY 10166 |
| | (212) 318-6000 |

# DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellant Cleo AI Inc. makes the following disclosures:

Cleo AI Ltd. is the parent corporation of Cleo AI Inc. and holds 100% of its stock.

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .............................................................iv

INTRODUCTION ..........................................................................1

JURISDICTIONAL STATEMENT ................................................4

STATEMENT OF THE ISSUES ....................................................4

STATEMENT OF THE CASE .......................................................5

    A.    Legal Background...........................................................5

        1.    The Federal Arbitration Act ..................................5

        2.    The Military Lending Act .....................................5

        3.    The Truth In Lending Act .....................................7

    B.    Factual Background .......................................................8

        1.    Cleo's Business......................................................8

        2.    Cleo's Arbitration Provision ................................10

    C.    Procedural Background .................................................11

SUMMARY OF THE ARGUMENT..............................................15

STANDARD OF REVIEW ............................................................19

ARGUMENT .................................................................................19

I.    An Arbitrator Must Decide Whether Moss's Claims Are Arbitrable ............................................................................20

II.    Moss's Claims Are Arbitrable................................................27

    A.    The MLA Precludes Enforcement Of Mandatory Arbitration Clauses, Not Optional Arbitration Clauses....................................27

    B.    Cleo's Cash Advances Are Not Consumer Credit .......................30

        1.    Cleo's Cash Advances Are Not Credit ................................31

            a.    Credit Is The Right To Defer Payment Of Debt, And Debt Is A Legal Obligation To Repay................31

            b.    Cleo Users Do Not Incur Debt Because They Have No Obligation To Repay................35

ii

2. Cleo's Cash Advances Are Not Subject To Finance Charges ................................................................................. 44

    a. Optional Expedite Fees Are Not Finance Charges .................................................................... 45

    b. Optional Subscription Fees Are Not Finance Charges ................................................................... 50

C. Moss's TILA Claim Is Arbitrable ..................................................... 53

CONCLUSION ................................................................................. 56

iii

# TABLE OF AUTHORITIES

Page(s)

CASES

*Almendarez-Torres v. United States,*
523 U.S. 224 (1998)................................................................29

*AT&T Mobility LLC v. Concepcion,*
563 U.S. 333 (2011)..................................................................5

*Attix v. Carrington Mortg. Servs., LLC,*
35 F.4th 1284 (11th Cir. 2022) ..............................................26

*Burnett v. Ala Moana Pawn Shop,*
3 F.3d 1261 (9th Cir. 1993).....................................................40

*Caremark, LLC v. Chickasaw Nation,*
43 F.4th 1021 (9th Cir. 2022)..................................................25

*Clark v. Sweeney,*
No. 25-52, 2025 WL 3260170 (U.S. Nov. 24, 2025) ...............52

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018)...............................................5, 17, 21, 23, 30

*Espin v. Citibank, N.A.,*
126 F.4th 1010 (4th Cir. 2025) ..........................................14, 53

*Gallardo ex rel. Vassallo v. Marstiller,*
596 U.S. 420 (2022).................................................................22

*Garrett v. Monterey Fin. Servs., LLC,*
No. 18-cv-325, 2018 WL 3579856 (D. Md. July 25, 2018).......28

*Gilman v. Comm'r,*
53 F.2d 47 (8th Cir. 1931)........................................................34

*Henry Schein, Inc. v. Archer & White Sales, Inc.,*
586 U.S. 63 (2019)..............................................................26, 27

*Hibbs v. Winn,*
542 U.S. 88 (2004)....................................................................29

*Holley-Gallegly v. TA Operating, LLC,*
74 F.4th 997 (9th Cir. 2023) ...................................................19

iv

*Household Credit Servs., Inc. v. Pfennig,*
541 U.S. 232 (2004)..........................................................................48

*Kisor v. Wilkie,*
588 U.S. 558 (2019)..........................................................................36

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
460 U.S. 1 (1983)................................................................................5

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012)..........................................................................40

*Olson v. Unison Agreement Corp.,*
No. 23-2835, 2025 WL 2254522 (9th Cir. Aug. 7, 2025)..........42, 43

*Oracle America, Inc. v. Myriad Grp. A.G.,*
724 F.3d 1069 (9th Cir. 2013).........................................................21

*Orubo v. Activehours, Inc.,*
780 F. Supp. 3d 927 (N.D. Cal. 2025)........................................43, 49

*Pennsylvania Dep't of Pub. Welfare v. Davenport,*
495 U.S. 552 (1990)..........................................................................33

*Perry v. United States,*
294 U.S. 330 (1935)..........................................................................34

*Pollice v. Nat'l Tax Funding, L.P.,*
225 F.3d 379 (3d Cir. 2000) ............................................................33

*Rent-A-Center, W., Inc. v. Jackson,*
561 U.S. 63 (2010).......................................................................23, 25

*Smith v. City of Jackson,*
544 U.S. 228 (2005)..........................................................................33

*Steines v. Westgate Palace, L.L.C.,*
113 F.4th 1335 (11th Cir. 2024) .....................................................26

*Thompson v. Comm'r,*
235 F.2d 599 (9th Cir. 1956)............................................................34

*United States v. Door,*
996 F.3d 606 (9th Cir. 2021).............................................................33

*United States v. Olano,*
507 U.S. 725 (1993)...........................................................................51

*United States v. Sineneng-Smith,*
590 U.S. 371 (2020) ................................................................52

*United States v. Yi-Chi Shih,*
73 F.4th 1077 (9th Cir. 2023) ...............................................31

*Veale v. Citibank, F.S.B.,*
85 F.3d 577 (11th Cir. 1996) .................................................47

*Yurth v. Experian Info. Sols., Inc.,*
622 F. Supp. 3d 89 (E.D. Pa. 2022) ......................................29

STATUTES

9 U.S.C. § 1 ...............................................................................5

9 U.S.C. § 3 ...............................................................................4

9 U.S.C. § 4 ...............................................................................4

9 U.S.C. § 16 .............................................................................4

9 U.S.C. § 401 .........................................................................22

9 U.S.C. § 402 .........................................................................22

10 U.S.C. § 987 .................. 4, 5, 6, 11, 12, 16, 19, 21, 24, 27, 28, 30, 32, 53, 54, 55

11 U.S.C. § 101 .......................................................................33

15 U.S.C. § 1601 ...................................................................4, 7

15 U.S.C. § 1638 .......................................................................7

15 U.S.C. § 1692a ...................................................................33

25 U.S.C. § 1621e ...................................................................25

28 U.S.C. § 1331 .......................................................................4

Ark. Code § 23-52-203 ...........................................................39

Ind. Code § 28-8-6-1002 .........................................................39

Kan. Stat. § 9-2407 .................................................................39

La. Stat. § 9:3591.5 .................................................................39

Mo. Stat. § 361.749.6 ..............................................................39

Nev. Rev. Stat. § 604D.190 .....................................................39

Pub. L. No. 90-321, § 102, 82 Stat. 146 (1968) .......................7

S.C. Code § 39-5-860 ..................................................................39

Utah Code § 13-78-106 ...............................................................39

**REGULATIONS**

12 C.F.R. pt. 1026, Supp. I...............................................36, 37, 52

12 C.F.R. § 1026.2 .......................................................................32

12 C.F.R. § 1026.4 ..............................3, 7, 13, 18, 44, 45, 47, 48, 50, 52

12 C.F.R. § 1026.17 .......................................................................7

12 C.F.R. § 1026.18 .......................................................................7

32 C.F.R. § 232.3 ......................3, 6, 7, 12, 17, 30, 31, 32, 40, 44

CFPB, *Truth in Lending (Regulation Z); Consumer Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work*, 89 Fed. Reg. 61358 (July 31, 2024).......................................49

Department of Defense, Office of the Secretary, *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 72 Fed. Reg. 18157 (Apr. 11, 2007) .........................................41

Office of the Under Secretary of Defense for Personnel and Readiness, Department of Defense, *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 80 Fed. Reg. 43560 (July 22, 2015).......................................................................1, 41

*Truth in Lending (Regulation Z); Nonapplication to Earned Wage Access Products*, 90 Fed. Reg. 60069 (Dec. 23, 2025)......38, 46, 50, 53

*Truth in Lending*, 65 Fed. Reg. 17129 (Mar. 31, 2000)......................38

*Truth in Lending*, 68 Fed. Reg. 16185 (Apr. 3, 2003) ......................46

**OTHER AUTHORITIES**

CFPB, *How Do I Stop Automatic Payments From My Bank Account?*, https://perma.cc/Z7P9-LFER ......................................................35

*Condition*, Black's Law Dictionary (12th ed. 2024)............................45

Consumer Arbitration Rules (Feb. 21, 2018), https://www.adr.org/media/tiifv2ft/consumer_rules_web.pdf.....................21

*Debt*, Merriam-Webster Online..............................................17, 32

*Debt*, Black's Law Dictionary (4th ed. 1968)......................................38

vii

*Debt*, Black's Law Dictionary (12th ed. 2024) ................................................32

*Impose*, Merriam-Webster Online ...............................................................46

*Incident*, Black's Law Dictionary (12th ed. 2024) ...........................................45

*Lend*, Black's Law Dictionary (12th ed. 2024) ................................................37

*Mobile Check Deposit*, PNC, https://perma.cc/7HSY-L7W8 ..........................47

*Standard Bank Transfers FAQ*, Venmo, https://perma.cc/39XT-EVAN .......48

*Your Venmo Account*, Venmo, https://perma.cc/3PTF-Y5NH ......................48

## INTRODUCTION

The Military Lending Act ("MLA") regulates the terms of consumer credit extended to active-duty servicemembers and their dependents. Among other things, the statute sets a cap on interest rates, provides for certain mandatory disclosures, and prohibits creditors from forcing covered members to submit to arbitration regarding violations of the statute's requirements. Those provisions work together to achieve an important, but limited, objective: to help protect members of the military and their families from becoming ensnared in a "debt trap" that could undermine military readiness. *See* Office of the Under Secretary of Defense for Personnel and Readiness, Department of Defense, *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 80 Fed. Reg. 43560, 43566 (July 22, 2015).

