**No. 25-5856**

𝔘nited 𝔖tates 𝔠ourt of 𝔄ppeals
for the 𝔑inth 𝔠ircuit

───────────────────────

TERRANCE MOSS, **individually, on behalf of all others similarly situated, and on behalf of the general public,**

*Plaintiff-Appellee,*

v.

CLEO AI INC.,

*Defendant-Appellant.*

───────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
NO. 2:25-CV-00879
HON. MICHELLE L. PETERSON

───────────────────────

## APPELLEE'S RESPONSE BRIEF

───────────────────────

Randall K. Pulliam
Lee Lowther
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
(501) 312-8500
rpulliam@cbplaw.com
llowther@cbplaw.com

Joshua Jacobson
Jacob L. Phillips
JACOBSON PHILLIPS PLLC
2277 Lee Road, Suite B
Winter Park, Florida 32789
(321) 447-6461
joshua@jacobsonphillips.com
jacob@jacobsonphillips.com

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ....................................................... 4

ISSUES PRESENTED ........................................................................... 5

STATEMENT OF THE CASE ............................................................... 6

   A. Factual Background ..................................................................... 6

      1. Cleo conditions its Cash Advances on borrowers'
         agreement to repay them from a linked bank account on a
         specific date through mandatory pre-authorized debits. ........... 6

      2. Cleo imposes fees on borrowers who take out Cash
         Advances on the terms advertised. ....................................... 10

   B. Statutory and Regulatory Background ...................................... 13

   C. Procedural Background .............................................................. 15

   D. The Order on Review ................................................................. 17

SUMMARY OF ARGUMENT ............................................................. 19

STANDARD OF REVIEW ................................................................... 23

ARGUMENT ........................................................................................ 23

   I. Binding Supreme Court Precedent Required the District
      Court, Not an Arbitrator, to Decide Whether SSgt.
      Moss's Claims Could be Compelled to Arbitration ................. 23

   II. The MLA's Plain Text Prohibits the Enforcement of *Any*
      Arbitration Clause, Regardless Whether the Clause is
      Mandatory or Optional ............................................................. 27

   III. SSgt. Moss Plausibly Alleges a Dispute Involving the
       Extension of Consumer Credit under the MLA ....................... 34

   A. SSgt. Moss pleads facts, confirmed by Cleo's terms, that
      demonstrate Cash Advances are "consumer credit." ................ 35

i.   The "non-recourse" provision in the Cash Advance terms does not preclude credit treatment. ...........................42

ii.   Cleo's argument that *non-recourse* cash advances are not consumer credit is unsupported. ...................................46

iii.  The CFPB's new Advisory Opinion is irrelevant but, if anything, confirms Cash Advances are credit......................52

B.  SSgt. Moss pleads facts that demonstrate Express Fees are "finance charges" .............................................................................55

1.  Nothing in Cleo's citations to distinguishable and non-binding regulatory guidance and caselaw support its argument that SSgt. Moss fails to plead Express Fees are finance charges ...................................................................60

2.  Cleo's defense that Express Fees fall within a statutory exception is legally unsupported and procedurally improper..................................................................................63

CONCLUSION .......................................................................................66

ii

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Carrington Mortg. Servs., LLC,*
23 F.4th 370, 377 n.2 (4th Cir. 2022) ....................................................60

*Alston v. Crown Auto, Inc.,*
224 F.3d 332 (4th Cir. 2000) ...............................................................64

*Attix v. Carrington Mortg. Servs., LLC*
35 F.4th 1284 (11th Cir. 2022) ............................................................27

*Bielski v. Coinbase, Inc.,*
87 F.4th 1003 (9th Cir. 2023) ..............................................................26

*Burnett v. Ala. Moana Pawn Shop,*
3 F.3d 1261 (9th Cir. 1993) .................................................................45

*Burrison v. FloatMe, Corp.,*
2026 WL 444638 (D. Mass. Feb. 17, 2026) .................................. passim

*Caremark, LLC v. Chickasaw Nation,*
43 F.4th 1021 (9th Cir. 2022) .................................................. 24, 26, 27

*Connecticut Nat. Bank v. Germain,*
503 U.S. 249 (1992) ...........................................................................28

*Consumer Fin. Prot. Bureau v. MoneyLion Techs. Inc.,*
799 F. Supp. 3d 152 (S.D.N.Y. 2025) ....................................... 26, 30, 31

*Cornist v. B.J.T. Auto Sales, Inc.,*
272 F.3d 322 (6th Cir. 2001) ...............................................................64

iii

*E.C. Warner Co. v. W. B. Foshay Co.,*
  57 F.2d 656 (8th Cir. 1932) ........................................................ 12, 45

*E.E. v. Norris Sch. Dist.,*
  4 F.4th 866 (9th Cir. 2021) .............................................................. 43

*Epic Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018) ......................................................................... 25

*FCC v. AT&T Inc.,*
  562 U.S. 397 (2011) ......................................................................... 35

*Garrett v. Monterey Fin. Servs., LLC,*
  2018 WL 3579856 (D. Md. July 25, 2018) ..................................... 31

*Gilman v. Comm'r of Internal Revenue,*
  53 F.2d 47 (8th Cir. 1931) ............................................................... 49

*Glover v. Ocwen Loan Servicing, LLC,*
  127 F.4th 1278, 1290 n.13 (11th Cir. 2025) .................................. 60

*Golubiewski v. Activehours, Inc.,*
  2025 WL 2484192 (M.D. Pa. Aug. 28, 2025) ........................... 3, 17, 57

*Holley-Gallegly v. TA Operating, LLC,*
  74 F.4th 997 (9th Cir. 2023) ........................................................... 23

*Household Credit Services, Inc. v. Pfennig,*
  541 U.S. 232 (2004) ................................................................... 18, 56

*Huertas v. Foulke Mgmt. Corp.,*
  2021 WL 5755081 (3d Cir. Dec. 3, 2021) ....................................... 64

iv

*In re Miller,*
   215 B.R. 970 (E.D. Ky. Bkr. 1997) ...................................................... 46

*INS v. National Ctr. For Immigrants' Rights, Inc.,*
   502 U.S. 183 (1991) ........................................................................... 32

*Johnson v. Activehours, Inc.,*
   2025 WL 2299425 (D. Md. Aug. 8, 2025) .................................. 3, 17, 57

*Lawson v. FMR LLC,*
   571 U.S. 429 (2014) ........................................................................... 32

*Lembeck v. Arvest Cent. Mortg. Co.,*
   498 F. Supp. 3d 1134 (N.D. Cal. 2020) .............................................. 60

*Lomax v. Ortiz-Marquez,*
   140 S. Ct. 1721 (2020) ................................................................. 28, 44

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) ............................................................... 38, 53, 61

*Milana v. Credit Discount Co.,*
   27 Cal. 2d 335 (1945) ........................................................................ 45

*New Prime Inc. v. Oliveira,*
   586 U.S. 105 (2019) ................................................................... passim

*Olson v. Unison Agreement Corp.,*
   2025 WL 2254522 (9th Cir. Aug. 7, 2025) ......................................... 49

*Orubo v. Activehours, Inc.,*
   2025 WL 1257695 (N.D. Cal. Apr. 30, 2025) ....................... 3, 17, 18, 57

*Pennsylvania Department of Public Welfare v. Davenport,*
   495 U.S. at 559 ................................................................................48

*Perry v. United States,*
   294 U.S. 330 (1935) ..........................................................................49

*Pope v. Marshall,*
   78 Ga. 635, 4 S.E. 116 (1887) ..........................................................45

*Rent-A-Center, West, Inc. v. Jackson,*
   561 U.S. 63 (2010) ............................................................................26

*Revell v. Grant Money, LLC,*
   2025 WL 3167318 (N.D. Cal. Nov. 5, 2025) ............................... passim

*Riggs v. Gov. Employees Fin. Corp.,*
   623 F.2d 68 (9th Cir. 1980) ..............................................................45

*Robinson v. Shell Oil Co.,*
   519 U.S. 337 (1997) ..........................................................................58

*Russell v. Dave Inc.,*
   2025 WL 3691977 (C.D. Cal. Dec. 12, 2025).............................. passim

*San Jose Christian Coll. v. City of Morgan Hill,*
   360 F.3d 1024 (9th Cir. 2004) ..........................................................35

*Steines v. Westgate Palace, L.L.C.,*
   113 F.4th 1335 (11th Cir. 2024).........................................5, 19, 25, 35

*Thompson v. Comm'r,*
   235 F.2d 599 (9th Cir. 1956) ............................................................49

*United States v. LKAV,*
    712 F.3d 436 (9th Cir. 2013) ..............................................................37

*United States v. Olander,*
    572 F.3d 764 (9th Cir. 2009) ..............................................................58

*Veale v. Citibank, F.S.B.,*
    85 F.3d 577 (11th Cir. 1996) ..............................................................61

*Vickery v. Empower Finance Inc.,*
    2025 WL 2841686 (N.D. Cal. Oct. 7, 2025)................................. passim

*Xi v. INS,*
    298 F.3d 832 (9th Cir. 2002) ..............................................................43

**Statutes**

9 U.S.C. § 1 ..............................................................................................33
9 U.S.C. § 16(a)(1)(A)...............................................................................4
10 U.S.C. § 987 .......................................................................................34
10 U.S.C. § 987(b).......................................................................13, 15, 29
10 U.S.C. § 987(e)(3)........................................................................26, 29
10 U.S.C. § 987(f)(4) ........................................................................ passim
10 U.S.C. § 987(i)(6) ...............................................................................14
10 U.S.C. § 987(b).....................................................................................15
10 U.S.C. § 987(e)(3) ...............................................................................29
15 U.S.C. § 1602(f)............................................................................15, 35
15 U.S.C. § 1605(a) ......................................................................15, 56, 58
15 U.S.C. § 1692a(5) ...............................................................................38

12 C.F.R. § 1026.4 ...................................................................................38
12 C.F.R. § 1026.4(a) ........................................................................ passim
12 C.F.R. § 226.4 .....................................................................................38

12 C.F.R. § 226.4(a)(1)(iii) ................................................................ 63

32 C.F.R. § 232.3(f) ......................................................................... 34

32 C.F.R. § 232.3(f)(1) ............................................................... 14, 35

32 C.F.R. § 232.3(h) ................................................................. passim

32 C.F.R. § 232.3(n) ......................................................................... 15

32 C.F.R. § 232.4(c)(iii)(C) ............................................................. 66

32 C.F.R. § 232.8(a) ......................................................................... 14


61 Fed. Reg. 49237 ........................................................................... 57

65 Fed. Reg. 13130 ........................................................................... 41

65 Fed. Reg. 17129 ..................................................................... 38, 40

80 Fed. Reg. 43560 ........................................................................... 39

90 Fed. Reg. 60069 ........................................................................... 52

90 Fed. Reg. 60071 ..................................................................... 53, 54

90 Fed. Reg. 60075 ........................................................................... 61

90 Fed. Reg. 60076 ........................................................................... 53


Ark. Code Ann. § 23-52-203(b)(4) .................................................. 59

S.C. Code Ann. § 39-5-820 .............................................................. 59

S.C. Code Ann. § 39-5-840 .............................................................. 59

Utah Code Ann. § 13-78-101 ........................................................... 59

Kan. Stat. Ann. § 9-2402 ................................................................. 59

Kan. Stat. Ann. § 9-2405 ................................................................. 59

## Other Authorities

Consumer Financial Protection Bureau, *Payday Loans and Deposit
Advance Products* 24-25 (April 2013) ............................................ 39

*Debt*, BLACK'S LAW DICTIONARY (12th ed. 2024) ............................ 35

*Debt*, MERRIAM-WEBSTER, https://www.merriamwebster.com/
dictionary/debt ............................................................................... 36

*Debt*, OXFORD ENGLISH DICTIONARY,
https://www.oed.com/search/dictionary/?scope=Entries&q=debt ........ 36

*Incident*, BLACK'S LAW DICTIONARY (4th ed. 1968) ................................. 56

*Obligation*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...................... 36, 47

*Obligation*, MERRIAM-WEBSTER,

    https://www.merriamwebster.com/dictionary/debt ............................ 36

*Recourse*, BLACK'S LAW DICTIONARY (12th ed. 2024) ........................ 16, 44

U.S. DEPT. OF DEF., Rep. on Predatory Lending Practices Directed at

    Members of the Armed Forces and Their Dependents (Aug. 9, 2006) 12

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................... 61, 63

## INTRODUCTION

Defendant-Appellant Cleo AI Inc. ("Cleo") is a tech-enabled payday lender, issuing payday advances ("Cash Advances") to borrowers through a smartphone app. Plaintiff-Appellee, Staff Sergeant Terrance Moss ("SSgt. Moss"), alleges Cleo charges active-duty servicemembers and their families rates of interest that shatter the Military Lending Act's ("MLA") usury cap.