In the decision below, however, the district court expanded the MLA far beyond its limited reach. It held that the MLA prohibits arbitration not just of borrowers' substantive claims, but also of the antecedent question of arbitrability. It further held that voluntary agreements to arbitrate MLA claims are unenforceable, even though it acknowledged that the MLA prohibits only mandatory arbitration clauses. And the court concluded that the MLA prevents arbitration of non-MLA claims, too, so long as those claims

1

arguably involve the extension of consumer credit. In doing so, the court created unnecessary conflict between the MLA and the Federal Arbitration Act ("FAA"), which establishes a strong background presumption in favor of arbitration that Congress did not intend to displace in the wholesale manner that the court's opinion supposes.

Beyond its arbitration-specific errors, the district court also made broader errors about the scope of the MLA's substantive protections. Defendant-Appellant Cleo AI Inc. operates a personal finance mobile application that helps users budget, save, and build credit. As part of its suite of products, Cleo offers users the ability to take out free cash advances that users can later pay back (either proactively or by allowing Cleo to make an authorized withdrawal from a linked account). While Cleo may deny additional advances to a user that chooses not to pay back a prior advance, Cleo expressly disclaims any contractual or legal right to recover for cash advances it has already made, and it does not engage in debt collection or report users to any consumer reporting agency. Contrary to the district court's conclusion, that issuance of non-recourse cash advances does not come within the MLA's regulation of "consumer credit," which is limited to circumstances in which a

2

consumer incurs a "debt" that the consumer is obligated to repay. 32 C.F.R. § 232.3(h).

Even if Cleo users *were* obligated to repay Cleo's cash advances, moreover, those advances still would not be covered by the MLA for a second reason. The MLA covers only "consumer credit" transactions that include a "finance charge," which is defined as a charge "imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit," and which excludes "any charge of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a). The district court held that cash advances were subject to finance charges because some users chose to pay subscription fees to access Cleo's entire suite of products or expedite fees to obtain delivery of their cash advances more quickly. Neither fee is "imposed" by Cleo as "an incident to or a condition of" cash advances, though, because users incur those fees voluntarily and can take out cash advances without paying them. Moreover, expedite fees are regularly imposed by banks and other financial services providers in connection with transfers of cash from one account to another, and they are thus "of a type payable in a comparable cash transaction." *Id.*

For any or all of those reasons, this Court should reverse the decision below and remand with instructions to order arbitration of the asserted claims.

## JURISDICTIONAL STATEMENT

Plaintiff-Appellee Terrance Moss alleges violations of the MLA, 10 U.S.C. § 987, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* Accordingly, the district court had jurisdiction pursuant to 28 U.S.C. § 1331.

On September 8, 2025, the district court entered an order denying Cleo's motion to compel arbitration and stay the case under 9 U.S.C. §§ 3 and 4. ER-3-13. Cleo filed a timely notice of appeal on September 15, 2025. ER-154-156.

This Court has jurisdiction under 9 U.S.C. § 16, which authorizes appeals from interlocutory orders "refusing a stay of any action under section 3" or "denying a petition under section 4 of this title to order arbitration to proceed." 9 U.S.C. § 16(a)(1)(A)-(B).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in deciding the arbitrability of Moss's claims in the first instance, where Moss and Cleo agreed that an arbitrator should decide questions of arbitrability.

2.      Whether the district court erred in deciding that the MLA precludes enforcement of a voluntary agreement to arbitrate Moss's claims concerning Cleo's non-recourse cash advances.

## STATEMENT OF THE CASE

### A.      Legal Background

#### 1.      The Federal Arbitration Act

In 1925, Congress enacted the FAA, 9 U.S.C. § 1 *et seq.*, in response to "widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). The FAA reflects a "liberal federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). A party seeking to establish that Congress precluded enforcement of arbitration agreements in a particular context therefore "faces a stout uphill climb" and must "bear[] the heavy burden of showing . . . a clear and manifest congressional command to displace the Arbitration Act and outlaw agreements like theirs." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510-11 (2018).

#### 2.      The Military Lending Act

The MLA, 10 U.S.C. § 987, regulates the terms of "consumer credit" extended to active-duty servicemembers and their dependents. As relevant here, the MLA imposes a 36% cap on the annual percentage rate of interest on

consumer credit extended to covered members and requires that creditors make certain disclosures in connection with the extension of such credit. *See* 10 U.S.C. § 987(b), (c). The MLA also prohibits creditors from requiring that covered members "waive [their] right to legal recourse under any otherwise applicable provision of State or Federal law," or from "requir[ing] the borrower to submit to arbitration." 10 U.S.C. § 987(e)(2), (3). And as part of its "Penalties and Remedies" provision, the MLA provides that "[n]otwithstanding [the FAA], no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member." 10 U.S.C. § 987(f)(4).

The MLA does not define "consumer credit," but rather delegates that responsibility to the Secretary of Defense. 10 U.S.C. § 987(h)(2)(D), (i)(6). Pursuant to that delegation, the Secretary has promulgated regulations defining "[c]onsumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) [s]ubject to a finance charge; or (ii) [p]ayable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1). The regulations further define "[c]redit" as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h).

6

And they provide that "[f]inance charge," for purposes of the MLA, "has the same meaning as 'finance charge' in Regulation Z," 32 C.F.R. § 232.3(n), which in turn defines the term as "the cost of consumer credit as a dollar amount," 12 C.F.R. § 1026.4(a).  More specifically, Regulation Z provides that the term "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit," but "does not include any charge of a type payable in a comparable cash transaction."  *Id.*

### 3. The Truth In Lending Act

Congress enacted TILA, 15 U.S.C. § 1601 *et seq.*, in 1968 with the goal of "assur[ing] a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."  15 U.S.C. § 1601; *see* Pub. L. No. 90-321, § 102, 82 Stat. 146 (1968).  As relevant here, TILA requires certain disclosures in connection with specified credit transactions.  *See* 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18.  Unlike the MLA, TILA does not regulate or purport to limit the use of arbitration clauses.

## B. Factual Background

### 1. Cleo's Business

Cleo operates a personal finance mobile application that helps users budget, save, and build credit. As part of its suite of products, Cleo provides users with the opportunity to receive free cash advances to a linked account or debit card. ER-54.

When requesting a cash advance, a Cleo user specifies a date up to 14 days in the future by which the user expects to pay the advanced amount back to Cleo. ER-55. The user also authorizes Cleo to withdraw an amount equal to the cash advance from the user's linked bank account or debit card on that date unless the user makes an earlier payment. *Id.* The user may later extend the specified date by up to 14 additional days. *Id.*

A user remains free to revoke Cleo's right to withdraw funds from his or her linked account at any time, even if the user previously received a cash advance and has not paid back the advanced amount. *Id.* Cleo's Terms of Service provide that Cleo has no contractual or legal right to repayment in connection with previously issued cash advances, and that Cleo will not engage in debt-collection efforts or report users to any consumer reporting agency. *Id.* Instead, if a user chooses not to pay back an amount Cleo previously

8

advanced, the user will simply be unable to continue to access Cleo's products and services (including additional advances). *Id.*

In addition to the flexibility that Cleo offers regarding the date by which a user will pay back advanced funds, Cleo also gives users flexibility regarding how quickly they will receive the advanced funds. Funds generally arrive within four business days of the user's request. *Id.* Users who wish to receive an advance more quickly may pay an expedite fee—similar to the expedite fee offered by banks and virtually all digital wallets in connection with the transfer of money from one user account to another—to receive the funds within 24 hours. *Id.* The expedite fee is completely optional, and it has no impact on whether the user may receive an advance or the amount of the advance; users who do not choose the expedited option still receive their full cash advance. *Id.*

Users pay subscription fees to access Cleo's full suite of products, which includes its cash advance product. ER-53-54. Users do not need to pay a subscription fee, however, to take out an advance. ER-54. Rather, users who do not wish to pay the subscription fee may instead submit requests for cash advances by e-mail. *Id.*

9

### 2.     Cleo's Arbitration Provision

When users sign up with Cleo, they agree to Cleo's Terms and Conditions.  ER-49-76.  The Terms and Conditions include an arbitration provision, which begins with the following preamble:

> YOU HAVE READ THIS PROVISION CAREFULLY AND UNDERSTAND THAT IT LIMITS YOUR RIGHTS IN THE EVENT OF A DISPUTE BETWEEN YOU AND US. YOU UNDERSTAND THAT YOU HAVE THE RIGHT TO REJECT THIS PROVISION AS PROVIDED BELOW . . . .