Rather than answer these allegations in court, Cleo seeks to force SSgt. Moss into private arbitration. But Congress, in plain and unambiguous language, displaced the Federal Arbitration Act ("FAA") for MLA claims: "Notwithstanding section 2 of [the FAA] . . . no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member." 10 U.S.C. § 987(f)(4). Nor could the district court enforce Cleo's delegation clause. The Supreme Court held in *New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019)—binding Supreme Court precedent that Cleo failed to cite—that where Congress exempts categories of claims from the FAA, courts lack authority to enforce delegation clauses and order arbitration of those claims.

1

The district court, too, correctly found the Complaint alleged a dispute involving consumer credit subject to a finance charge under the MLA. When SSgt. Moss took Cash Advances from Cleo, Cleo required him to agree to make repayment on a specified "repayment date" and to preauthorize Cleo to debit his linked bank account to "repay" the advance he "borrow[ed]." ER-54–55, 140. The statutory definition of "credit"—"the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment," 32 C.F.R. § 232.3(h)—describes a Cash Advance exactly. As the district court recognized, "Cleo provides funds to users with a clear expectation—and near certain reality—of recouping them from their linked bank accounts upon receipt of their paychecks." ER-10. That Cleo voluntarily waived its right to sue defaulting borrowers does not mean SSgt. Moss never had an obligation to repay Cash Advances; it means only that Cleo chose to forgo one enforcement method while retaining others.

The Order also rightly held SSgt. Moss's credit agreements with Cleo were subject to a finance charge. The "finance charge" under the MLA is the "cost of consumer credit," and includes "any charge" levied by the creditor "as an incident to or a condition of the extension of credit."

2

12 C.F.R. § 1026.4(a). This definition requires only that there be a "necessary connection" between the fee and the extension of credit. As the district court held, Express Fees (charged by Cleo for immediate disbursement of advances) are necessarily connected to the extension of credit. The fees are mandatory to receive the advertised, instant version of Cash Advance and are only collected in conjunction with advances. Express Fees are finance charges.

SSgt. Moss adequately pleaded a dispute involving consumer credit. Eight district courts applying the plain language of the same statutes to allegations involving materially similar cash advance products have reached the same conclusion. *See Orubo v. Activehours, Inc.*, No. 5:24-cv-4702, 780 F.Supp.3d 927, 2025 WL 1257695, at *5 (N.D. Cal. Apr. 30, 2025); *Johnson v. Activehours, Inc.*, No. 1:24-cv-2283, 2025 WL 2299425, at *8 (D. Md. Aug. 8, 2025) (similar); *Golubiewski v. Activehours, Inc.*, No. 1:24-cv-02283-JRR, 2025 WL 2484192 (M.D. Pa. Aug. 28, 2025); *Vickery v. Empower Finance Inc.*, No. 25-cv-03675-JSC, 2025 WL 2841686, at *9 (N.D. Cal. Oct. 7, 2025); *Revell v. Grant Money, LLC*, No. 25-cv-05994-TLT, __ F. Supp. 3d __, 2025 WL 3167318 (N.D. Cal. Nov. 5, 2025); *Russell v. Dave Inc.*, No. 2:25-cv-04029-MRA-MBK, 2025 WL 3691977

3

(C.D. Cal. Dec. 12, 2025); *Burrison v. FloatMe, Corp.*, No. 25-cv-10885-DJC, 2026 WL 444638 (D. Mass. Feb. 17, 2026). The conclusions reached by the district court rest on sound legal footing.

But resolution of the merits must wait for a later day before a judge or jury in district court. Congress stated so in crystal clear language. Because this Court's jurisdiction over this appeal rests solely on the FAA and that statute does not apply, this Court lacks jurisdiction to hear this appeal. Therefore, SSgt. Moss respectfully requests the Court dismiss this appeal for lack of jurisdiction or, in the alternative, affirm the Order and remand so SSgt. Moss's claims may be adjudicated in the forum Congress guaranteed him and other servicemembers.

## JURISDICTIONAL STATEMENT

SSgt. Moss agrees the district court possessed jurisdiction over this lawsuit. He disputes, however, that this Court possesses appellate jurisdiction. Cleo bases appellate jurisdiction on the Federal Arbitration Act, which permits interlocutory appeals of orders denying motions to stay or compel arbitration governed by the statute. Appellant's Opening Brief ("AOB") at 4; 9 U.S.C. § 16(a)(1)(A)-(B). But here, the MLA overrides the FAA. *See infra* pages 23–34. Because the FAA does not apply, neither

does its interlocutory appeal provision. And without the FAA hook, this Court lacks appellate jurisdiction. *See Steines v. Westgate Palace, L.L.C.*, 113 F.4th 1335, 1348 (11th Cir. 2024) (finding "the MLA *did* override the FAA" and "dismiss[ing] th[e] interlocutory appeal for lack of jurisdiction") (emphasis in original).

## ISSUES PRESENTED

1.      The Military Lending Act displaces the Federal Arbitration Act for disputes involving the extension of consumer credit to covered members. The Supreme Court held in *New Prime* that courts lack authority to compel claims to arbitration when the FAA does not apply. This lack of authority extends to delegation clauses. SSgt. Moss contends the FAA does not apply to his claims. Did the district court correctly conclude that, notwithstanding the presence of a delegation clause, the court, and not an arbitrator, must decide whether the FAA applies?

2.      The MLA provides that "*no agreement* to arbitrate *any dispute* involving the extension of consumer credit shall be enforceable" against covered servicemembers and their dependents. 10 U.S.C. § 987(f)(4) (emphasis added). This sweeping prohibition contains no exception for arbitration provisions a borrower can opt out of. Did the district court

correctly conclude SSgt. Moss pleaded claims involving the extension of consumer credit, which cannot be compelled to arbitration?

## STATEMENT OF THE CASE

### A.    Factual Background

Cleo is a tech-enabled payday lender. Through a product it calls Cash Advance, Cleo issues short-term payday loans to borrowers. ER-54, 128–29. Cleo markets to consumers who are "living paycheck to paycheck" and with "POOR CREDIT," purporting to offer a "much cheaper alternative" to "credit cards or personal loans" despite charging sky-high fees to access quick cash. ER-120, 128–29 (quoting Cleo's website touting Cash Advance as a "perfect loan alternative for meeting your short-term financial needs"), 131, 135.

> **1.    Cleo conditions its Cash Advances on borrowers' agreement to repay them from a linked bank account or debit card on a specific date through mandatory pre-authorized debits.**

To receive a Cash Advance, borrowers must create an account in the Cleo app, provide a litany of personal and financial information, and agree to pay recurring monthly subscription charges. ER-50–51, 136–38. Cleo performs extensive underwriting before lending funds, directly accessing borrowers' bank account data (through Plaid, a third-party

6

bank connection service) to assess their financial health, liquidity, anticipated income, spending patterns, and borrowing history. ER-54 (providing in the terms of service that "eligibility and the amount you are eligible for is defined via an analysis of your transaction and deposit history and patterns"), 136–38. Like other credit issuers, Cleo extends larger amounts of credit to borrowers who prove to be a low default risk. ER-138–39. And it continually adjusts borrowers' eligibility based on their default risk to ensure repayment. ER-54, 138–39.

In addition to satisfying stringent underwriting criteria, Cash Advance borrowers must pre-authorize Cleo to collect repayment via automated debits from linked bank accounts or debit cards. ER-54–55, 129, 140. Cleo schedules repayment on "the user's next anticipated payday or the next 1–2 days immediately following that payday" to ensure funds are available. ER-55, 140. To that end, borrowers taking an advance must agree to a "repayment date" on which they will "pay [the advanced funds] back." ER-140. These advances are "repayable in one installment on the date ('the Repayment Date') agreed at the time of requesting the cash advance, which can be up to 14 days from the date of the request." ER-54.

7

So, per Cleo's Cash Advance–request process, borrowers must agree to repay Cash Advances on a specified "repayment date" within 14 days and establish a mechanism for making repayment (pre-authorized debits) each time they request an advance. ER-54–55, 129, 140. In fact, Cleo's own representations—*i.e.*, that borrowers must "repay [their] cash advance" or "pay it back" on a specified "repayment date" and that cash advanced by Cleo is "borrow[ed]"—confirm borrowers take on a repayment obligation with each advance. *See* ER-54–55, 137, 140. And this is in addition to the monthly "subscription" fees borrowers must pay to even have *access* to the short-term advances.

Cleo fortifies its ability to collect repayment in other ways. First, Cleo prompts borrowers to make a "backup plan" for repayment, permitting it to "take up to 3 partial repayments if [the borrower's bank] balance can't cover the full cost of" an advance. ER-140. Second, regardless of whether a borrower opts into this "backup plan," borrowers must check a box agreeing that if their primary payment method fails, "Cleo can use my other linked accounts to repay my cash advance, or fees." *Id.* These permissions are reflected in Cleo's terms of service, which empower Cleo to "charge your linked account / debit card for advance

8

repayment any time after the later of: (1) we see evidence of income (such as a paycheck) deposited into your linked account, or (2) the latest agreed Repayment Date." ER-55. So, if Cleo is unable to collect repayment on the agreed Repayment Date, it maintains the right to debit borrowers' accounts when money is deposited into the account (which Cleo continually monitors through its Plaid-enabled account access). ER-55, 138–41. Through its comprehensive underwriting and collections processes, Cleo collects approximately 97% or more of the money it lends. ER-141.

Failure to repay carries consequences. Cleo informs borrowers they "may be barred from using other products or services offered by Cleo," notwithstanding that they pay a monthly subscription fee to access such products and services, "if you fail to repay your cash advance." ER-55. And until late 2023, Cleo prevented borrowers with an outstanding balance from cancelling subscription payments; *i.e.*, Cleo continued to charge what had until then been a fee for access to consumer credit they could no longer access. ER-141. Moreover, Cleo will not issue new Cash Advances to borrowers with an unpaid balance. ER-55, 136–38, 141.