ER-71.  The provision then informs users:

> You and the Cleo Parties ("we," "us," and "our" for purposes of this section) agree that the sole and exclusive forum and remedy for resolution of a Claim be final and binding arbitration pursuant to this Section (the "Arbitration Provision"), unless you opt out as provided below.  As used in this Arbitration Provision, "Claim" shall include any past, present, or future claim, dispute, or controversy involving you (or persons claiming through or connected with you), on the one hand, and us on the other hand, relating to or arising out of these Terms, and/or the activities or relationships that involve, lead to, or result from these Terms, including . . . the validity or enforceability of this Arbitration Provision, any part thereof, or the entire Agreement.

*Id.*  The provision also includes an express opt-out clause:  "You may opt out of this Arbitration Provision for all purposes by sending an arbitration opt out notice to team@meetcleo.com, within 60 days of the date of your electronic acceptance of these Terms."  ER-72*.*

10

C. Procedural Background

On April 10, 2025, Plaintiff-Appellee Terrance Moss filed a putative class action against Cleo in Washington state court. ER-119-153. Moss alleges that he is an active-duty servicemember who took out cash advances from Cleo and paid expedite fees and subscription fees. ER-142-143. He alleges that those advances violated the disclosure requirements of TILA and the MLA, as well as the MLA's 36% interest-rate cap and its prohibitions on mandatory arbitration and class action waivers. ER-148-151. Moss seeks to represent two nationwide classes, one for his MLA claim and one for his TILA claim. ER-144-145.

Cleo removed the case to the United States District Court for the Western District of Washington and thereafter filed a motion to dismiss Moss's class claims and stay his individual claims in favor of arbitration. ER-113-117; ER-81-112. In its motion, Cleo explained that the parties had agreed to arbitrate any claims between them, and that they also had agreed that an arbitrator would decide the antecedent question of whether any claims between them were arbitrable. ER-98-99. Cleo acknowledged that the MLA prohibits mandatory arbitration of "any dispute involving the extension of consumer credit," 10 U.S.C. § 987(f)(4), but it explained that the arbitration

11

provision here was not mandatory because Moss had the option to opt out and did not do so. ER-100-101. Cleo further maintained that Moss's lawsuit was not a "dispute involving the extension of consumer credit," 10 U.S.C. § 987(f)(4), because "[c]onsumer credit" is defined in relevant part as "credit" that is "[s]ubject to a finance charge," 32 C.F.R. 232.3(f)(1), and Cleo's cash advances satisfied neither element of that definition. ER-101-110. Even if the court determined that Moss's MLA claim was not arbitrable, moreover, Cleo urged that Moss's TILA claim should be dismissed in favor of arbitration. ER-110-111.

The district court denied the motion. The court began by concluding that it, rather than an arbitrator, should decide whether Moss's claims were arbitrable. ER-7. In support of that conclusion, the court stated that "the MLA plainly overrides the FAA," and that, as a result, the Terms and Conditions' "delegation clause cannot be enforced." *Id.* (internal quotation marks omitted).

The district court next determined that Cleo's cash advances qualified as "credit" under the MLA's implementing regulations. ER-7-9; *see* 32 C.F.R. § 232.3(h) (defining "[c]redit" as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment"). Cleo had

12

argued that its cash advances did not involve the extension of credit because users had no obligation to repay them. The court rejected that argument, though, based on its view that "Regulation Z, which implements TILA, clarifies that 'credit' includes cash advances provided in exchange for the consumer's authorization to debit their deposit account at a later date." ER-8 (citing Consumer Financial Protection Bureau, *Official Interpretation of Regulation Z*, 12 C.F.R. pt. 1026, Supp. I, ¶ 2(a)(14)). The court stated that "Cleo's narrow interpretation would improperly introduce a legal requirement," "disregard Regulation Z[,] and undermine TILA's consumer protection purpose." ER-9.

Having concluded that cash advances were "credit," the district court further held that Cleo's expedite fees and subscription fees were "finance charges." ER-10-12. As noted above, the MLA incorporates Regulation Z's definition of "finance charge," which "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit," but "does not include any charge of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a). With respect to expedite fees, Cleo had argued that they were not "incident to or a condition of the extension of credit" because they were

13

optional, but the court found it sufficient that there was "[a] connection between the charge and the extension of credit." ER-11. Cleo had also argued that expedite fees were "charge[s] of a type payable in a comparable cash transaction," given that expedite fees are frequently charged for non-credit products, but the court did not address that argument. With respect to subscription fees, Cleo had offered several reasons why they did not qualify as finance charges, and Moss had *agreed* with Cleo. *See* ER-43 n.16 ("Plaintiff agrees that subscription charges are exempted from the definition of 'finance charge' under the MLA and TILA."). The court nevertheless held that "Moss adequately pleads facts establishing that Cleo's Subscription Fees are finance charges." ER-12.

Finally, the district court held that Moss's TILA claim could not be arbitrated, even though TILA imposes no limits on arbitration. *Id.* Cleo had argued otherwise based on the Fourth Circuit's decision in *Espin v. Citibank, N.A.*, 126 F.4th 1010 (4th Cir. 2025), which held that servicemembers' claims under the Servicemembers Civil Relief Act ("SCRA") should be arbitrated even though their MLA claims arising out of the same credit card accounts might not be arbitrable. *See id.* at 1020. The district court concluded that

14

*Espin* was distinguishable, however, because "Moss's TILA claim arises from the same factual nucleus as his MLA claim." ER-12.

## SUMMARY OF THE ARGUMENT

The district court erred in holding that it should decide the arbitrability of Moss's substantive claims, rather letting an arbitrator decide that antecedent question as provided in the parties' agreement. Moreover, having improperly seized the arbitrability question for itself, the district court answered it incorrectly. This Court should reverse.

I.     Under Cleo's Terms and Conditions, the parties agreed that an arbitrator would decide not only the substance of any arbitrable disputes between them, but also the antecedent question of whether a given dispute was arbitrable or instead exempt from arbitration. The district court, however, decided the arbitrability question for itself, concluding that "the MLA plainly overrides the FAA." ER-7 (internal quotation marks omitted). That was error. The parties agreed that the arbitrability question would be decided in the first instance by an arbitrator, not a court. Absent some provision in the MLA clearly barring them from delegating that threshold arbitrability question (as opposed to an underlying substantive question) to an arbitrator, the FAA required the court to give effect to the parties' choice.

15

II.     The district court erred, moreover, in holding that Moss's claims are not arbitrable.  The MLA prohibits mandatory arbitration of "any dispute involving the extension of consumer credit."  10 U.S.C. § 987(f)(4).  It does not preclude enforcement of optional arbitration clauses like the one here.  And even if it did, the instant dispute is arbitrable because it does not involve consumer credit.  At a minimum, Moss's TILA claim is arbitrable, even if his MLA claim is not.

II.A.  The court held that Moss's claims are not arbitrable because, under the MLA, "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member."  ER-7 (quoting 10 U.S.C. § 987(f)(4)).  The court failed, however, to read Section 987(f)(4) in context.  The MLA prohibits only *mandatory* arbitration agreements.  *See* 10 U.S.C. § 987(e)(3) ("It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which . . . the creditor *requires* the borrower to submit to arbitration . . . ." (emphasis added)).  It does not prohibit arbitration provisions with opt-out clauses like the one at issue.  If Section 987(f)(4) prohibited enforcement of all arbitration agreements, then Section 987(e)(3)'s prohibition of mandatory agreements would be subsumed.

16

This Court should not read the former provision to render the latter superfluous, particularly given the Supreme Court's admonitions that Congress will make its intent "clear and manifest" when it wishes "to displace the Arbitration Act and outlaw agreements" to arbitrate. *Epic Sys.*, 584 U.S. at 510-11.

II.B. Even if Section 987(f)(4) prohibited optional arbitration agreements in some circumstances, it would not preclude arbitration here because Moss's claims do not "involv[e] the extension of consumer credit." The MLA defines "[c]onsumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is . . . [s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1)(i). For multiple reasons, Cleo's cash advances do not come within that definition.

First, cash advances are not "credit." The MLA's implementing regulations define "[c]redit" as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). Debt, in turn, means "a state of being under obligation to pay or repay someone or something in return for something received." *Debt*, Merriam-Webster Online, https://perma.cc/CHT7-MP8W. Cleo users do not incur debt when they take out cash advances because they have no obligation

17

to repay. And because cash advances are not "debt," they are not "credit" either.