9

### 2. Cleo imposes fees on borrowers who take out Cash Advances on the terms advertised.

Cleo charges two different fees to Cash Advance borrowers: (1) expedite fees and (2) subscription charges. ER-53–55, 129.

First, expedite fees ("Express Fees") provide instant disbursement of loaned funds. ER-54–55, 130–32. These Express Fees—which are unavoidable if a borrower wants immediate access to funds rather than waiting 3–4 business days—assessed by Cleo range from $3.99 to $9.99. ER-129–30. The fee increases with the size of the loan. *Id.* Like traditional interest, Express Fees ensure servicemembers who receive the use of money for a longer period pay a higher price.

Cleo encourages borrowers to take advances instantly for a fee and has cultivated a customer base that needs cash urgently. ER-129–32. Specifically, it advertises its loans as providing "quick access" to cash, informing borrowers the funds arrive "instantly," "within minutes," "today," and "at lightning speed." ER-130–31. By contrast, according to Cleo, the non-expedited version of Cash Advance will take up to "four (4) business days" to clear. ER-55, 131. Such a lengthy delay is problematic for Cleo's user base—individuals with "POOR CREDIT" living "paycheck

10

to paycheck"—who turn to payday loan products like Cleo's precisely because they cannot afford to wait. ER-130–32.

Second, to participate in the Cash Advance program, military borrowers must pay a $5.99 or $14.99 per month recurring subscription fee to access cash advances. ER-53, 132–33.[1] With the $5.99 subscription, Cleo users may borrow "[u]p to $250"; with the $14.99 subscription, they may borrow "[u]p to $500." ER-132–133. Cleo's app prohibits users from accessing Cash Advances unless they pay for a subscription, and for much of the class period, users could not cancel their subscriptions until they had repaid all Cash Advances. ER-53, 132–34.

\* \* \*

The military annual percentage rate (APR) on Cleo's charges imposed on military servicemembers is breathtaking: A survey of thousands of Cleo Cash Advances revealed an *average* APR of **652%**. ER-

---

[1] Cleo's terms of service purport to allow users to *request* to "access Salary Advance without subscribing to the Cleo Plus service" by emailing Cleo. ER-54. There is no indication how often—if ever—such requests are granted versus denied. Notwithstanding that term, disclosures in the Cleo app indicate that borrowers who do not pay *at least* $5.99 monthly subscription fees will be unable to access Cash Advances. ER-133. And in any event, it is impossible to receive the expedited Cash Advance without paying Express Fees.

11

134, 142. SSgt. Moss received similarly costly Cash Advances. ER-142. This is not merely a moral wrong. *E.g.*, *E.C. Warner Co. v. W. B. Foshay Co.*, 57 F.2d 656, 659 (8th Cir. 1932) ("Usury is a moral taint, and no subterfuge, however cunningly devised, will be permitted to conceal it."). Studies confirm that products like Cash Advance degrade borrowers' financial health by fostering dependence and rampant repeat borrowing, depleting future paychecks through repayments and fees, which cause overdrafts on other accounts to "increase[] 56% on average after use of an advance product." ER-135–36. That is precisely *why* Congress passed the Military Lending Act: to protect servicemembers like SSgt. Moss from these harms. *See* the U.S. Department of Defense's Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents ("DoD Report"),[2] at 3 (noting predatory loans "trap the borrower in a cycle of debt; and leave the borrower in worse financial shape").

---

[2] U.S. DEPT. OF DEF., Rep. on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents (Aug. 9, 2006), https://apps.dtic.mil/sti/pdfs/ADA521462.pdf [https://perma.cc/NAC5-D97H].

12

## B.   Statutory and Regulatory Background

In 2006, the Department of Defense issued a report documenting the harms payday loans inflict on active-duty military servicemembers and their families, finding "[p]redatory lending undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force." DoD Report, at 53. To protect military families from these harms and ensure a financially secure fighting force, Congress enacted the MLA, providing myriad protections for covered members of the armed forces and dependents.

First and foremost, the MLA prohibits creditors from charging more than 36% interest in any consumer credit agreement with a servicemember or their dependent. 10 U.S.C. § 987(b). To name just a few more protections, the MLA requires detailed cost-of-credit disclosures and prohibits agreements requiring borrowers to waive the right to legal recourse or requiring borrowers to provide a check or access to a bank account as security for the obligation. *Id.* §§ 987(c), (e)(2), (3), (5). Crucially, the MLA displaces the FAA, providing "no agreement to arbitrate *any* dispute involving the extension of consumer credit shall be enforceable" against servicemembers or their dependents. 10 U.S.C. §

13

987(f)(4) (emphasis added). This provision guarantees servicemembers access to a judicial forum for *any* dispute they have under the MLA.

The MLA applies to "creditors" who extend "consumer credit" to covered military members and their dependents. Operative terms are defined by statute and Department of Defense regulations. *Id.* §§ 987(h), (i). "Creditor" means an entity "engaged in the business of extending consumer credit." *Id.* § 987(i)(6); 32 C.F.R. § 232.3(h). Notably, the MLA's regulations single out "person[s] engaged in . . . payday loan transactions," like Cleo, as within this definition. 32 C.F.R. § 232.8(a).

Most salient for purposes of this appeal is the definition of "consumer credit." The MLA adopts the consumer credit definition "provided . . . in regulations" by the DoD. 10 U.S.C. § 987(i)(6). Those regulations, in relevant part, define "consumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) subject to a finance charge..." 32 C.F.R. § 232.3(f)(1). Cash Advances are subject to the MLA because they constitute "credit" subject to a "finance charge." *Id.*

The terms "credit" and "finance charge" are also defined. "Credit means the right granted to a consumer by a creditor to defer payment of

14

debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). This definition is substantially similar to the "credit" definition provided under the Truth in Lending Act ("TILA"). *Compare* 32 C.F.R. § 232.3(h), *with* 15 U.S.C. § 1602(f). Finally, MLA regulations adopt Regulation Z's "finance charge" definition, which provides:

> The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit.

12 C.F.R. § 1026.4(a); 32 C.F.R. § 232.3(n); *accord* 15 U.S.C. § 1605(a).

As explained below, Cash Advances neatly fit these definitions.

## C.    Procedural Background

On April 10, 2025, SSgt. Moss filed the Complaint in Washington Superior Court in King County, bringing claims under the MLA and TILA, individually and on behalf of two putative classes. ER-119–52. SSgt. Moss alleges Cleo violates the MLA by, among other things, extending Cash Advances that carry interest exceeding the Act's usury cap and omitting mandatory cost-of-credit disclosures. ER-142, 149–50; 10 U.S.C. §§ 987(b), (c).

15

On May 9, 2025, Defendant removed this action to the U.S. District Court for the Western District of Washington. ER-159. A month later, Defendant filed its Motion to Dismiss Class Claims and Stay Individual Claims in Favor of Arbitration, or for Alternative Relief. ER-81–112 ("Motion"). Through the Motion, Cleo raised the same arguments it raises here, seeking to compel arbitration notwithstanding the MLA's clear override of the FAA, and arguing Cash Advances are not consumer credit under the MLA because they are "non-recourse"[3] and the Express Fees are notionally optional. *Id.*

On July 16, 2025, Sgt. Moss filed his Response in Opposition to Defendant's Motion. ER-14–45 ("Response"). The Response explained that the MLA's unambiguous text prohibits enforcement of Cleo's

---

[3] Though Cleo characterizes its product as "non-recourse" because it waived its right to pursue some collection remedies, "non-recourse" is a misnomer. Recourse is defined simply as "[e]nforcement of, or a method for enforcing, a right." *Recourse*, BLACK'S LAW DICTIONARY (12th ed. 2024). And it is undisputed that, for each advance, borrowers must agree to Cleo's "enforcement of, or [] method for enforcing" its right to repayment through pre-authorized debits from linked bank accounts. *See id.* Cleo thus provides "*recourse* Cash Advances" because each advance is conditioned on the borrower agreeing to "a method for enforcing" repayment regardless of whether Cleo disavows an entirely *different* enforcement method. Accordingly, SSgt. Moss intentionally sets off in quotation marks each reference to "non-recourse."

16

arbitration agreement and the delegation clause (itself an arbitration agreement) contained therein. ER-26–30. SSgt. Moss also showed Cash Advances constitute consumer credit agreements subject to a finance charge under the applicable statutory definitions. ER-31–43. Cleo replied on August 6, 2025. ER-163.

**D.     The Order on Review**

The Order on review is one in an unbroken line of district court decisions that have rejected the same arguments Cleo makes in this appeal, including the applicability of the FAA to disputes involving the extension of consumer credit and whether the transactions at issue here constitute "consumer credit." *See Orubo*, 780 F. Supp. 3d 927; *Johnson*, 2025 WL 2299425; *Golubiewski*, 2025 WL 2484192; *Vickery*, 2025 WL 2841686; *Revell*, __ F. Supp. 3d __, 2025 WL 3167318; *Russell*, 2025 WL 3691977; *Burrison*, 2026 WL 444638.

After oral argument, the district court issued its Order denying the Motion. ER-3–13. The Order begins with a careful review of 10 U.S.C. § 987(f)(4), holding it displaces the FAA for disputes involving consumer credit agreements with covered borrowers. Consistent with every other court to consider the question, the district court found § 987(f)(4) "reflects

17

a clear congressional directive that overrides the [FAA] and protects servicemembers' rights to seek judicial relief." ER-7. This provision, likewise, precluded enforcement of the delegation provision. *Id.*

Next, the court found SSgt. Moss's Complaint pleaded a plausible claim that Cash Advance constitutes consumer credit. First, Cash Advances involve "precisely" the type of cash advance scheme that Regulation Z's official commentary characterizes as credit. ER-8. Second, the court rejected Cleo's argument that its waiver of *some* available remedies rules out the creation of "debt," recognizing that relevant definitions of debt "do not mandate such a formalistic requirement" and that introducing such a requirement would undermine the core purposes of the operative statutes. ER-8–9. Third, the court observed the purported "non-recourse" nature of Cash Advance had little practical effect given the "circumstances under which repayment would not occur are extremely narrow" and the allegations and evidence supported that "Cleo provides funds to users with a clear expectation—and near certain reality—of recouping them from their linked bank accounts upon receipt of their paychecks." ER-10 (quoting *Orubo*, 780 F. Supp. 3d at 933 (first quotation)).

18

Turning to the finance charge, the court, after addressing the operative definition and the Supreme Court's decision in *Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232, 240–41 (2004), found Express Fees are "intertwined with the Cash advance product" and at least "'incident to' the extension of credit." ER-11. As such, they constitute a "finance charge." The court also found subscription fees to be finance charges. *Id.*

Finally, the court declined Cleo's invitation to compel SSgt. Moss's TILA claim to arbitration based on the MLA's plain text applying its arbitration prohibition to *any* disputes that arise from a contract that falls within the MLA's scope. ER-12 ("If the MLA applies to a contract involving the extension of consumer credit, the district court cannot enforce any agreement in that contract to arbitrate any dispute." (quoting *Steines*, 113 F.4th at 1344)).