Second, Cleo's cash advances also are not "[s]ubject to a finance charge." Under the MLA, a finance charge "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit," but it "does not include any charge of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a). Cleo's expedite fees and subscription fees do not come within that definition. Expedite fees are purely optional, and thus they are not "imposed" by Cleo as "an incident to or a condition of" cash advances. They also are "of a type payable in a comparable cash transaction," because banks and digital wallets like Venmo regularly charge fees for expedited transfers. Subscription fees are likewise not "imposed" by Cleo as "an incident to or a condition of" cash advances, because users can take out cash advances without choosing to pay the fees, and because users who do choose to pay fees thereby receive access to Cleo's entire suite of products. Indeed, Moss *conceded* that Cleo's subscription fees are not finance charges, and the district court had no sound basis for disregarding that concession.

18

II.C. At a minimum, the district court erred in declining to compel arbitration of Moss's TILA claim. The MLA prohibits mandatory arbitration of "any dispute involving the extension of consumer credit." 10 U.S.C. § 987(f)(4). That prohibition is most naturally read to apply only to claims brought under Section 987, which imposes limitations on the "[t]erms of consumer credit extended to members and dependents." It does not apply to claims brought under other statutes (like TILA).

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's decision to grant or deny a motion to compel arbitration." *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1000 (9th Cir. 2023).

## ARGUMENT

When Moss signed up with Cleo, he agreed not only that an arbitrator would decide any arbitrable disputes that arose between the parties, but also that the arbitrator would resolve the antecedent question of whether a particular dispute is arbitrable. The district court nevertheless concluded that it, rather than an arbitrator, should decide the arbitrability of Moss's claims, then held that under the MLA none of those claims is subject to arbitration. That decision was doubly flawed. First, nothing in the MLA authorized the

19

district court to disregard the parties' agreement to arbitrate arbitrability. And second, having nevertheless decided to resolve the arbitrability question itself, the court erred in finding that the MLA bars the arbitration of Moss's substantive claims.

## I. An Arbitrator Must Decide Whether Moss's Claims Are Arbitrable

Under the Terms and Conditions, Moss and Cleo "agree[d] that the sole and exclusive forum and remedy for resolution of a Claim [would] be final and binding arbitration." ER-71. The Terms and Conditions defined "Claim," in turn, to include "any . . . dispute . . . relating to . . . the validity or enforceability of this Arbitration Provision." *Id.* Moss and Cleo thus agreed that any disagreement about whether the arbitration provision was enforceable would be decided by an arbitrator, not a court.

Moss and Cleo delegated the question of arbitrability to the arbitrator in a second way, too. The Terms and Conditions expressly incorporate the procedures of the American Arbitration Association ("AAA"). ER-73. At the time Moss created his account in 2021, *see* ER-80, the applicable version of the AAA rules provided that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any

20

claim or counterclaim," Consumer Arbitration Rules, R-14(a) (Feb. 21, 2018), https://www.adr.org/media/tiifv2ft/consumer_rules_web.pdf. As this Court has explained, "incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Oracle America, Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013).

The district court nevertheless decided for itself whether Moss's substantive claims should be arbitrated. It did so based on its view that "the MLA plainly overrides the FAA," and that therefore "the delegation clause cannot be enforced." ER-7 (internal quotation marks omitted). That was error. As discussed further below, whether the MLA overrides the FAA with respect to the arbitrability of a particular claim turns on whether the arbitration clause at issue is mandatory and whether the "dispute involv[es] the extension of consumer credit." 10 U.S.C. § 987(f)(4). And nothing in the MLA (or any other federal statute) prohibits parties from agreeing that an arbitrator will decide those threshold questions of arbitrability.

Had Congress intended to prevent the delegation of threshold arbitrability questions to an arbitrator, it would have done so in "clear and manifest" terms. *Epic Sys.*, 584 U.S. at 511. In this regard, Congress's approach in the Ending Forced Arbitration of Sexual Assault and Sexual

21

Harassment Act ("EFAA"), 9 U.S.C. § 401 *et seq.*, is instructive. Similar to the MLA, the EFAA provides that certain types of arbitration agreements "shall [not] be valid or enforceable with respect . . . to [a] sexual assault dispute or [a] sexual harassment dispute." 9 U.S.C. § 402(a). Unlike the MLA, however, the EFAA also provides—under the heading "Determination of Applicability"—that "[t]he applicability of this chapter to an agreement to arbitrate and the validity and enforceability of an agreement to which this chapter applies shall be determined by a court, rather than an arbitrator, . . . irrespective of whether the agreement purports to delegate such determinations to an arbitrator." 9 U.S.C. § 402(b). Congress's decision to expressly override the delegation of arbitrability questions in the EFAA, while omitting any such override in the MLA's otherwise similar provisions regarding arbitration, indicates that Congress did not intend the MLA to displace the ordinary presumption that arbitrators may decide threshold questions of arbitrability. *See Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420, 431 (2022) (observing that courts "must give effect to, not nullify, Congress' choice to include limiting language in some provisions but not others").

22

The district court's choice to override the parties' delegation without express congressional authorization also leads to analytical inconsistencies and circularities. Consider what would have happened if the court had completed its analysis of the MLA and determined that the arbitration clause was enforceable, whether because the clause was optional, the cash advances were not "consumer credit," or both. It would follow that the arbitration clause validly delegated the question of arbitrability to the arbitrator, in addition to validly providing for the arbitration of Moss's substantive claims. *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) ("[T]he FAA operates on this additional arbitration agreement just as it does on any other."). The district court thus would have reached the conclusion that the arbitrator should decide the question of arbitrability—confirming that it had been improper for the district court to decide that question itself. Congress cannot have intended that self-defeating analytical result.

Instead, because the MLA contains no "clear and manifest congressional command to displace the Arbitration Act" with respect to delegation clauses, *Epic Sys.*, 584 U.S. at 511, courts should enforce such clauses in cases like this one in which the parties dispute the applicability of the MLA to the substantive claims asserted. In those circumstances, an arbitrator will then decide

23

whether the MLA applies. If the arbitrator decides that the MLA does not apply—whether because the arbitration clause is optional or the dispute is not one "involving the extension of consumer credit," 10 U.S.C. § 987(f)(4)—then the arbitrator will proceed to adjudicate the plaintiff's claims. If the arbitrator determines that the MLA does apply, then the arbitrator will direct the parties to take their dispute to court. There is no scenario in which the arbitrator, by deciding the arbitrability question one way, thereby realizes that it should not have decided the question at all.

Reading the MLA to allow for delegations of arbitrability determinations also makes sense of situations in which plaintiffs bring multiple claims, only some of which are arguably credit related. As noted above, Cleo offers multiple products to its users, including Cleo Wallet Services, Budget Management, and a Credit Score Service, that unambiguously do not "involv[e] the extension of consumer credit." 10 U.S.C. § 987(f)(4).[1] If a user brings a claim against Cleo related to its Credit Score Service, as well as a claim related to its cash advance product, there is no question that an arbitrator should decide whether the Credit Score Service claim is subject to

---

[1] Cleo's Credit Score service allows a user to receive their credit score, and related information, from a third-party provider. It is not related to any extension of credit by Cleo. *See* ER-57.

24

arbitration, as that is a purely informational feature. It is unlikely that Congress would have wanted to send the cash advance claim to a court for a threshold arbitrability determination—particularly when the court might end up sending it to the arbitrator—rather than have the arbitrator decide, in the first instance, whether to keep both claims or send one to court for resolution on the merits.

This Court has enforced delegation clauses in analogous circumstances. In *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021 (9th Cir. 2022), the Chickasaw Nation argued that the Indian Health Care Improvement Act precluded enforcement of arbitration provisions, including their delegation clauses, by specifying that "no provision of any contract . . . shall prevent or hinder the right of recovery of . . . an Indian tribe[] or tribal organization." 25 U.S.C. § 1621e(c). This Court rejected that position, explaining that it was "a challenge to the enforceability of the arbitration provisions as a whole," rather than a challenge to "the validity of the delegation clauses specifically." 43 F.4th at 1033. Accordingly, the proper course was to enforce the delegation clause and "leav[e] any challenge to the validity of the arbitration agreement as a whole for the arbitrator." *Id.* (alteration omitted) (quoting *Rent-A-Center*, 561 U.S. at 72). The same is true here. Moss argues that the MLA

25

precludes enforcement of the arbitration clause as a whole. That argument should be addressed by an arbitrator in the first instance.[2]

At bottom, the district court seemed to think that, because it was confident about the answer to the arbitrability question, it should decide that question itself. As discussed below, the district court's confidence was misplaced—it was wrong to hold that Moss's claims are not arbitrable. But even if the court had been right about arbitrability, it was still required to let the arbitrator decide the issue in the first instance. As the Supreme Court explained in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63 (2019), even where a court believes that "the argument that the arbitration agreement applies to the particular dispute is 'wholly groundless,'" it must

---

[2] In reaching a contrary conclusion, the district court relied on the Eleventh Circuit's decision in *Steines v. Westgate Palace, L.L.C.*, 113 F.4th 1335 (11th Cir. 2024). But *Steines* focused primarily on whether the MLA overrides the FAA when both statutes apply. *See id.* at 1343-45. Here, in contrast, the parties' primary dispute concerns whether the MLA even applies in the first place. In any event, *Steines* itself is at odds with the Eleventh Circuit's earlier decision in *Attix v. Carrington Mortgage Services, LLC*, 35 F.4th 1284 (11th Cir. 2022), which held that a provision of the Dodd-Frank Act that "prohibit[ed] arbitration of plaintiff's claims relating to plaintiff's mortgage" did not preclude arbitration of the antecedent question whether the parties' "agreement to arbitrate [plaintiff's] claims falls within the scope of [that provision's] protections against arbitration." *Id.* at 1307-08. *Attix* is on all fours with the instant case and would require enforcement of the delegation clause here.

nevertheless respect the parties' agreement to delegate the threshold arbitrability question to the arbitrator. *Id.* at 65. The district court should have followed that guidance and sent the dispute to an arbitrator to decide whether the parties agreed to arbitrate Moss's claims.