On September 15, 2026, Cleo filed its notice of appeal. ER-164.

## SUMMARY OF ARGUMENT

In plain, unambiguous language, the MLA displaces the FAA for disputes involving the extension of consumer credit to servicemembers. Cleo's Cash Advance product constitutes consumer credit subject to the

19

MLA's protections, including, most importantly for this appeal, its arbitration ban. The district court correctly denied Cleo's motion to compel arbitration of SSgt. Moss's claims.

**First**, the district court correctly decided it lacked authority to enforce Cleo's arbitration agreement. Under binding Supreme Court precedent, before a court may invoke its statutory powers to compel arbitration, it must first determine whether the agreement at issue falls within the boundaries of the FAA. The MLA places disputes involving consumer credit extended to servicemembers outside those boundaries: "Notwithstanding section 2 of title 9 [the FAA], . . . no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member." 10 U.S.C. § 987(f)(4). Because the FAA does not apply to SSgt. Moss's dispute with Cleo, the district court lacked authority to enforce any portion of the arbitration agreement, including its delegation clause.

**Second**, the MLA's plain text prohibits the enforcement of any arbitration clause, mandatory or not. Section 987(f)(4) states that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable" against a covered borrower. No agreement

20

means no agreement, regardless of whether the agreement was a required or optional term. Cleo invites this Court to read "no agreement" as "no agreement, except those a borrower can opt out of." But that is not the statute Congress wrote and that this Court must enforce.

**Third**, SSgt. Moss plausibly pleads that Cleo's Cash Advances constitute consumer credit and thus the parties have a dispute involving the extension of consumer credit. "Credit" means "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). The Complaint alleges facts (which Cleo's terms of service confirm) placing Cash Advances squarely within this definition. Each time SSgt. Moss took an advance, he promised to repay Cleo on a particular date and was required to preauthorize Cleo to debit his linked bank account or debit card. SSgt. Moss alleges, and Cleo's terms of service confirm, Cash Advances constitute consumer credit.

**Fourth**, Cleo's "non-recourse" provision does not alter the analysis. Cleo's choice to voluntarily waive some available methods for collecting borrowers' debts does not mean Cash Advances are not consumer credit. This argument relies on an invented "legal recourse in court" prerequisite that exists nowhere in the applicable statutes, regulations, or caselaw.

21

Cleo's waiver of judicial and debt collection remedies does not eliminate the repayment obligation that SSgt. Moss undertook each time he took a Cash Advance.

**Fifth**, SSgt. Moss plausibly alleges Express Fees are "finance charges." Regulation Z defines "finance charge" as the cost of consumer credit, which includes any charge imposed by the creditor "as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a). Servicemembers must pay an Express Fee to receive the advertised version of Cash Advance that arrives "instantly," "within minutes," "today," and "at lightning speed." The fee thus has a connection to the extension of credit and fits comfortably within Regulation Z's definition of finance charge. Unsurprisingly, every court to consider analogous fees in analogous contexts reached this commonsense conclusion.

For all these reasons, more fully set forth below, the Order on appeal was correctly decided. SSgt. Moss respectfully requests this Court dismiss this appeal for lack of jurisdiction or, in the alternative, affirm the district court's order and remand this case for further proceedings in the judicial forum that Congress guaranteed to SSgt. Moss and other servicemembers for resolving disputes involving consumer credit.

## STANDARD OF REVIEW

This Court reviews *de novo* orders denying motions to compel arbitration. *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1000 (9th Cir. 2023).

## ARGUMENT

The Order on appeal rejecting Defendant's attempt to compel arbitration of Plaintiff's claims should be affirmed because: (i) if the MLA is applicable, it displaces the FAA and categorically precludes arbitration; (ii) Cleo's Cash Advance product constitutes consumer credit within the meaning of the MLA; and (iii) Express Fees are finance charges. As such, the MLA is implicated, displaces the FAA, and forbids arbitration of Plaintiff's claims. Plaintiff begins by showing the MLA, if implicated, displaces the FAA and prohibits the enforcement of arbitration agreements and then turns to showing that, here, the MLA is indeed implicated. As such, the district court properly denied the Motion and its Order must be affirmed.

## I. Binding Supreme Court Precedent Required the District Court, Not an Arbitrator, to Decide Whether SSgt. Moss's Claims Could be Compelled to Arbitration

The FAA provides no basis for compelling arbitration of claims that fall outside the scope of the FAA.. "That is because, if a contract falls

within an FAA-exempt category, the district court has no power at all to compel arbitration—including to compel arbitration of gateway issues pursuant to a delegation clause." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1034 (9th Cir. 2022). The district court was required to determine whether it had power to compel SSgt. Moss's claims to arbitration. It correctly concluded it lacked that power. Cleo's arguments to the contrary lack merit.

Tellingly, Cleo failed to cite the Supreme Court's controlling precedent, *New Prime Inc. v. Oliveira*, 586 U.S. 105, 111 (2019). There, the Court explained that "[w]hile a court's authority under the Arbitration Act to compel arbitration may be considerable, it isn't unconditional." *Id.* at 110. A court's authority to compel arbitration "doesn't extend to all private contracts, no matter how emphatically they may express a preference for arbitration." *Id.* So, before a court can "invoke its statutory powers to stay litigation and compel arbitration," it "must first know whether the contract itself falls within or beyond the boundaries of §§ 1 and 2" of the FAA. *Id.* at 111. Nor is different treatment appropriate for "[a] delegation clause" which "is merely a specialized type of arbitration agreement" that the FAA applies to (or not)

24

"just as it does on any other." *Id.* at 112 (cleaned up). Thus, binding Supreme Court precedent required the district court to do exactly what it did: determine whether Cleo's arbitration provision, including its delegation clause, fell outside the reach of the FAA. And the district court correctly concluded it lacked authority to compel this case to arbitration.

Congress unmistakably placed disputes arising under the MLA outside the reach of the FAA: "Notwithstanding section 2 of title 9 [the FAA], . . . no agreement to arbitrate *any* dispute involving the extension of consumer credit shall be enforceable against any covered member." 10 U.S.C. § 987(f)(4) (emphasis added). In language that "couldn't be clearer," Congress guaranteed servicemembers and their dependents a day in court. *Steines*, 113 F.4th at 1343. Therefore, the FAA does not apply to SSgt. Moss's dispute with Cleo, and, under *New Prime*, the district court lacked authority to enforce the arbitration provision, including its delegation clause.

This is not a close call: The Supreme Court has cited the MLA as a textbook example of Congress overriding the FAA. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 514 (2018) ("Congress has . . . shown that it knows how to override the [FAA] when it wishes—by explaining, for example,

25

that . . . requiring a party to arbitrate is 'unlawful' [], 10 U.S.C. § 987(e)(3)."). Lower courts, too, have easily found that where the MLA applies, courts lack authority to compel arbitration. *See, e.g., Steines*, 113 F. 4th at 1344 ("If the MLA applies to a contract involving the extension of consumer credit, the district court cannot enforce any agreement in that contract to arbitrate any dispute."); *Consumer Fin. Prot. Bureau v. MoneyLion Techs. Inc.*, 799 F. Supp. 3d 152, 189 (S.D.N.Y. 2025) ("Section 987(f)(4) [of the MLA] independently renders all arbitration agreements unenforceable as against military borrowers."); *Russell*, 2025 WL 3691977, at *5 (similar); *Vickery*, 2025 WL 2841686, at *4 (similar); *Revell*, 2025 WL 3167318, at *8–9 (similar); *Burrison*, 2026 WL 444638, at *8.

All the cases Cleo cites actually support SSgt. Moss's position. In *Rent-A-Center, West, Inc. v. Jackson,* the Supreme Court explained that when "a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering" a case to an arbitrator, notwithstanding the presence of a delegation clause. 561 U.S. 63, 71 (2010); *accord Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023). In *Caremark*, this Court could not

26

decide whether the delegation clause was enforceable because the Chickasaw Nation did not challenge "the validity of the delegation clauses specifically," but rather mounted "a challenge to the enforceability of the arbitration provisions as a whole." 43 F.4th at 1033.[4]

Unlike in *Caremark*, SSgt. Moss challenged the enforceability of the delegation provision. ER-28–30. Because he did so, the district court was required to resolve whether the delegation clause was enforceable. Cleo's arguments that the district court improperly reached the issue are meritless.

## II. The MLA's Plain Text Prohibits the Enforcement of *Any* Arbitration Clause, Regardless Whether the Clause is Mandatory or Optional

"[N]o agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against a" covered borrower. 10 U.S.C. § 987(f)(4). Those words could not be clearer and encompass every agreement to arbitrate—whether the agreement was a required or optional term. Cleo invites this Court to read into the statute an

---

[4] The same is true of *Attix v. Carrington Mortg. Servs., LLC*: "[A]lthough he claims that he has, Attix has not specifically challenged the enforceability of the parties' agreement to arbitrate threshold questions about the arbitrability of his claims." 35 F.4th 1284, 1289 (11th Cir. 2022).

27

exception for arbitration clauses that a consumer can opt out of. AOB at 27–28. The Court should reject the invitation to rewrite the MLA under the guise of interpreting it.

The purpose of interpreting a statute is to "determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others": "that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992). "When the words of a statute are unambiguous, then, this first canon is also the last," and the "judicial inquiry is complete." *Id.* at 254 (internal quotation marks and citation omitted). Under this principle, courts cannot "narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020).

Section 987(f)(4) states Congress's unambiguous intent to categorically prohibit the enforcement of Cleo's arbitration provision with SSgt. Moss for claims involving consumer credit. To avoid the force of Congress's plain words, Cleo asks this Court to limit § 987(f)(4)'s sweeping prohibition to only the sliver of arbitration provisions that violate § 987(e)(3). But those two provisions achieve different goals and

28

can be readily harmonized so that neither is superfluous. *See Burrison*, 2026 WL 444638, at *4 ("The Court agrees that the prohibitions in [10 U.S.C. §§ 987(e)(3)] serve different purposes, and neither renders the other superfluous.").

*First*, § 987(f)(4) ensures that "a servicemember can still bring an action to challenge *other* violations of the MLA or the very voluntariness of the arbitration provision." *Russell*, 2025 WL 3691977, at *4 (emphasis original). Thus, Congress made the judicial forum available for all challenges a covered borrower might have against a creditor, including *inter alia* the creditor's conduct of extending consumer credit with an APR greater than 36%, 10 U.S.C. § 987(b); imposing "onerous legal notice provisions," *id.* at § 987(e)(3); demanding "unreasonable notice . . . as a condition for legal action," § 987(e)(4); and using "a check or other method of access to a deposit, savings, or other financial account . . . as security for the obligation," *id.* at § 987(e)(5).

*Second*, Congress' choice to impose liability on creditors only for required arbitration provisions does not undercut its clear intention to preclude arbitration and preserve the judicial forum for "*any* dispute involving the extension of consumer credit[.]" *Id.* at § 987(f)(4) (emphasis

29

added). Rather, § 987(e)(3) shows that Congress considered a subset of arbitration clauses so pernicious that including them in a contract for consumer credit should expose a creditor to criminal fines, imprisonment, statutory damages, and punitive damages, § 987(f)(1) & (5)(A)(i)–(ii). *See MoneyLion*, 799 F. Supp. 3d at 188 n.13 (noting 10 U.S.C. § 987(e)(3) "makes it unlawful to include mandatory arbitration clauses in covered loan agreements and subjects a violator to civil or criminal liability").