## II.    Moss's Claims Are Arbitrable

Even if this Court determines that a court, rather than an arbitrator, should decide the threshold arbitrability question in this case, the decision below should still be reversed because the MLA does not foreclose arbitration of Moss's claims. That is true for three reasons. First, while the MLA precludes enforcement of mandatory arbitration clauses, it does not preclude enforcement of optional arbitration clauses like the one here. Second, Cleo's cash advances are not consumer credit, and Moss's claims therefore do not present a "dispute involving the extension of consumer credit." 10 U.S.C. § 987(f)(4). And third, at a minimum, Moss's TILA claim is arbitrable, even if his MLA claim is not.

### A.    The MLA Precludes Enforcement Of Mandatory Arbitration Clauses, Not Optional Arbitration Clauses

The district court held that Moss's claims are not arbitrable because of Section 987(f)(4) of the MLA, which provides that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable

27

against any covered member." ER-7 (quoting 10 U.S.C. § 987(f)(4)). Understood in context, however, Section 987(f)(4) does not establish the categorical exemption from arbitration that the court supposed.

The MLA prohibits only *mandatory* arbitration agreements. *See* 10 U.S.C. § 987(e)(3) ("It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which . . . the creditor *requires* the borrower to submit to arbitration . . . ." (emphasis added)). It does not prohibit arbitration provisions with opt-out clauses. *See Garrett v. Monterey Fin. Servs., LLC*, No. 18-cv-325, 2018 WL 3579856, at *4 (D. Md. July 25, 2018) (declining to find that an "arbitration provision violates the MLA" where "the arbitration provision contains an opt-out clause"). And it is undisputed here that the arbitration provision to which Moss agreed was optional. *See* ER-72 ("You may opt out of this Arbitration Provision for all purposes . . . .").

Section 987(f) is the "Penalties and Remedies" provision of the MLA, 10 U.S.C. § 987(f), setting out the consequences for violations of the substantive MLA provisions in the immediately preceding Section 987(e). As with any penalties provision, Section 987(f) must be read in light of the substantive provision to which it attaches, rather than as a freestanding provision

establishing separate legal prohibitions. *See Almendarez-Torres v. United States*, 523 U.S. 224, 226 (1998) (holding that statutory subsection was "penalty provision" that "does not define a separate crime"). And here, the violation is mandating arbitration. *See, e.g., Yurth v. Experian Info. Sols., Inc.*, 622 F. Supp. 3d 89, 99 n.6 (E.D. Pa. 2022) ("The MLA prohibits any credit agreement under which a creditor gives 'consumer credit' to members of the armed forces and the borrower must arbitrate related claims." (citation omitted)). The penalty provision should thus be read to prohibit enforcement only of those mandatory arbitration agreements, rather than to prohibit enforcement of all arbitration agreements, even voluntary arbitration agreements permitted under the substantive provisions of the MLA.

Indeed, to read Section 987(f)(4) more broadly as prohibiting enforcement of *all* arbitration agreements would render Section 987(e)(3) superfluous. *Contra Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal quotation marks and alteration omitted)). If Section 987(f)(4) prohibited enforcement of all arbitration agreements, then Section 987(e)(3)'s prohibition of mandatory agreements would be subsumed. Parties could avoid enforcement of

29

arbitration agreements, mandatory or not, by simply invoking Section 987(f)(4). No sound basis exists to conclude that Congress intended its "Penalties and Remedies" provision to authorize widescale circumvention of voluntary, perfectly legal arbitration agreements in that manner—and Section 987(f)(4) certainly does not provide the "clear and manifest" evidence that would be necessary to displace the FAA's strong background principles about the enforceability of voluntary arbitration agreements. *Epic Sys.*, 584 U.S. at 510-11.

## B. Cleo's Cash Advances Are Not Consumer Credit

Even if the MLA could be understood to prohibit enforcement of voluntary arbitration agreements in the context of "dispute[s] involving the extension of consumer credit," 10 U.S.C. § 987(f)(4), that prohibition would not apply here because this case does not involve the extension of "consumer credit" as that term is defined in the MLA and its implementing regulations. As relevant here, those regulations define "[c]onsumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is . . . [s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1)(i); *see* 10 U.S.C. § 987(i)(6) (providing that "consumer credit" will be defined by regulation). Because Cleo's cash advances are neither "credit"

30

nor "[s]ubject to a finance charge," they are not consumer credit within the meaning of the MLA.

### 1. Cleo's Cash Advances Are Not Credit

The MLA's implementing regulations define "[c]redit" as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). Cleo users do not incur debt when they receive cash advances because they have no legal obligation to repay those advances. Cleo's cash advances therefore are not credit under the MLA.

### a. Credit Is The Right To Defer Payment Of Debt, And Debt Is A Legal Obligation To Repay

Although the MLA's implementing regulations define "[c]redit" as the right "to defer payment of debt," 32 C.F.R. § 232.3(h), they do not supply a further definition of the term "debt." The regulations specify, though, that "[w]ords that are not defined in this part or Regulation Z, or any interpretation thereof, have the meanings given to them by State or Federal law." 32 C.F.R. § 232.3(s). More generally, in interpreting regulations, this Court "give[s] undefined terms their ordinary meaning," which typically "accords with [the] dictionary definition." *United States v. Yi-Chi Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (citation omitted).

Here, all available sources point to the same understanding: debt is an obligation to repay. As a matter of ordinary and legal meaning, "debt" is "a state of being under obligation to pay or repay someone or something in return for something received." *Debt*, Merriam-Webster Online, https://perma.cc/CHT7-MP8W; *see Debt*, Black's Law Dictionary (12th ed. 2024) ("Liability on a claim; a specific sum of money due by agreement or otherwise . . . ."). Statutory and regulatory context likewise show that "debt" entails a legal obligation to repay. The MLA's implementing regulations define a "[c]overed borrower," in part, as an active-duty servicemember (or dependent) who "becomes *obligated* on a consumer credit transaction." 32 C.F.R. § 232.3(g)(1) (emphasis added). And Regulation Z defines the "[c]onsummation" of a credit transaction as "the time that a consumer becomes contractually *obligated* on [the] credit transaction." 12 C.F.R. § 1026.2(a)(13) (emphasis added). The MLA also prohibits creditors from using "a check or other method of access" to a borrower's account "as security for the *obligation*." 10 U.S.C. § 987(e)(5) (emphasis added). The existence of an obligation is thus assumed throughout the MLA's treatment of credit.

Other statutes bolster that view. The Fair Debt Collection Practices Act ("FDCPA"), for example, defines "debt" as "any *obligation* or alleged

*obligation* of a consumer to pay money." 15 U.S.C. § 1692a(5) (emphases added). That definition is particularly probative when interpreting the term "debt" in the context of the MLA and TILA, because the three statutory schemes have a shared purpose of protecting consumers from abusive lending practices. As a general matter, "when Congress uses the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality opinion); *see United States v. Door*, 996 F.3d 606, 615 n.5 (9th Cir. 2021) (same). And courts have held specifically that the FDCPA's definition of "debt" should be imported into analogous statutory schemes that do not define the term. *See, e.g.*, *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 410 (3d Cir. 2000) (construing the term "debt" in TILA consistently with its definition in the FDCPA).

The Bankruptcy Code likewise defines "debt" as "liability on a claim." 11 U.S.C. § 101(12). And the Code further defines "claim" as a "right to payment." 11 U.S.C. § 101(5)(A). In interpreting those provisions, the Supreme Court has explained that "a 'right to payment' is nothing more nor less than an enforceable obligation." *Pennsylvania Dep't of Pub. Welfare v.*

33

*Davenport*, 495 U.S. 552, 559 (1990). Debt, once again, equates to the existence of an obligation.

Case law from other contexts is in accord. In *Thompson v. Commissioner*, 235 F.2d 599 (9th Cir. 1956), which addressed the question of what constitutes a "bad debt" under the Internal Revenue Code, this Court wrote that "[a] debt is that which is due from one person to another, whether money, goods or services; that which one person is bound to pay to another, or perform for his benefit." *Id.* at 601 (internal quotation marks omitted); *see Gilman v. Comm'r*, 53 F.2d 47, 50 (8th Cir. 1931) ("The term 'indebtedness' as used in the Revenue act implies an unconditional obligation to pay."). And in *Perry v. United States*, 294 U.S. 330 (1935), which dealt with a claimant's right to payment on a war bond issued by the United States, the Supreme Court equated the words "public debt" in Section 4 of the Fourteenth Amendment with "public obligations." *Id.* at 354; *see id.* ("[T]his provision was undoubtedly inspired by the desire to put beyond question the obligations of the government issued during the Civil War."). That consistent interpretation of "debt" across different substantive areas reaffirms that the term should be given the same meaning when used in the MLA.