Creditors who include optional arbitration provisions in their contracts need not fear criminal liability or statutory damages for doing so. They will, however, still have to answer in court for other MLA violations, because "Section 987(f)(4) independently renders all arbitration agreements unenforceable as against military borrowers, guaranteeing that military borrowers who commence legal action will still have their day in court notwithstanding the voluntariness of any arbitration clause." *MoneyLion*, 799 F. Supp. 3d at 189; *see also Revell*, 2025 WL 3167318, at *8 (finding § 987(f)(4) lacks "language limiting the enforcement prohibition to mandatory or 'required' arbitration agreements") (cleaned up). In other words, if SSgt. Moss were bringing a claim seeking statutory damages due to the inclusion of the arbitration

30

provision, Cleo could defend itself against liability by arguing its arbitration agreement was optional, not mandatory (or required). But whether a creditor is statutorily liable for an arbitration provision is a separate question from whether the provision is enforceable. And the MLA is crystal clear that it is not.

This reading of the statute harmonizes sections 987(e)(3) and (f)(4), such that both do independent work and neither is superfluous. Section 987(f)(4) ensures that our nation's active duty servicemembers and their dependents will have their disputes involving consumer credit adjudicated in open court. Section 987(e)(3) makes unlawful arbitration provisions the creditor requires, subjecting the creditor to consequences beyond merely not enforcing the agreement. *Revell*, 2025 WL 3167318, at *8 (rejecting argument that construing § 987(f)(4) as banning the enforcement of all arbitration provisions would render § 987(e)(3) superfluous); *MoneyLion*, 799 F. Supp. 3d at 188 n.13; *Burrison*, 2026 WL 444638, at *4. There is no superfluity problem to resolve.[5]

---

[5] In support of its argument that the MLA prohibits only mandatory arbitration agreements, Cleo cites *Garrett v. Monterey Fin. Servs., LLC*, No. 18-cv-325, 2018 WL 3579856, at *4 (D. Md. July 25, 2018). AOB at 28. It does not appear the plaintiff in that action raised section 987(f)(4) as the basis for why the arbitration provision was not enforceable and the

31

Cleo seeks refuge in the "Penalties and Remedies" title of section 987(f). Like all canons of interpretation, "the title of a [] section can aid in resolving an ambiguity in the legislation's text." *INS v. National Ctr. For Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991). The canon has no work to do when there is no ambiguity. Even when titles are helpful, they offer "but a short-hand reference to the general subject matter of the provision, not meant to take the place of the detailed provisions of the text." *Lawson v. FMR LLC*, 571 U.S. 429, 446 (2014) (internal quotation marks and citations omitted). The text of § 987(f)(4) is clear. There is no ambiguity for the title of the section to help resolve. *See Burrison*, 2026 WL 444638, at *4 (observing "statutory titles and headings cannot limit the plain meaning of the [MLA's] text").

Even if there were, the section title is underinclusive and cannot be read to restrict § 987(f)(4)'s reach. In addition to setting forth penalties and remedies for violations, the "Penalties and Remedies" section includes the MLA's jurisdiction and venue provisions. *Id.* at § 987(f)(5)(E). Read as a whole, § 987(f) establishes where a civil action

---

court found the MLA did not apply to the dispute. Regardless, the *Garrett* court did not cite, much less analyze, section 987(f)(4). The opinion simply has nothing to say about whether section 987(f)(4) displaces the FAA.

arising under the MLA may be filed ("any appropriate United States district court . . . or in any other court of competent jurisdiction)," *id.*; who must resolve the claim (a judge or jury, not an arbitrator), § 987(f)(4); and the remedies for a proven violation, (voiding the contract; recovering actual or statutory damages, punitive damages, and equitable relief; and recovering costs and attorney fees)), § 987(f)(3) & (5). Perhaps a more descriptive title would have been "Penalties, Remedies, and Forum." But that's quibbling. The section's provisions are clear and must be given effect, regardless of whether the title is underinclusive.

Nor can Cleo find safe harbor in the Ending Forced Arbitration in Sexual Assault and Sexual Harassment Act. Were Cleo's argument correct that Congress must speak directly to delegation clauses for them to be unenforceable, the Supreme Court would have enforced the delegation provision in *New Prime*, as there is no statement in 9 U.S.C. § 1 expressly overriding delegation clauses for contracts of employment for covered transportation workers. The unanimous Court, however, rejected that argument, because certain contracts—such as those defined in 9 U.S.C. § 1 and 10 U.S.C. § 987(f)(4)—lie outside the reach of the FAA.

33

Congress expressed its meaning in the plain text of § 987(f)(4). This section is readily harmonized with § 987(e)(3) and both must be given effect. The district court correctly concluded it lacked authority to compel SSgt. Moss's claims involving the extension of consumer credit to arbitration.[6] This Court should reject Cleo's efforts to read atextual exceptions into the MLA's expansive prohibition on enforcing arbitration provisions.

## III. SSgt. Moss Plausibly Alleges a Dispute Involving the Extension of Consumer Credit under the MLA

As set forth above, if the MLA is implicated, it displaces the FAA and prohibits enforcement of Cleo's arbitration provision. The next question, then, is whether SSgt. Moss's claims implicate the MLA.

The MLA applies to: (1) credit agreements that are (2) subject to a finance charge. 10 U.S.C. § 987; 32 C.F.R. § 232.3(f). SSgt. Moss alleged facts (buttressed by Cleo's terms) sufficient to state a claim that Cleo's Cash Advances meet these definitions. Because SSgt. Moss pleaded a "dispute involving the extension of consumer credit," the MLA applies

---

[6] The district court correctly held § 987(f)(4) displaces the FAA for SSgt. Moss's claim under the Truth in Lending Act, as that claim, like the MLA claim, is a dispute involving the extension of consumer credit. Cleo's arguments in Section II.C. miss the mark.

34

and overrides the FAA. This Court, therefore, "lack[s] any source of appellate jurisdiction" and should dismiss this appeal so litigation may proceed in the normal course. *See Steines*, 113 F.4th at 1348.

## A. SSgt. Moss pleads facts, confirmed by Cleo's terms, that demonstrate Cash Advances are "consumer credit."

Consumer credit under the MLA is "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is [] subject to a finance charge[.]" 32 C.F.R. § 232.3(f)(1). "Credit," in turn, is defined as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h); *accord* 15 U.S.C. § 1602(f) (providing similar definition under TILA). Because the MLA does not define "debt," the term is given its "ordinary meaning." *See FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011). Dictionary definitions provide a suitable starting place for discerning ordinary meaning. *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004).

**Dictionary definitions**: "Debt" is defined as "[l]iability on a claim; a specific sum of money due by agreement or otherwise." *Debt*, BLACK'S LAW DICTIONARY (12th ed. 2024). The ordinary meaning of "debt" is "something owed; obligation," or "a state of being under obligation to pay

35

or repay someone or something in return for something received; a state of owing." *Debt*, MERRIAM-WEBSTER, https://www.merriamwebster.com/dictionary/debt; *see also Debt*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/search/dictionary/?scope=Entries&q=debt ("That which is owed or due.").

The word *obligation*, in turn, simply means a "legal or moral duty to do or not do something," which may arise from a "duty [] imposed by law, contract, promise, social relations, courtesy, kindness, or morality." *Obligation*, BLACK'S LAW DICTIONARY (12th ed. 2024); *accord Obligation*, MERRIAM-WEBSTER, https://www.merriamwebster.com/dictionary/debt ("**1:** the action of obligating oneself to a course of action (as by a promise or vow) **2a:** something (such as a formal contract, a promise, or the demands of conscience or custom) that obligates one to a course of action").

The Complaint alleges, and Cleo's terms of service confirm, Cash Advance transactions allowed SSgt. Moss "to incur debt and defer its payment." *See* 32 C.F.R. § 232.3(h). Cleo allowed SSgt. Moss to "borrow" money in exchange for a promise to "repay" or "pay [] back" a specific amount due on the "Repayment Date." ER-54–55, 129, 140. Not only

36

must borrowers agree to repay advances, but they must also preauthorize Cleo to debit a linked bank account or debit card, are prompted to create a "backup plan" to make repayment if the automated payday debit fails, and agree that Cleo may collect unpaid balances after the Repayment Date when money becomes available. *See* ER-55, 129, 140; *Revell*, 2025 WL 3167318, at *10 (finding cash advance provider's representations to borrowers—*i.e.*, "displaying 'repayment date'"—"support a mutual understanding that customers must repay the" advance).

Each time SSgt. Moss took an advance, he promised to repay (and pre-authorized repayment to) Cleo on a particular date. Cleo Cash Advances thus enabled SSgt. Moss to "incur debt and defer its payment" until his next payday.

**Debt defined by other federal statutes**: Language used in other statutes can also "aid in interpretation" of undefined terms. *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013).

As the Order recognized, the Fair Debt Collection Practices Act defines "debt" broadly as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction

37

are primarily for personal, family, or household purposes." ER-8 (quoting 15 U.S.C. § 1692a(5)). This definition's broad coverage easily encompasses Cleo's Cash Advance transactions because, for each advance, borrowers take on an "obligation or alleged obligation … to pay money arising out of a transaction." *See id.*

**Official Regulation Z Commentary**: The Federal Reserve Board's ("FRB") official commentary to Regulation Z bolsters SSgt. Moss's position.[7] Specifically, the FRB issued on-point commentary[8] applying TILA's credit definition in the payday advance context,

---

[7] "Because Congress directed DOD and the Federal Reserve Board to 'fill up the details of [the] regulatory scheme[s]' of the MLA and the TILA, respectively, the agencies' reasoned interpretations, within the constitutional bounds of its delegated authority, are entitled to deference." *Vickery*, 2025 WL 2841686, at *5 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024)).

[8] The relevant official commentary addressed in this section was originally issued by the FRB. 65 Fed. Reg. 17129 (Mar. 30, 2000). After the Dodd-Frank Wall Street Reform and Consumer Protection Act transferred rulemaking authority under the TILA to the Consumer Financial Protection Bureau, the CFPB published a rule reissuing a substantively identical version of the same commentary. *Compare* 65 Fed. Reg. 17129, 17131 (March 30, 2000), *codified at* 12 CFR 226.4, Supp. I, Paragraph 2(a)(14)-2, *with* 76 Fed. Reg. 79772, 79919 (December 22, 2011), *recodified at* 12 CFR 1026.4, Supp. I, Paragraph 2(a)(14)-2 (CFPB reissuing older FRB official staff commentary verbatim).

38

explaining payday advance transactions materially identical to Cash

Advance constitute consumer credit:

> **Payday loans; deferred presentment**. Credit includes a transaction in which a cash advance is made to a consumer . . . in exchange for the consumer's authorization to debit the consumer's deposit account, and where the parties agree . . . that the consumer's deposit account will not be debited, until a designated future date. This type of transaction is often referred to as a "payday loan" or "payday advance" or "deferred-presentment loan." A fee charged in connection with such a transaction may be a finance charge for purposes of § 1026.4, regardless of how the fee is characterized under state law.