34

b. Cleo Users Do Not Incur Debt Because They Have No Obligation To Repay

Cleo's cash advances do not create debt, and thus are not credit, because Cleo users have no obligation to repay them. As the Terms and Conditions explain, "all Salary Advance cash advances are made on a non recourse basis and Cleo has no contractual or legal claim against you based on a failure to repay an advance." *See* ER-55. The Terms and Conditions likewise state that "Cleo will not engage in any debt collection activities or report you to a consumer reporting agency." *Id.* Cleo reserves the right to prevent users from accessing its products and services if they fail to pay back an advance, and the Terms and Conditions specify that "Cleo will not allow [users] to request another cash advance until a cash advance can be paid in full." *Id.* But users can (and do) take out advances, disconnect their accounts, and retain the money, all without incurring liability to Cleo. Indeed, even the Consumer Financial Protection Bureau ("CFPB") recognizes the viability of that option. *See* CFPB, *How Do I Stop Automatic Payments From My Bank Account?*, https://perma.cc/Z7P9-LFER ("You have the right to stop a company from taking automatic payments from your account, even if you previously allowed them.").

The district court nevertheless concluded that Cleo's cash advances constitute "credit" based on its understanding that "Regulation Z, which implements TILA, clarifies that 'credit' includes cash advances provided in exchange for the consumer's authorization to debit their deposit account at a later date." ER-8. That was error. As a preliminary matter, the court mistakenly thought that it was citing Regulation Z, when it was in fact citing the CFPB's interpretation of Regulation Z. *See* 12 C.F.R. pt. 1026, Supp. I. In any event, the court was wrong to rely on that interpretation for two reasons: First, even if the interpretation did purport to classify cash advances like Cleo's as credit, it would be inconsistent with the plain language of Regulation Z (and TILA and MLA) for the reasons just discussed, and would not be worthy of deference. *See Kisor v. Wilkie*, 588 U.S. 558, 573 (2019) ("[T]he possibility of deference can arise only if a regulation is genuinely ambiguous."). And second, the interpretation does not classify cash advances like Cleo's as credit.

In the interpretation, the CFPB sets out its understanding that "[c]redit" includes "a transaction in which a cash advance is made to a consumer in exchange for the consumer's personal check, or in exchange for the consumer's authorization to debit the consumer's deposit account, and

36

where the parties agree either that the check will not be cashed or deposited, or that the consumer's deposit account will not be debited, until a designated future date." 12 C.F.R. pt. 1026, Supp. I, ¶ 2(a)(14)(2). The district court appeared to believe based on that description that the right to debit a consumer's account was sufficient for an advance to qualify as credit. *See* ER-8. The interpretation makes clear, however, that the CFPB was simply describing payday loans, rather than defining a new category of transactions. *See* 12 C.F.R. pt. 1026, Supp. I, ¶ 2(a)(14)(2) ("This type of transaction is often referred to as a 'payday loan' or 'payday advance' or 'deferred-presentment loan.'"). And payday loans, like all loans, come with a legal obligation to repay. *Lend*, Black's Law Dictionary (12th ed. 2024) ("[t]o provide (money) temporarily on condition of repayment").

The drafting history of the CFPB's interpretation also shows that it was intended to clarify that a particular type of obligation constituted credit, rather than define a new kind of credit that lacked an obligatory repayment element. When the interpretation was initially issued by the Board of Governors of the Federal Reserve System, which had authority to interpret TILA prior to the CFPB, the Board specified that the interpretation was intended "to clarify that transactions commonly known as 'payday loans'

37

constitute credit for purposes of TILA." *Truth in Lending*, 65 Fed. Reg. 17129, 17129 (Mar. 31, 2000). And the Board emphasized throughout that its interpretation contemplated an arrangement pursuant to which a consumer had a repayment obligation that was deferred. *See, e.g.*, *id.* ("[T]he consumer may have the option of repaying the obligation or further deferring repayment of the advance."); *id.* ("The consumer may repay the obligation in various ways, for example, by providing cash or by allowing the obligee to deposit the consumer's check or electronically debit the consumer's deposit account."). The Board did not intend to redefine the term "credit" to exclude the existence of an obligation.

If that were not enough, subsequent CFPB interpretations confirm that the agency views "debt," and thus "credit," as requiring an obligation to repay. In a recent Advisory Opinion, the CFPB noted that "the common meaning of debt is 'a sum of money due by certain and express agreement' or 'a financial liability or obligation owed by one person, the debtor, to another, the creditor.'" *Truth in Lending (Regulation Z); Nonapplication to Earned Wage Access Products*, 90 Fed. Reg. 60069, 60071 (Dec. 23, 2025) (quoting *Debt*, Black's Law Dictionary (4th ed. 1968)). And in explaining why certain earned wage access providers were not engaged in the extension of "credit" under

38

TILA and Regulation Z, the CFPB noted that those providers "reserve no recourse" and "cannot engage in debt collection, report to consumer reporting agencies, or sell or place the transaction as a debt with any third party." *Id.* at 60072.[3] Thus even if the CFPB once thought that "credit" could be defined without reference to an obligation—which it did not, for reasons just discussed—that is no longer the agency's position.

In addition to relying on its misperception of the CFPB's interpretation, the district court also appeared to conclude independently that debt does not require an obligation to repay. *See* ER-8-9. The court acknowledged that statutory definitions of "debt," such as those in the FDCPA, equate debt with an obligation to pay. *See* ER-8. But the court then concluded that "Cleo's reliance on a dictionary definition of 'obligated,' while ignoring the applicable statutory definition of 'debt' or 'credit,' undermines its argument." ER-9. That criticism appears to get Cleo's position backwards. Cleo is not arguing that "obligation" has some specialized meaning in the context of the MLA. It

---

[3] The CFPB's understanding is consistent with that of a growing number of States that have recently passed laws regulating earned wage access products. In most of those States, the laws acknowledge that earned wage access products are not credit and must be regulated separately from credit. *See* Ark. Code § 23-52-203(b); Ind. Code § 28-8-6-1002(a)(3); Kan. Stat. § 9-2407(a)(1)(A); La. Stat. § 9:3591.5; Mo. Stat. § 361.749.6(1)(b); Nev. Rev. Stat. § 604D.190; S.C. Code § 39-5-860(B), (D); Utah Code § 13-78-106(1)(b).

39

is arguing that the MLA uses the term "debt" without defining it, thus requiring resort to other legal sources. And those sources uniformly recognize that debt is an obligation to repay.

The district court provided no textual basis for its contrary reading. Rather, the court reasoned that "[a]ccepting Cleo's narrow interpretation would improperly introduce a legal requirement where Congress and regulators have not." *Id.* Reading "debt" to require an obligation to repay, however, does not introduce a legal requirement that Congress and the relevant regulators omitted. It just interprets the meaning of a key legal term consistent with its ordinary meaning and the meaning uniformly ascribed to it in analogous "State or Federal law." 32 C.F.R. § 232.3(s).

The district court's real qualm appears to have been its belief that Cleo's reading would "disregard Regulation Z and undermine TILA's consumer protection purpose." ER-9. Relatedly, the court stated that it was required to "liberally construe TILA to protect consumers and 'look past the form of the transactions to their economic substance.'" *Id.* (quoting *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993) (alteration omitted)). The best evidence of a law's purpose, however, is its text. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012). And here, the text of TILA, the

40

MLA, and the relevant implementing regulations demonstrates an intention to distinguish between transactions that result in debt—*i.e.*, transactions in which a consumer incurs a legal obligation to repay—and transactions that do not. Accordingly, the court had no warrant to disregard that distinction based on its (highly questionable) view that a transaction that a consumer is legally obligated to repay is no different in its "economic substance" than a transaction that a consumer is *not* legally obligated to repay.

A focus on transactions that result in debt obligations, moreover, makes particular sense in the context of the MLA. The Department of Defense has explained that the "overarching aim" of the MLA's protections is "to promote readiness by taking steps to reduce the risk that a Service member or his or her family could get caught in a 'debt trap.'" Office of the Under Secretary of Defense for Personnel and Readiness, Department of Defense, *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 80 Fed. Reg. 43560, 43566 (July 22, 2015) (quoting Department of Defense, Office of the Secretary, *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 72 Fed. Reg. 18157, 18159 (Apr. 11, 2007)). Transactions that a servicemember is obligated to repay create just such a risk: If the servicemember does not repay the amount initially owed,

41

the outstanding balance will grow over time as unpaid interest is added to the principal, making it even harder to pay off and leading to greater financial distress or even bankruptcy. *See id.* at 43589. Where a servicemember has no obligation to repay, however, that risk is not present: Far from being "trap[ped]" by a snowballing debt balance, *id.*, the servicemember can simply walk away, with no adverse impact on his or her future finances. To the extent that unexpressed statutory purposes have any bearing on the outcome here, therefore, they strongly support the conclusion that Cleo's cash advances are not subject to the MLA's restrictions.