*Official Interpretation of Regulation Z*, 12 C.F.R. pt. 1026, Supp. I,

Paragraph 2(a)(14)-2, *Credit*.[9]

When the commentary was issued, the FRB explained that the

payday advance illustration was provided "as an example of a specific

---

[9] Similarly, the DoD has opined that in the MLA context, "[m]ost, if not all, 'deposit advance' products would (when offered to a covered borrower) be covered as consumer credit because this type of product typically involves credit . . . for which the borrower pays any fee or charge that is, or is expected to be, repaid from funds available in the borrower's asset account held by that creditor." 80 Fed. Reg. 43560, 43561, 43579–80 (July 22, 2015). Like Cash Advance, deposit advances are "typically structured as short-term loans," where borrowers "stipulate that repayment will automatically be taken out of the borrower's next [] electronic deposit [i.e., paycheck]." Consumer Financial Protection Bureau, *Payday Loans and Deposit Advance Products* 24-25 (April 2013), available at http://files.consumerfinance.gov/f/201304_cfpb_payday-dap-whitepaper.pdf.

type of transaction that involves an agreement to defer payment of a debt." *Truth in Lending*, 65 Fed. Reg. 17129, 13130 (Mar. 31, 2000). Because such transactions "fall[] within the existing statutory and regulatory definition of 'credit,' the comment does not represent a change in the law." *Id.*

The FRB commentary was intentionally aimed broadly at any transaction structured to operate like a payday advance, "*however they are described*–as payday loans, **cash advances**, check advance loans, deferred presentment transactions, or by another name." *Id.* (emphases added); *see also id.* ("Transactions in which the parties agree to defer payment of a debt are 'credit' transactions regardless of the label used to describe them."). So, a creditor that delivers a "cash advance" to a consumer in exchange for authorization to debit the consumer's bank account on a future date is extending "credit." The FRB's description of this category of regulated credit products structured like a payday advance describes Cleo Cash Advance perfectly.

Nevertheless, Cleo claims the FRB commentary "does not classify cash advances like Cleo's as credit" and instead applies only to "payday loans," which, "like all loans, come with a legal obligation to repay." AOB,

40

at 36–37. First, nothing in the text of the commentary or its accompanying explanation supports this contention. What's more, Cleo ignores that the FRB explicitly addressed *all* transactions in which a "cash advance is made to a consumer . . . in exchange for the consumer's authorization to debit" their account at a future date, "however they are described–as payday loans, ***cash advances***, … or by another name."[10] *Truth in Lending*, 65 Fed. Reg. at 13130 (emphasis added). The notion that the FRB commentary covers only cash advances in which the creditor has preserved unconditionally its right to collect the debt *in court* is incompatible with the operative statutory and regulatory text.

**Other District Courts' Consumer Credit Holdings**: Courts applying the same MLA- and TILA-derived definitions to similar allegations have agreed these transactions meet the definition of consumer credit. *See, e.g.*, *Russell*, 2025 WL 3691977, at *6 (concluding that "similar cash advance programs constitute 'credit' within the meaning of the TILA" and MLA); *Vickery*, 2025 WL 2841686, at *4 ("By

---

[10] Cleo misleadingly cites the FRB's comments explaining its credit commentary, inaccurately claiming the commentary was meant to apply only to so-called "payday loans" while failing to mention the Board's explicit invocation of "cash advances" and similarly structured transactions "by any other name." AOB, at 37–38.

41

providing users funds and imposing a procedure to collect those funds at a later date, Empower's Cash Advances provide consumers the right to 'incur debt and defer its payment' [] and therefore extend 'credit.'"); *Revell*, 2025 WL 3167318, at *9–10 (similar); *Burrison*, 2026 WL 444638, at *5–7 (similar).

This consensus is unremarkable. The statutory and regulatory definitions of credit support only one conclusion: App-based cash advances which the borrower agrees to repay on a specified "Repayment Date," and for which pre-authorized repayment debits are required, constitute credit. Cleo's contrary argument is wrong and has unsurprisingly been repeatedly rejected.

### i. The "non-recourse" provision in the Cash Advance terms does not preclude credit treatment.

Cleo does not dispute SSgt. Moss owed it money when an advance was outstanding nor that he was "obligated" to repay money he "borrowed" through Cash Advance. Instead, Cleo argues its advances are not credit because of a provision in its terms of service stating Cash Advances "are made on a non recourse basis and Cleo has no contractual or legal claim against you based on a failure to repay an advance." ER-55; AOB, at 31–44. This argument ignores the allegations in the

42

Complaint and relies on an invented "legal recourse in court" prerequisite for consumer credit that exists nowhere in the applicable statutes, regulations, caselaw, or common sense. A debt that might later be forgiven or avoided if some contingency occurs is still a debt.

First, whether a cash-advance product meets the definition of "credit" does not hinge on whether a creditor voluntarily waives some available options for collecting the debt. Accepting Cleo's argument would require reading "a limitation into the statute that does not exist." *See Revell*, 2025 WL 3167318, at *10; ER-9 ("Accepting [this] narrow interpretation would improperly introduce a legal requirement where Congress and regulators have not."); *Vickery*, 2025 WL 2841686, at *5 ("[N]either Black's Law Dictionary nor the MLA and its implementing regulations require a consumer receiving money and entering into debt to have a *legal* obligation to repay that debt.").

As this Court has done in other statutory contexts, it should decline Cleo's invitation to "judicially create an exception to the" MLA "because it would add a contingency [] that Congress did not include in the statute." *See E.E. v. Norris Sch. Dist.*, 4 F.4th 866, 873 (9th Cir. 2021); *accord Xi v. INS*, 298 F.3d 832, 839 (9th Cir. 2002) ("[A] decision to

43

rearrange or rewrite [a] statute falls within the legislative, not the judicial, prerogative."); *Lomax*, 140 S. Ct. at 1725 (courts cannot "narrow a provision's reach by inserting words Congress chose to omit").

Second, Cleo's argument that Plaintiff never had an "obligation to repay" is wrong on the facts. AOB, at 32. Recourse means simply "[e]nforcement of, or a method for enforcing, a right." *Recourse*, BLACK'S LAW DICTIONARY (12th ed. 2024). The Complaint alleges that, among other methods of enforcing its right to repayment, Cleo (1) required borrowers to provide access to their deposit accounts and provide authorization to debit their linked accounts or debit card, either on the "Repayment Date" or after new funds were deposited to an account with insufficient funds to repay, (2) prohibited borrowers with an outstanding advance from accessing future Cash Advances, and (3) for much of the class period, prohibited borrowers from cancelling their paid monthly subscriptions until they repaid outstanding Cash Advances. Cleo's assertion that its loans are non-recourse is nonsense.

Third, "because the MLA was designed to protect customers from predatory loans, the statutory text must be read broadly." *Revell*, 2025 WL 3167318, at *10. Likewise, "[c]ourts must liberally construe TILA to

44

protect consumers and 'look[] past the form of the transactions to their economic substance.'" ER-9 (quoting *Burnett v. Ala. Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993)); *cf. Riggs v. Gov. Employees Fin. Corp.*, 623 F.2d 68, 71 (9th Cir. 1980) ("It is well established that [TILA] is to be liberally construed to effectuate its remedial purpose.").

The economic substance principle has added force in the usury context, as courts have for more than a century looked past labels and "cunning devices" to ensure usury limitations are not evaded by subterfuge. *See, e.g.*, *E.C. Warner Co.*, 57 F.2d at 659 ("If it appears that the transaction [] was in substance a receiving or contracting for the receiving of usurious interest for a loan or forbearance of money, then, regardless of the forms or devices resorted to conceal the character of the transaction, the parties thereto are subject to the consequences provided by the usury statutes."); *Milana v. Credit Discount Co.*, 27 Cal. 2d 335, 340 (1945) (noting courts must "pierce the veil of any plan designed to evade the usury law and in doing so . . . disregard the form and consider the substance"); *Pope v. Marshall*, 78 Ga. 635, 640, 4 S.E. 116 (1887) ("No disguise of language can avail for covering up usury, or glossing over an usurious contract. The theory that a contract will be usurious or not

45

according to the kind of paper bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating it, is altogether erroneous. The law intends that a search for usury shall penetrate to the substance.").

Considering the substance of Cash Advance transactions—*i.e.*, the designed function and purpose, consistent with the terms of service—they constitute credit transactions under the MLA. *Cf. In re Miller*, 215 B.R. 970, 974 (E.D. Ky. Bkr. 1997) ("[The defendants] are disbursing funds to people like the plaintiff on the promise of repayment of the sum plus the 'service charge,' at a later time. If this is not an extension of credit, [it is] hard to imagine any transaction that is.").

### ii. Cleo's argument that *non-recourse* cash advances are not consumer credit is unsupported.

Initially, Cleo cites several dictionary and statutory definitions of "debt" which similarly define the term as "an obligation to repay." AOB, at 32–33. Cleo doesn't define "obligation" in its brief. *See generally id.* By keeping the term undefined, Cleo attempts to manufacture ambiguity to enable its argument that obligation means "legal obligation [enforceable in court]." *Id.* at 31–44. Cleo's strained construction goes far beyond what any dictionary could support, claiming borrowers have "no obligation to

46

repay" and that it does not even have "a right to repayment" because of the "non-recourse" provision. *Id.* at 42–44.

But Cleo conflates "repayment obligation" with "retention of judicial remedies," which Cleo voluntarily waived. Each time SSgt. Moss took a Cash Advance, he took on a "repayment obligation" and Cleo had a "right to repayment" that it enforced through mandatory pre-authorized repayment debits in addition to backup collection measures. *See Obligation*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining obligation as a "legal or moral duty to do or not do something," stemming from a "law, contract, promise, social relations, courtesy, kindness, or morality"); *cf. Revell*, 2025 WL 3167318, at *10 (finding that similar cash advance "product [] requires promise of repayment, and therefore constitutes 'credit'"). Cleo's "right to repayment" is what permits it to debit borrowers' accounts. *See* ER-55, 129, 140–41. Without that right, it would be committing theft. And again, it is also irrelevant—the MLA simply does not distinguish between non-recourse and recourse extensions of credit.

The possibility that a borrower could avoid repayment without being sued or sent to collections has no bearing on whether the borrower

47

undertook an "obligation to repay" a Cash Advance. As Judge Corley aptly observed, "[t]hat some users avoid their obligation to repay [the cash advance provider] does not mean no obligation ever exists." *See Vickery*, 2025 WL 2841686, at *5. An unpaid debt is a debt.