The district court also thought that this Court's unpublished decision in *Olson v. Unison Agreement Corp.*, No. 23-2835, 2025 WL 2254522 (9th Cir. Aug. 7, 2025), "preclud[ed] Cleo's argument" because it held that "a 'consumer credit obligation' does not require a legal obligation for repayment." ER-9. In *Olson*, though, the Court held that a complex financing arrangement constituted a "consumer credit obligation" under Washington law where it gave the lender the right to exercise an option that would obligate the borrowers to make future payments unless the value of the borrowers' home declined substantially. *See* 2025 WL 2254522, at *4 ("[T]he Olsons have a very real set of contingent obligations to make future payments to Unison."). *Olson*

42

thus has no bearing on the outcome here, where Cleo users lack any such obligation. *Olson* is also inapposite because the Court there specifically stated that the Washington law at issue did "not include any provision stating that [the law] should be interpreted consistently with the TILA, much less with the interpretations of that statute given by the CFPB." *Id.* at *5.[4]

At bottom, the district court concluded that, "[w]hile Cleo disclaims a formal legal right to repayment, its actual practices suggest otherwise." ER-9. Nothing about Cleo's practices, however, suggests that it has a right to repayment. As explained above, the Terms and Conditions explicitly state that "Cleo has no contractual or legal claim against you based on a failure to repay an advance," ER-55, and users can (and do) take full advantage of those terms

---

[4] The district court also pointed to another recent decision, *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927 (N.D. Cal. 2025), as support for the conclusion that a cash advance can qualify as credit "despite the lender's disavowal of a legal obligation." ER-10. But *Orubo* was wrongly decided for many of the reasons already discussed. Like the district court here, the *Orubo* court conflated the CFPB's interpretation of Regulation Z with Regulation Z itself. *See* 780 F. Supp. 3d at 935. And like the district court here, the *Orubo* court mistakenly understood the CFPB's interpretation to define "credit" in a way that requires no obligation to repay. *See id.* In reaching that conclusion, *Orubo* failed to grapple at all with the meaning of the term "debt," and it adopted an interpretation of "credit" that turns on an unworkable post-hoc balancing of subjective considerations, such as "the parties' alleged expectations." *Id. Orubo* also incorrectly reasoned—as did the district court here—that a contrary interpretation would "disregard[] Regulation Z entirely, and contradict TILA's very purpose." *Id.* at 936.

by disconnecting their accounts rather than paying Cleo back, thereby retaining the advance free and clear of any obligation to Cleo. *See* p. 35, *supra.* That reality vividly illustrates the difference between Cleo's cash advances and the potentially debt-trap-creating credit products that the MLA exists to address. And because Cleo's cash advances do not involve the extension of credit, the MLA's provisions do not apply.

### 2. Cleo's Cash Advances Are Not Subject To Finance Charges

Even if Cleo's cash advances qualified as credit, they would not be "[c]onsumer credit" within the meaning of the MLA because they are not "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1)(i).[5] Under the MLA's implementing regulations, "[f]inance charge has the same meaning as 'finance charge' in Regulation Z." 32 C.F.R. § 232.3(n). And Regulation Z provides that a finance charge "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit," but "does not include any charge of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a).

---

[5] Cleo's cash advances also are not "[p]ayable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1)(ii). When consumers choose to pay back an advance, the payments are typically in a single installment and never more than four. *See* ER-55.

44

The district court concluded that Cleo's optional expedite fees and optional subscription fees both qualified as finance charges. *See* ER-10-12. Neither conclusion was correct.

### a. Optional Expedite Fees Are Not Finance Charges

Cleo's optional expedite fees are not finance charges for two reasons. First, they are not "imposed . . . by the creditor as an incident to or a condition of" cash advances. 12 C.F.R. § 1026.4(a). Second, they are "of a type payable in a comparable cash transaction." *Id.*

Beginning with the first, Cleo's optional expedite fees are not imposed by the creditor as an incident to or a condition of cash advances because users can obtain the same cash advances regardless of whether they choose to pay an expedite fee. The term "incident" means "[a] dependent, subordinate, or consequential part (of something else)." *Incident*, Black's Law Dictionary (12th ed. 2024). And the term "condition" means "[a] stipulation or prerequisite." *Condition*, Black's Law Dictionary (12th ed. 2024). Expedite fees are neither of those. They are wholly independent expenses that have nothing to do with whether a user may receive an advance. A user can opt to pay a fee for expedited delivery of their cash advance within 24 hours. *See* ER-55.

45

For related reasons, expedite fees are not "imposed" by Cleo. In this context, to "impose" means "to force someone to accept (something)." *Impose*, Merriam-Webster Online, https://perma.cc/M87Q-X9GZ. But Cleo does not force users to pay expedite fees to obtain cash advances; rather, users themselves choose whether to pay those fees based on whether they want to receive funds more quickly than they otherwise would.

The CFPB adopted precisely this understanding of expedite fees in the Advisory Opinion discussed above. There, the agency explained that "in the normal course, expedited delivery fees associated with EWA [earned wage access] are not finance charges" because "consumers can receive exactly the same service without paying the fee." 90 Fed. Reg. at 60075. The agency cited a 2003 rule in which the Board of Governors of the Federal Reserve System had determined that expedite fees paid in connection with certain credit cards were not finance charges because the same services were available on a non-expedited basis if the consumers chose not to pay the fees. *See id.* (citing *Truth in Lending*, 68 Fed. Reg. 16185, 16186-87 (Apr. 3, 2003)). And the CFPB concluded that "[f]ees that EWA providers charge for expedited delivery of EWA fit squarely into this mold." *Id.*

46

The CFPB also relied on the Eleventh Circuit's decision in *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996). There, the court held that an optional Federal Express fee paid to expedite the mailing of loan documents was not a finance charge because it was not incident to the extension of credit. The court explained that the borrowers in the case "could have chosen not to pay the Federal Express fee and the bank did not require it," and the fee therefore "was not imposed as an incident to the extension of credit and need not be included in the Finance Charge." *Id.* at 579. The same is true with respect to the expedite fee that Cleo users can choose to pay to receive their cash advances more quickly. Cleo does not require it, and users are free to follow the default option of receiving their funds within four business days.[6]

The second reason that expedite fees are not finance charges is that they are "of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a). Banks frequently charge fees to expedite settlement of check deposits. *See, e.g.*, *Mobile Check Deposit*, PNC, https://perma.cc/7HSY-L7W8. And virtually all digital wallets offer expedited withdrawals for

---

[6] Given that users are able to request advances up to 14 days ahead of the date by which they intend to pay Cleo back (which can itself be extended by another 14 days), users who employ the default option still obtain substantial liquidity benefits from the advances. *See* ER-55.

47

additional fees. *See, e.g., Standard Bank Transfers FAQ*, Venmo, https://perma.cc/39XT-EVAN. Those cash transactions are "comparable" with, if not materially identical to, Cleo's expedite option. Indeed, even the magnitude of the fees is similar. Venmo, for example, charges between $0.25 and $25, whereas Moss alleges that Cleo charges between $3.99 and $9.99. *Compare Fees with Your Venmo Account*, Venmo, https://perma.cc/3PTF-Y5NH, *with* ER-129-130.

The district court, remarkably, failed altogether to address Cleo's argument that its expedite fees are "of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a). Instead, it held that the expedite fees were finance charges after concluding that they were "an incident to" Cleo's cash advances. *Id.*; *see* ER-10-11. In so holding, the court reasoned that expedite charges have a connection to cash advances, and that "[a] connection between the charge and the extension of credit is . . . sufficient." ER-11. The only source that the district court cited for that "connection" standard, however, was the Supreme Court's decision in *Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232 (2004), where the Court said that the phrase "incident to" in TILA "implies some *necessary* connection" between a finance charge and an extension of credit. *Id.* at 241 (emphasis in original); *see* ER-10-11.

The district court overlooked *Pfennig*'s insistence that the connection between a finance charge and an extension of credit be "necessary," and it offered no other basis to depart from the ordinary meaning of "incident" discussed above.

The district court also held that, in any event, "Moss pleads facts showing that Cleo's Express Fees are effectively mandatory." ER-11. "While nominally optional," the court wrote, "they are intertwined with the Cash Advance product," because "Cleo advertises instant access to cash, and the app design makes avoiding the Express Fee difficult." *Id.* (citing ER-129-131). Those statements, however, are entirely unsupported. The paragraphs in the complaint that the court cited say nothing suggesting that the app design makes it difficult to avoid express fees, and the complaint more generally says nothing to support the court's conclusion that express fees are effectively mandatory. The district court believed that "the time at which funds are received is a material term of credit." *Id.* (quoting *Orubo*, 780 F. Supp. 3d at 938).[7] But the relevant question is whether expedite fees are "imposed . . . by

---

[7] The quoted portion of the *Orubo* decision relied on discussion in a notice of proposed rulemaking published by the CFPB in 2024. *See* 780 F. Supp. 3d at 938 (citing, *inter alia*, CFPB, *Truth in Lending (Regulation Z); Consumer Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work*, 89 Fed. Reg. 61358, 61362 (July 31, 2024)). Subsequent to the decision below, however, the CFPB formally withdrew that proposed interpretive rule and "officially rejected the interpretations advanced in it."