**Cleo's bankruptcy cases**. Cleo also cites several bankruptcy cases interpreting "right to payment" and "debt." AOB, at 33–34. For instance, Cleo cites *Pennsylvania Department of Public Welfare v. Davenport* for its definition of "claim" as "right to payment," defined in turn as "an enforceable obligation." AOB, at 33–34 (citing 495 U.S. 552, 559 (1980)). It is initially noteworthy that the obligations in *Davenport* were held to constitute "debt" notwithstanding they were not enforceable "obligations in civil proceedings." 495 U.S. at 559. In any event, and setting aside that this case entails a different factual and statutory scheme than in *Davenport*, SSgt. Moss's allegations and Cleo's Terms confirm Cash Advances are "obligations" which are "enforceable" through pre-authorized repayment debits and other means. Nothing in *Davenport*

48

suggests that enforceable obligations are limited to those enforceable in court.[11]

Cleo ironically faults the district court for considering this Court's determination in *Olson v. Unison Agreement Corp.*, No. 23-2835, 2025 WL 2254522 (9th Cir. Aug. 7, 2025), that the term "consumer credit obligation" does not require a legal collection remedy to be available. AOB, at 42; ER-9. According to Cleo's newly-discovered perspective, that decision is "inapposite" because it entailed a wholly different financing arrangement under state law. AOB at 42. But Cleo sang a different tune

---

[11] Cleo's other authority which supposedly exclude "non-recourse" liabilities from the definition of credit or debt generally support *Plaintiff*'s position. *See Thompson v. Comm'r*, 235 F.2d 599, 601 (9th Cir. 1956) ("A debt is 'that which is due from one person to another, whether money, goods or services[.]'"); *Perry v. United States*, 294 U.S. 330, 354 (1935) (observing "the *validity* of the public debt" embraces "whatever concerns the integrity of the public obligations" (emphasis added)).

What's more, in its citation to *Gilman v. Comm'r of Internal Revenue*, 53 F.2d 47 (8th Cir. 1931), Cleo omits the initial citation to Iowa law for the "unconditional obligation to pay" definition of indebtedness. *See id.* at 50 (citing "Code of Iowa 1924, §§ 9461, 9463" for the proposition that a valid promissory note requires an "unconditional promise[] to pay"). Though the court also said that "indebtedness" as used in the Internal Revenue Act "implies an unconditional obligation," the factual context of the promissory notes—assignments made with "no consideration" from a husband to a wife, which were "in the nature of gifts to the members of the petitioner's family"—further distinguishes *Gilman* from this case. *Id.* at 49–50.

49

in its Motion, arguing the lower court's order that was reversed by *Olson* supported Cleo's position that Cash Advances do not create debt "despite the advance of money and actuarial likelihood of repayment." ER-103–04. So, when *Olson* appeared to support its position, it was highly relevant, according to Cleo; when the Ninth Circuit reversed, it suddenly became irrelevant. Setting aside Cleo's shifting positions, *Olson* helpfully construed the "plain and ordinary meaning" of the term "credit obligation" through equally applicable dictionary definitions, construing the term as "an initial advance of funds or goods coupled with an obligation to make future payment to the person providing that advance." 2025 WL 2254522, at \*3. That construction is relevant here—and supports SSgt. Moss.

**Cleo's policy argument**. In a bit of misdirection, Cleo invokes the MLA's "overarching aim" of protecting military families from "debt traps," arguing Cash Advances shouldn't be regulated because "the servicemember can simply walk away" from their repayment commitments without penalty and thereby avoid being trapped in debt. AOB at 41–42. This argument lacks any factual support. Cleo's counsel *say* servicemembers are "free to revoke Cleo's right to withdraw funds

50

from his or her linked account at any time." AOB at 8. But there are no allegations or facts in the record to support this proposition. Cleo cites ER-55 to support that servicemembers can freely revoke pre-authorized debits, but that page of Cleo's terms makes no mention of such a right.

Even if the argument were based on the record, it is a policy argument wholly detached from allegations in the Complaint. SSgt. Moss alleges that Cash Advance operates much like the debt traps the MLA was designed to combat—funneling military families into cycles of reborrowing, reliably squeezing borrowers for fees and fostering an "ever-increasing reliance on emergency funds from [] EWA loans." ER-134–35. These tendencies have borne out by research linking EWA use with increased repeat borrowing and account overdrafts. ER-134–35. The MLA's "overarching aim" of protecting covered borrowers from debt traps therefore supports SSgt. Moss, not Cleo. *Cf.* DoD Report, at 3 (observing predatory lending products "strip earnings or savings from the borrower; place the borrower's key assets at undue risk; do not help the borrower resolve their financial shortfall; trap the borrower in a cycle of debt; and leave the borrower in worse financial shape than when they initially contacted the lender").

51

\*    \*    \*

Cleo's self-serving, atextual construction would create impossible line-drawing problems as to the degree of recourse necessary to support credit treatment. Would a financing product that permitted debt collection efforts short of litigation (*i.e.*, dunning letters, collection calls, emails, and texts) constitute credit? What about a financing product that permitted credit reporting but not collection lawsuits? The answers to these questions and innumerable others are unclear because Cleo's proposed exception is untethered to any text, precedent, or standard. This Court should decline Cleo's invitation to carve out an indeterminate exception, divorced from text, to "credit" transactions that fit into "the kind of paper bag" Cleo chose for Cash Advances. *See Pope*, 78 Ga. at 640.

### iii. The CFPB's new Advisory Opinion is irrelevant but, if anything, confirms Cash Advances are credit.

Cleo also invokes the Consumer Financial Protection Bureau's ("CFPB") recent nonbinding guidance, *Truth in Lending (Regulation Z); Nonapplication to Earned Wage Access Products*, 90 Fed. Reg. 60069, 60071 (Dec. 23, 2025) ("Advisory Opinion"), in support of its credit argument. Cleo's reliance is misplaced for at least three independent reasons.

52

**First**, the Advisory Opinion "has no legally binding effect" on its face and cannot supplant this Court's independent judgment. *See* 90 Fed. Reg. at 60076. As the Supreme Court recently explained, "agencies have no special competence in resolving statutory ambiguities. Courts do." *Loper Bright*, 603 U.S. at 400–01. And "[c]ourts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences." *Id.* at 403. As shown above, application of "traditional tools of statutory construction" compels the conclusion that Cash Advances are credit. *Id.*

**Second**, the products addressed in the Advisory Opinion are dispositively different than Cash Advance. The Advisory Opinion addressed "Covered EWA" products, for which providers give workers access to no more than the "accrued cash value of the[ir] wages" based on the provider's review of "payroll data." 90 Fed. Reg. at 60071. Further, "Covered EWA" entails repayment through "a payroll process deduction in connection with the worker's next payroll event," and never from the "consumer's regular transaction accounts after the payment of wages into that account." *See id.*

53

Cash Advance is plainly not a "Covered EWA" product as defined by the Advisory Opinion. Cleo does not provide access to the "accrued cash value" of earned wages, access payroll data, or collect repayment through payroll deductions. There is no record support for the proposition that Cash Advances even provide access to "earned wages." According to SSgt. Moss's allegations *and* Cleo's terms, Cleo determines eligibility based on prior Cash Advance repayment history, spending habits, and overall financial health as gleaned from bank account "transaction and deposit history and patterns." ER-54, 136–38. And Cleo's terms of service confirm that Cash Advance "offers the ability to apply for cash advances based on your *anticipated* income," not *earned* income. ER-54, 128–29 (emphasis added). Finally, repayment is not collected from a payroll deduction, but instead from the "consumer's regular transaction accounts after the payment of wages into that account." *See* 90 Fed. Reg. at 60071; ER-55.

**Third**, under the Advisory Opinion's logic, Cash Advance's structure demonstrates the advances *are* credit. The Advisory Opinion noted that "the defining element of 'credit' is a consumer's repayment—at some point in the future—of the amount owed." 90 Fed. Reg. at 60072.

54

This "defining element" is lacking for Covered EWA products—borrowers "make[] no deferred payment" since wages accessed are repaid through payroll process deductions and "never touch the consumer's regular transaction account." *Id.* Unlike the products addressed by the Advisory Opinion, Cash Advance retains the "defining element of 'credit'": "a consumer's repayment—at some point in the future—of the amount owed." *See id.* Accordingly, the Advisory Opinion supports the conclusion that Cleo Cash Advances are credit.

## B.    SSgt. Moss pleads facts that demonstrate Express Fees are "finance charges"

SSgt. Moss plausibly alleges Express Fees are "finance charges," and thus constitute "interest" under the MLA. Cleo's arguments to the contrary have been rejected by every court to consider them. Those arguments rely on a stilted reading of the MLA and its implementing regulations, rely on "facts" outside the Complaint, and ignore allegations SSgt. Moss pleads in his Complaint. As the district court correctly determined, SSgt. Moss plausibly stated a claim that Cleo's Express Fees constitute "finance charges," and its decision should be affirmed.

As discussed above, credit agreements are covered by the MLA if they are subject to a finance charge. Regulation Z defines "finance

55

charge" as "the cost of consumer credit as a dollar amount" which includes "*any charge* payable…by the consumer and imposed…by the creditor as an *incident to or a condition of* the extension of credit." 12 C.F.R. § 1026.4(a) (emphases added); *accord* 15 U.S.C. § 1605(a). As the Supreme Court explained, the term "incident to" "implies some *necessary* connection between the antecedent and its object," but "does not make clear whether a substantial (as opposed to remote) connection is required." *Pfennig*, 541 U.S. at 241 (emphasis in original).[12]

Cleo's Express Fees fall comfortably within this definition. Servicemembers must pay an Express Fee to receive the advertised version of Cash Advance (*i.e.*, cash "instantly," "within minutes," "today," and "at lightning speed"). *See* ER-130–31. No one pays an Express Fee without taking a Cash Advance. Without a Cash Advance, there is nothing to disburse on an "express" basis. Thus, the fee necessarily arises only in connection with a cash advance—at minimum, it is "incident to" the extension of credit. Every court to consider analogous fees in the

---

[12] When TILA was enacted, "incident" was defined as simply "anything which is usually connected with another, or connected for some purposes, though not inseparably." *Incident*, BLACK'S LAW DICTIONARY (4th ed. 1968).

context of payday cash advances reached this commonsense conclusion. *See, e.g.*, *Orubo*, 780 F. Supp. 3d at 937–38; *Johnson*, 2025 WL 2299425, at *8–9 (similar); *Golubiewski*, 2025 WL 2484192, at *6; *Vickery*, 2025 WL 2841686, at *6–7; *Revell, LLC*, 2025 WL 3167318, at *10–12; *Russell*, 2025 WL 3691977, at *8; *Burrison*, 2026 WL 444638, at *7.

That Cleo offers advances that it disburses at a later date for no fee does not sever this connection. Consistent with the Supreme Court's explication that "incident to" implies only a "necessary connection" to the extension of consumer credit, the Federal Reserve Board promulgated a rule in 1996 explaining that "optional charges" may be considered part of the finance charge. Taking debt-cancellation agreements as an example, the FRB explained that "the voluntary nature of the arrangement does not alter the fact that debt cancellation coverage is a feature of the loan affecting the total price paid for the credit." Truth in Lending, 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996). So, "even though a lender may not require a particular loan feature, the feature may become a term of the credit if it is included." *Id.* And "when it is included for an additional charge (either paid separately at closing or paid in the form of a higher interest rate or points), that amount represents part of the finance

57

charge, even though less costly loans may be available without that feature." *Id.* Those principles apply with equal force to other "optional" fees charged for certain credit-related rights, such as "variable-rate loans [with] a[ paid] option to convert the loan to a fixed interest rate" and "premiums for voluntary credit insurance." *Id.*

Cleo briefly argues that the use of the word "imposed" in the regulation means only mandatory fees may be considered finance charges. That reads the regulation out of context. Finance charge means "the sum of all charges, *payable* directly or indirectly by the person to whom credit is extended, and *imposed* directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. 1605(a) (emphasis added). It thus establishes a counterpoint: the fee is *payable* by the borrower and *imposed* (*i.e.*, charged) by the lender. *See United States v. Olander*, 572 F.3d 764, 768 (9th Cir. 2009) (in interpreting statutes, courts must "consider 'the language itself, the *specific context in which that language is used*, and the broader context of the statute as a whole'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)) (emphasis added)).