49

the creditor as an incident to or a condition of" cash advances. 12 C.F.R. § 1026.4(a). Because they are completely optional, and Cleo will advance the same amount regardless of whether the option is selected, the answer is no.

### b. Optional Subscription Fees Are Not Finance Charges

Cleo's subscription fees also are not finance charges because they are not "imposed" as "an incident to or a condition of" cash advances. 12 C.F.R. § 1026.4(a). They are not an incident to cash advances because they are not charged specifically for access to cash advances but instead are charged for access to Cleo's entire suite of products. *See* ER-52-54. And they are not imposed as a condition of cash advances because users can obtain cash advances without subscribing. Indeed, the Terms and Conditions explain that all a user needs to do is "email team@meetcleo.com and state that you would

---

90 Fed. Reg. at 60076 n.81. Of particular relevance here, the CFPB described as "facially implausible" the notion that optional expedite fees can be treated as mandatory because they have to be paid in order to receive expedited delivery advertised by a provider. *See id.* at 60075 (explaining that "the longstanding interpretation of 'finance charge' by the Board itself in its 2003 rule and by the Eleventh Circuit in *Veale*" forecloses the argument "that fees for expedited delivery of earned wages are finance charges because earned-wages-plus-expedited-delivery is one credit product, and earned-wages-without-expedited delivery is an entirely different product"). As a result, the CFPB indicated that the handful of district court decisions that had relied on the reasoning in the proposed rule—specifically naming both the decision below and *Orubo*—lack ongoing persuasive force. *See id.* at 60076 n.81.

like to receive Salary Advance without subscribing to the Cleo Plus services." ER-54.

Perhaps because the point was so obvious, Moss *agreed* in his district court briefing that Cleo's subscription fees are not finance charges. Specifically, he stated in his opposition to Cleo's motion below that he "agrees that subscription charges are exempted from the definition of 'finance charge' under the MLA and TILA." ER-43 n.16. Moss therefore did not merely forfeit any argument to the contrary; he affirmatively waived it. *See United States v. Olano*, 507 U.S. 725, 733 (1993) (explaining that "forfeiture is the failure to make the timely assertion of a right," whereas "waiver is the intentional relinquishment or abandonment of a known right" (internal quotation marks omitted)).

Remarkably, the district court held that Moss had not waived the argument that subscription fees were finance charges, notwithstanding his unambiguous concession. Instead, the court held that "Moss sufficiently addressed this issue by asserting the subscription fees are a condition of obtaining cash advances." ER-12 (citing ER-43 n.16). The footnote that the district court cited, though, is precisely the footnote in which Moss stated that he agreed with Cleo that subscription fees were *not* finance charges. In failing

to give effect to that concession, the court either made an inadvertent error or committed a clear violation of the principle that courts should "normally decide only questions presented by the parties." *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) (internal quotation marks omitted); *see Clark v. Sweeney*, No. 25-52, 2025 WL 3260170, at *1 (U.S. Nov. 24, 2025) (per curiam) (summarily reversing court of appeals decision based on failure to adhere to "the principle of party presentation" and observing that "[t]o put it plainly, courts call balls and strikes; they don't get a turn at bat" (internal quotation marks omitted)). In any event, the court was also wrong to conclude that Moss could not obtain a cash advance without subscribing; as just noted, it is undisputed that he could. *See* pp. 50-51, *supra*.

Moreover, even if the district court had been correct that subscription fees were a condition of obtaining a cash advance (and that Cleo's cash advances were credit), such fees would not be finance charges for the additional reason that they would fall within the definition's exception for "[f]ees charged for participation in a credit plan." 12 C.F.R. § 1026.4(c)(4). As the CFPB has explained, that exception "applies to any credit plan in which payment of a fee is a condition of access to the plan itself." 12 C.F.R. pt. 1026, Supp. I, ¶ 4(c)(4)(1). And as the agency has said in the context of earned wage

access products specifically, to the extent such products qualify as credit, any subscription fees charged to access the products are not finance charges because they fall within the exception for participation fees. *See* 90 Fed. Reg. at 60074 n.55. For the reasons discussed above, Cleo's cash advances are not credit, and a Cleo subscription is not a condition of access to cash advances. But even if they were, Cleo's subscription fees would not be finance charges because they would come within the exception for participation fees.

## C. Moss's TILA Claim Is Arbitrable

For the foregoing reasons, the district court should have granted Cleo's motion to compel in its entirety. At a minimum, though, the court erred in declining to compel arbitration of Moss's TILA claim. As discussed above, the MLA's "Penalties and Remedies" provision bars mandatory arbitration of "any dispute involving the extension of consumer credit." 10 U.S.C. § 987(f)(4). That prohibition is most naturally read to apply only to claims brought under 10 U.S.C. § 987, which imposes limitations on the "[t]erms of consumer credit extended to [service]members and dependents." It should not be interpreted to apply to all statutes and claims, no matter how far removed from the MLA.

The Fourth Circuit's decision in *Espin v. Citibank, N.A.*, 126 F.4th 1010 (4th Cir. 2025), supports that understanding of the MLA's operation. In

53

*Espin*, the plaintiffs brought claims under both the MLA and the SCRA in connection with credit card accounts that they had with Citibank. *See id.* at 1013. The court held that the plaintiffs were required to arbitrate their SCRA claims because nothing in the text of the SCRA demonstrated an intention on the part of Congress to override the FAA. *See id.* at 1014. The court also held, however, that the plaintiffs might not be required to arbitrate their MLA claims because they might be able to show on remand that their dispute arose out of the "extension of consumer credit" within the meaning of § 987(f)(4). *See id.* at 1019-20. The Fourth Circuit accordingly required arbitration of the plaintiffs' SCRA claims, but directed that there should be further proceedings on remand with respect to the plaintiffs' MLA claims. *See id.* at 1020.

In its decision here, the district court purported to distinguish *Espin* on the ground that "Moss's TILA claim arises from the same factual nucleus as his MLA claim." ER-12. But the same was true in *Espin*, where the plaintiffs' SCRA and MLA claims arose out of the same credit card accounts. *See* Compl. ¶¶ 89-111, *Espin v. Citibank, N.A.*, No. 5:22-cv-383 (E.D.N.C. Sept. 22, 2022), ECF No. 1. If the district court were correct that all claims arising out of the same factual nucleus should be treated alike, then the court in *Espin* erred by

compelling arbitration of the plaintiffs' SCRA claims rather than remanding those claims for further proceedings alongside the MLA claims.

Reading Section 987(f)(4) to prohibit arbitration of any dispute that relates to the extension of consumer credit to a covered member would present courts with difficult line-drawing questions and could lead to absurd results. For one thing, it is unclear why a plaintiff would need to bring an MLA claim at all to argue that the MLA prohibited arbitration, so long as the claim "involv[ed] the extension of consumer credit." 10 U.S.C. § 987(f)(4). For another, the prohibition could be interpreted capaciously to cover disputes that the drafters of the MLA plainly did not intend to preclude from arbitration, such as a slip-and-fall suit that a borrower brings based on a bank's failure to salt its steps when the borrower goes to take out a loan. At the very least, divorcing Section 987(f)(4) from the MLA would leave courts with no guidance as to how closely related the extension of consumer credit must be to a dispute in order for the dispute to "involv[e]" that extension. This Court should not countenance such a problematic interpretation of the MLA, when a workable one is readily available.

55

## CONCLUSION

This Court should reverse the decision below and remand to the district court with instructions to order Moss to arbitrate his individual claims and stay the case while arbitration is pending.

Dated:  February 2, 2026

John S. Devlin, III
Erin Wilson
BALLARD SPAHR, LLP
1301 Second Avenue, Suite 2800
Seattle, WA  98101
(206) 223-7000

Derek Wetmore
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, CA  94111
(415) 856-7000

Respectfully submitted,

*/s/ Benjamin W. Snyder*
Benjamin W. Snyder
Allyson B. Baker
Meredith Boylan
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC  20036
(202) 551-1700

Ben Gifford
Margaret Shields
PAUL HASTINGS LLP
200 Park Avenue
New York, NY  10166
(212) 318-6000

56

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 25-5856

The undersigned attorney or self-represented party states the following:

○ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◉ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

> The following appeals may present issues similar to the issues presented in this case:
> Vickery v. Empower Finance, Inc., No. 25-6377
> Revell v. Grant Money, LLC, No. 25-7035
> Russell v. Dave, Inc., No. 26-12

**Signature** | /s/ Benjamin W. Snyder    **Date** | February 2, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 17** *New 12/01/2018*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-5856

I am the attorney or self-represented party.

**This brief contains** 12,092 **words, including** 0 **words**

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated _____.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Benjamin W. Snyder **Date** February 2, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 2, 2026, I caused the foregoing brief to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit via the ACMS system and that service on all counsel of record will be accomplished by the ACMS system.

*/s/ Benjamin W. Snyder*
Benjamin W. Snyder