58

This is the natural reading of the word in context. The Federal Reserve Board explained that when a loan is structured with an optional feature, the fee for that feature "is one that has been imposed as an incident to that particular transaction." 61 Fed. Reg. 49237-02, 49240. Even more on the nose, Cleo cites several state statutes that use the word "imposed" to describe charges for optional expedite fees. AOB at 39 n.3. These statutes require EWA providers to offer consumers an advance "at no cost[.]" *E.g.*, Ark. Code Ann. § 23-52-203(b)(4).[13] When the consumer elects the expedited option, however, then he or she must pay "a charge *imposed by* a provider for delivery or expedited delivery of proceeds [.]" *Id.* at § 23-52-202(7)(A) (emphasis added).[14] To say that a cable provider does not "impose" a charge for HBO Max because a consumer could have avoided imposition of the charge by choosing the basic package would be nonsensical—and Cleo's argument is no different.

The conclusion that optional fees may have a necessary connection with a transaction is bolstered by cases construing the term "incidental

---

[13] *See also* Kan. Stat. Ann. § 9-2405; S.C. Code Ann. § 39-5-840; Utah Code Ann. § 13-78-101.

[14] *See also* Kan. Stat. Ann. § 9-2402; S.C. Code Ann. § 39-5-820; Utah Code Ann. § 13-78-101.

to" a debt in the context of the Fair Debt Collection Practices Act and analogous state laws. Courts interpreting these laws have held fees a borrower voluntarily pays for making loan payments online or over the phone are "incidental" to the debt, and thus prohibited, even though the fees are optional. *Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 377 n.2 (4th Cir. 2022) ("[W]e have a hard time seeing how the convenience fee is not incidental to the debt. Without the mortgage payment, there is of course no convenience fee."); *Glover v. Ocwen Loan Servicing, LLC*, 127 F.4th 1278, 1290 n.13 (11th Cir. 2025) (similar); *Lembeck v. Arvest Cent. Mortg. Co.,* 498 F. Supp. 3d 1134, 1136 (N.D. Cal. 2020) ("The only plausible reading of the word 'incidental' in this context is as a reference to something that is connected to but far less significant than the underlying debt. That describes the [Pay-to-Pay] fee well.").

1. **Nothing in Cleo's citations to distinguishable and non-binding regulatory guidance and caselaw support its argument that SSgt. Moss fails to plead Express Fees are finance charges.**

The CFPB's Advisory Opinion does not support Cleo's argument. As a factual matter, the Advisory Opinion's assumption that "consumers can receive exactly the same service without paying the fee" is flatly contradicted by the allegations in this case. 90 Fed. Reg. at 60075. SSgt.

60

Moss alleges Cleo offers a payday advance service that provides "same-day access to funds," which it markets with phrases such as "get up to $250 instantly," "quick access to funds," and "Most [advances] arrive within minutes[.]" ER-4 (internal quotation marks omitted). Cleo imposes an unavoidable fee for *that* service. *Id.* Providing immediate disbursement of funds that must be paid within 14 calendar days is not "exactly the same service" as providing those funds 3–4 *business days* later. So, even if the Advisory Opinion—which "has no legally binding effect, including on persons or entities outside the Federal government"— were entitled to any deference under *Loper Bright*, it does not address the facts SSgt. Moss pleaded in his Complaint, which the district court found stated a plausible claim to relief under Rule 12(b)(6).

Cleo relies on *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996). There, the Veales refinanced their home with a $361,800.00 loan from Citibank. *Id.* at 578. As part of the transaction, the Veales accepted Citibank's offer to mail payoff checks to their other mortgagees for a "$21.00 Federal Express charge." *Id.* at 578–79. The plaintiffs claimed the FedEx fee was a finance charge. The Eleventh Circuit disagreed. *Id.*

61

As an initial matter, *Veale* wrongly assumed that only a fee "required by" the lender could be considered "incident to the extension of credit." *Id.* at 579. That restrictive interpretation does not survive *Pfennig*, where the Supreme Court clarified that "incident to" requires only a "connection" with the extension of credit. 541 U.S. at 241; *see also Vickery*, 2025 WL 2841686, at *7 ("[*Veale*] assumed 'incident to' requires the fee be a necessary condition of the extension of credit, but *Pfennig* [] rejected that assumption."). Relevant here, if "incident to" means "required by," that would render superfluous the disjunctive in the "finance charge" definition, which encompasses fees charged "as an incident to *or* a condition of an extension of credit." 12 C.F.R. § 1026.4(a) (emphasis added). "A condition of" equates to "required by." If "incident to" *also* equates to "required by," its inclusion is superfluous.

That aside, *Veale* is distinguishable—the FedEx fee differs materially from Cleo's Express Fees. The disbursement date of the Citibank loan was set—providing the Veales immediate use of those funds—regardless of whether they mailed the payoff checks to the other mortgagees themselves or, instead, reimbursed Citibank to do so for them. Notably, there was no evidence Citibank retained any portion of

62

the FedEx fee. *See* 12 C.F.R. 226.4(a)(1)(iii) (finance charge would include "the portion retained" by the creditor). Thus, the FedEx fee "did not relate to Citibank's own extension of credit but rather the plaintiffs' repayment to other creditors," whereas Cleo's Express Fee "is a condition of Plaintiff['s] receipt of instant credit from" Cleo. *See Vickery*, 2025 WL 2841686, at *7; *accord Russell*, 2025 WL 3691977, at *8.

## 2. Cleo's defense that Express Fees fall within a statutory exception is legally unsupported and procedurally improper.

The district court properly disregarded Cleo's argument that Express Fees "are payable in comparable cash transactions" and are therefore not finance charges. 12 C.F.R. § 1026.4(a). Cleo supported this argument entirely with matters outside the Complaint. The district court would have committed reversible error had it granted Cleo relief. Even if Cleo had properly supported its motion, its argument fails on its merits. This is because the purported "comparable cash transactions" Cleo identifies are neither "comparable" nor "cash transactions."

*First*, Cleo's arguments were procedurally improper under Rule 12(b)(6). Without any support, its counsel nakedly asserted in briefing that "banks frequently charge fees to expedite settlement of check

63

*deposits*," not even cash advances. ER-107. And without attempting to lay a foundation or filing a request for judicial notice, Cleo's counsel cited an unauthenticated Venmo website to argue that "digital wallets offer expedited withdrawals" for a fee. ER-107. Cleo provided no basis for the district court to consider its defense. It is hardly "remarkabl[e]" that the district court ignored counsel's unsupported factual assertions. AOB at 48.

*Second*, in Cleo's own words, "the appropriate test to determine whether a charge qualifies for the exclusion involves comparing charges with those payable in a similar cash transaction by the seller of the property or service." ER-109 (citing 12 C.F.R. pt. 1026, Supp. I, ¶ 4(a) Official Interpretation) (cleaned up); *see also Huertas v. Foulke Mgmt. Corp.*, No. 20-3443, 2021 WL 5755081, at *2 (3d Cir. Dec. 3, 2021) (finding the exclusion applied where "the processing fees were charged by the dealership in every transaction, whether the purchase of the vehicle was financed by credit or paid for with cash"); *Alston v. Crown Auto, Inc.*, 224 F.3d 332, 334 (4th Cir. 2000) (similar); *Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322, 327 (6th Cir. 2001) (holding TILA "require[s] sellers to

64

disclose as 'finance charges' fees payable by credit customers, but not by cash customers, in comparable transactions").

So, the exception applies where the *same* creditor applies the *same* fee to cash customers and credit customers. Even if unknown banks and Venmo—or any company that is not Cleo—were offering "comparable cash transactions" to Cleo's Cash Advance, that would not implicate the exception. Cleo has identified no "comparable" cash transactions it offers to which the fee applies, much less comparable transactions with similar fees for "cash" and "non-cash" customers. This is unsurprising since the comparable cash transaction exclusion paradigmatically applies to fees that are identical in transactions paid for in *cash or credit*. 12 C.F.R. pt. 1026, Supp. I, ¶ 4(a). That paradigm is foreign to payday cash advances, which are pure credit transactions.[15] Thus, at the motion-to-dismiss stage, Cleo's arguments fail as a matter of law.[16]

---

[15] The exception is meant for instances where consumers are purchasing goods, which they might pay for in cash and they might purchase on credit. Cleo inherently cannot have cash customers, because the service they provide is providing cash.

[16] Because Express Fees clearly constitute finance charges—and therefore the MLA is implicated—it is irrelevant to this appeal whether Subscription Fees are also finance charges. The district court was correct that subscription charges must be included as interest under the MLA,

## CONCLUSION

The MLA plainly prohibits the enforcement of any agreement to arbitrate a dispute involving the extension of consumer credit to a covered member. The district court correctly concluded SSgt. Moss pleaded facts sufficient to show such a dispute exists here. The district court lacked authority to compel the parties' dispute to arbitration. And because the FAA does not apply, this Court lacks jurisdiction over the appeal. SSgt. Moss therefore respectfully requests the Court dismiss this appeal for lack of jurisdiction or, alternatively, affirm the district court's Order.

---

which defines "interest" broadly to "include[] all cost elements associated with the extension of credit, including fees, service charges . . . and any other charge or premium with respect to the extension of consumer credit." *Id.* at § 987(i)(3). The MLA's implementing regulation requires that "charges for the MAPR shall include" "[f]inance charges," as defined by Regulation Z, as well as "[a]ny fee imposed for participation in any plan or arrangement for consumer credit," "even if that charge would be excluded from the finance charge under Regulation Z." 32 C.F.R. § 232.4(c)(iii)(C) & (c)(iv). Subscription fees that must be paid to take a loan fit that definition and thus must be included in the calculation of interest for purposes of the MLA.

66

Dated: March 4, 2026         Respectfully submitted,

*/s/ Lee Lowther*
Randall K. Pulliam
Lee Lowther
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
(501) 312-8500
rpulliam@cbplaw.com
llowther@cbplaw.com

Joshua Jacobson
Jacob L. Phillips
JACOBSON PHILLIPS PLLC
2277 Lee Road, Suite B
Winter Park, Florida 32789
(321) 447-6461
joshua@jacobsonphillips.com
jacob@jacobsonphillips.com

*Counsel for Plaintiff-Appellee*

67

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-5856

I am the attorney or self-represented party.

**This brief contains** 13,516 **words, including** 0 **words** manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [              ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Lee Lowther    **Date** March 4, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 25-5856

The undersigned attorney or self-represented party states the following:

○ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◉ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

> The following appeals may present issues similar to the issues presented in this case:
>
> Vickery v. Empower Finance, Inc., No. 25-6377
> Revell v. Grant Money, LLC, No. 25-7035
> Russell v. Dave, Inc., No. 26-12

**Signature** | /s/ Lee Lowther  **Date** | Mar 4, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17** *New 12/01/2018*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 4, 2026, I caused the foregoing brief to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit via the ACMS system and that service on all counsel of record will be accomplished by the ACMS system.

*/s/ Lee Lowther*
Lee Lowther