**No. 25-5856**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

TERRANCE MOSS, individually, on behalf of all others similarly situated, and on behalf of the general public,

*Plaintiff-Appellee,*

– v. –

CLEO AI INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Washington
No. 2:25-cv-00879-MLP

## BRIEF OF AMICI CURIAE MILITARY AND VETERANS SERVICE ORGANIZATIONS IN SUPPORT OF PLAINTIFF AND AFFIRMANCE

Seth E. Mermin
David S. Nahmias
Iman Eslami
CENTER FOR CONSUMER LAW & ECONOMIC JUSTICE
UC BERKELEY LAW
305 Berkeley Law
Berkeley, CA 94720-7200
tmermin@law.berkeley.edu
(510) 643-3519

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 26.1(a), the undersigned counsel states that the amici curiae have no parent corporations, and no publicly held corporation owns 10% or more of their stock.

Dated: March 11, 2026

*/s/ Seth E. Mermin*
Seth E. Mermin

*Counsel for Amici Curiae*

i

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF CONTENTS ........................................................ ii

TABLE OF AUTHORITIES ....................................................iv

INTERESTS OF AMICI CURIAE .............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .....................................2

BACKGROUND..................................................................5

    I.     HIGH-COST LENDING JEOPARDIZES MILITARY READINESS. ........................................................5

    II.    THE PAYDAY LOAN INDUSTRY HAS LONG TARGETED SERVICEMEMBERS AND THEIR FAMILIES. ........................................................8

    III.   EXHAUSTIVE EVIDENCE GATHERED BY THE DEPARTMENT OF DEFENSE SPURRED THE ENACTMENT OF THE MILITARY LENDING ACT.....................10

    IV.   THE MLA CODIFIED THE DEFENSE DEPARTMENT'S RECOMMENDATIONS AND ESTABLISHED ESSENTIAL SAFEGUARDS PROTECTING SERVICEMEMBERS FROM HIGH-COST LENDERS....................12

        A.     The MLA Requires Apples-To-Apples Disclosure Of The Total Cost of Credit. .............................13

        B.     Congress Capped The Total Cost Of Credit At 36 Percent. ..............................................15

        C.     Congress Established Judicially Enforceable Remedies To Preserve Servicemembers' Legal Rights..................................................16

ARGUMENT ..................................................................18

    I.     PAYDAY CASH ADVANCE IS PRECISELY THE KIND OF PRODUCT THE MLA IS INTENDED TO ADDRESS. ............19

        A.     Cleo Extends "Consumer Credit" Within The Meaning Of The MLA..................................20

B.      Payday Cash Advance Products Closely Resemble Earlier Predatory High-Cost Loans To Military Families. ...................................................22

II.      PAYDAY CASH ADVANCE VIOLATES THE MLA........................25

III.    BECAUSE THE MLA SUPERSEDES THE FAA, PLAINTIFFS' CLAIMS CANNOT BE COMPELLED TO ARBITRATION....................................................................28

CONCLUSION ...........................................................................32

CERTIFICATE OF SERVICE..................................................33

CERTIFICATE OF COMPLIANCE.........................................34

APPENDIX ................................................................................35

iii

# TABLE OF AUTHORITIES

## CASES

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ....................................................................................28

*Arrington v. Colleen, Inc.*,
2001 WL 34117735 (D. Md. Mar. 29, 2001) ...............................................21

*Avery v. TEKsystems, Inc.*,
165 F.4th 1219 (9th Cir. 2026) ...................................................................31

*Bostock v. Clayton Cty.*,
590 U.S. 644 (2020) .....................................................................................31

*Burnett v. Ala Moana Pawn Shop*,
3 F.3d 1261 (9th Cir. 1993) .........................................................................22

*Burrison v. FloatMe, Corp.*,
2026 WL 444638 (D. Mass. Feb. 17, 2026)....................................21, 27, 28

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024) .....................................................................................31

*CompuCredit Corp. v. Greenwood*,
565 U.S. 95 (2012) .................................................................................28, 29

*Cox v. Cmty. Loans of Am., Inc.*,
625 F. App'x 453 (11th Cir. 2015) ...............................................................17

*Cty. of Maui v. Hawaii Wildlife Fund*,
590 U.S. 165 (2020) .....................................................................................19

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) .....................................................................................29

*Espin v. Citibank, N.A.*,
126 F.4th 1010 (4th Cir. 2025) ....................................................................29

*Golden Pisces, Inc. v. Fred Wahl Marine Const., Inc.*,
495 F.3d 1078 (9th Cir. 2007) ...............................................................26

*Goldman v. Weinberger*,
475 U.S. 503 (1986) ...............................................................................18

*Hamilton v. York*,
987 F. Supp. 953 (E.D. Ky. 1997) ..........................................................21

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002) .................................................................................30

*Johnson v. Activehours, Inc.*,
2025 WL 2299425 (D. Md. Aug. 8, 2025) ...............................................21

*Merritt v. Countrywide Fin. Corp.*,
759 F.3d 1023 (9th Cir. 2014) ................................................................19

*Moss v. Cleo AI, Inc.*,
799 F. Supp. 3d 1152 (W.D. Wash. 2025) ...............................................27

*Mourning v. Family Publ'ns Serv., Inc.*,
411 U.S. 356 (1973) ...................................................................14, 20, 21

*New Prime Inc. v. Oliveira*,
586 U.S. 105 (2019) ................................................................................30

*Orubo v. Activehours, Inc.*,
780 F. Supp. 3d 927 (N.D. Cal. 2025).....................................................21

*Rent-a-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010) .................................................................................31

*Revell v. Grant Money, LLC*,
808 F. Supp. 3d 1036 (N.D. Cal. 2025)...............................................21, 27

*Russell v. Dave Inc.*,
2025 WL 3691977 (C.D. Cal. Dec. 12, 2025) ......................................21, 27

*Shearson/Am. Exp., Inc. v. McMahon*,
  482 U.S. 220  (1987) ...........................................................................29

*Steines v. Westgate Palace, LLC*,
  113 F.4th 1335 (11th Cir. 2024) ...........................................29, 30

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
  444 U.S. 11 (1979) ...............................................................................16

*Turner v. E-Z Check Cashing, Inc.*,
  35 F. Supp. 2d 1042 (M.D. Tenn. 1999)..............................................21

*Vickery v. Empower Fin., Inc.*,
  2025 WL 2841686 (N.D. Cal. Oct. 7, 2025)...........................21, 27

## STATUTES

10 U.S.C. § 987 ..................................................................................passim

15 U.S.C. § 1226 ............................................................................................29

15 U.S.C. § 1601 ............................................................................................13

15 U.S.C. § 1605 ....................................................................................14, 26

15 U.S.C. § 1606 ............................................................................................14

15 U.S.C. § 1639 ............................................................................................29

7 U.S.C. § 26 ....................................................................................................29

Pub. L. No. 109-163, 119 Stat. 3136, 3276 (2006) ...................................10

Pub. L. No. 109-364, 120 Stat. 2083 (2006) ..........................................3

## RULES

Fed. R. App. P. 29(a) ....................................................................................1

## REGULATIONS

12 C.F.R. § 1026..................................................................13, 14, 20

32 C.F.R. § 232.6..............................................................................15

34 C.F.R. § 232.4..............................................................................16

## LEGISLATIVE MATERIALS

*Hearing before the House Comm. on Pensions, Investments, &*
*Financial Servs.*, 2025 Leg., 89th Sess. (Tex. Mar. 24, 2025).....................24

## CONGRESSIONAL AND EXECUTIVE AUTHORITIES

169 Cong. Rec. S5999 (daily ed. Dec. 14, 2023) ......................................3

*A Review of the Department of Defense's Report on Predatory Lending*
*Practices Directed at Members of the Armed Forces and Their*
*Dependents*, Hearing Before the Sen. Comm. on Banking, Hous.
& Urban Affairs, 109th Cong. 1 (2006)................................................passim

Cong. Rsch. Serv., No. R46983, *Military Families and*
*Financial Readiness* (2022) ...........................................................7

Off. of the Comptroller of the Currency, *Comptroller's Handbook:*
*Consumer Compliance, Military Lending Act* (May 2018) .........................16

U.S. Dep't of Army, Reg. 600-15,
Indebtedness Of Military Personnel (1986).................................................6

U.S. Dep't of Def., DOD Instruction 1342.22:
Military Family Readiness (2021) ................................................6

U.S. Dep't of Def., DOD Instruction No. 1344.09:
Indebtedness of Military Personnel (2022)...............................................6, 7

U.S. Dep't of Def., *Report on Predatory Lending Practices Directed*
*at Members of the Armed Forces and Their Dependents* (2006)...........passim

U.S. Dep't of Def., *Report on the Military Lending Act and the Effects of High Interest Rates on Readiness* (2021).................................................4, 7

**OTHER AUTHORITIES**

Buddin, Richard & D. Phuong Do, RAND Corp., *Assessing the Personal Financial Problems of Junior Enlisted Personnel* (2002)..............9

Carrell, Scott & Jonathan Zinman, *In Harm's Way? Payday Loan Access and Military Personnel Performance*, 27 Rev. Fin. Studies 2805 (2014).................................................................6, 7

*Cash Advance App vs Personal Loans*, Cleo........................................................26

*Cleo Cash Advance*, Cleo ...............................................................18, 20, 22

*Duty Stations & Deployment*, Today's Military ......................................................8

Gordley, Brianna & Ann Baddour, Texas Appleseed, *Skimming Fees from Texans' Paychecks* (2025)............................................23

Graves, Steven M. & Christopher L. Peterson, *Predatory Lending and the Military: The Law and Geography of "Payday" Loans in Military Towns*, 66 Oh. S. L.J. 653 (2005).......................................7, 8, 9, 23

Harris, G.L.A.*Charlatans on the Move: How Predatory Lenders Fleece Military Personnel*, 13 Public Integrity 353 (2011) ...........................5

Kantwill, Paul & Christopher L. Peterson, *American Usury Law and the Military Lending Act*, 31 Loyola Consumer L. Rev. 498 (2019) ............10

Navy Fed. Credit Union, Credit Card Application Disclosure...............................25

PenFed Credit Union, Power Cash Rewards Visa Card..........................................25

*Rates and Fees*, USAA.........................................................................25

Saunders, Mike, *Service Members and Veterans: Beware of Paycheck Advance Apps and Easy "Credit,"* Military.com (Mar. 23, 2021)................23

Tripoli, Steve & Amy Mix, Nat'l Consumer L. Ctr., *In Harm's Way—At Home: Consumer Scams and the Direct Targeting of America's Military and Veterans* (2003) ...............................................................8, 9, 24

## **INTERESTS OF AMICI CURIAE**[1]

Amici curiae are two nonprofit organizations that represent the interests of U.S. military servicemembers, veterans, and their spouses and dependents. Amici provide programming and other resources focused on financial wellness and career advancement to millions of individuals across the armed forces each year. Those efforts include protecting military families from unfair or predatory lending practices, counseling them on financial planning and responsibility, and ensuring their overall economic wellbeing. As nonprofits serving the military, amici have an interest in guaranteeing that the Military Lending Act (MLA) remains effective and enforceable, including as applied to novel high-cost lending products like the app-based cash advance products at issue in this case. The high fees charged for these predatory loans eat into servicemembers' paychecks, negatively impacting their readiness to fulfill mission-critical activities. Removing Appellant's products from the aegis of the MLA would undermine both the mission of amici and the preparedness of the nation's armed forces.

Individual statements of interest of the amici are in the Appendix.

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than amici curiae, their members, and their counsel made a monetary contribution to the preparation or submission of this brief. Fed. R. App. P. 29(a). All parties have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Predatory lenders are blatantly targeting our military personnel, undermining their financial stability and tarnishing their service records. This practice not only creates financial problems for individual soldiers and their families, but also weakens our military's operational readiness.*

Statement of Senator Elizabeth Dole (R-N.C.) before the Senate Committee on Banking, Housing & Urban Affairs (Sept. 14, 2006).[2]

Over twenty years ago, Congress, urged on by the U.S. Department of Defense (DoD), took bold steps to safeguard the financial health and mission readiness of our nation's men and women in uniform. Payday lenders surrounding military bases nationwide hawked easy access to credit to young servicemembers and their families—for a price. Those loans regularly included interest rates surpassing 450 percent, piled on additional mandatory fees, and forced servicemembers to waive their right to litigate disputes in court. These lenders specifically targeted members of the armed forces because they were generally young, received steady but modest paychecks that might not cover unexpected expenses, and, critically, had to adhere to strict military codes of conduct requiring careful management of their financial affairs. At the behest of Congress, the

---

[2] *A Review of the Department of Defense's Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, 109th Cong. 1 (2006), https://perma.cc/D5RP-H2M9 [hereafter *Predatory Lending Hearing*].

Department of Defense published a landmark report in 2006 identifying and decrying widespread abusive lending practices affecting servicemembers' creditworthiness, security clearances, and preparedness for mission-critical activities.[3] The Department concluded that "predatory lending undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all-volunteer fighting force," and made specific recommendations to combat the problem.[4]

Congress answered the Department's call by adopting the Military Lending Act. Pub. L. No. 109-364, § 670, 120 Stat. 2083, 2266 (2006), *enacted at* 10 U.S.C. § 987. The law is bold and sweeping. It adopts a total cost-of-credit framework for all active-duty servicemembers and their families which mandates disclosure of all fees, caps annualized interest rate at 36 percent, and creates safeguards for legal recourse through a private right of action and a ban on arbitration for claims involving consumer credit.

The MLA has been notably successful in curbing predatory lending practices that target our troops.[5] Yet new schemes continue to emerge that attempt to

---

[3] DoD, *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (2006), https://perma.cc/A5ZY-4TWX [hereinafter DoD Report].

[4] *Id*. at 9, 53.

[5] *See, e.g.*, 169 Cong. Rec. S5999–6000 (daily ed. Dec. 14, 2023) (statement of Sen. Reed) (celebrating the MLA's "successful track record"); DoD, *Report on the*

circumvent the law's protections. App-based payday cash advance products are just the latest twist on the kind of predatory, usurious loans that Senator Dole denounced twenty years ago. Put plainly, Cleo offers the same kind of product, targets the same population—our uniformed troops—and causes the same harms to financial stability and military readiness that lawmakers prohibited with the MLA.

Cleo's products plainly violate the MLA. They fail to disclose or include all fees in their total cost of credit; their effective cost exceeds the categorical 36-percent ceiling; and they require servicemembers to arbitrate their claims. Accordingly, the lending contracts are subject to the Act's decisive and effective remedy: they are null and void. No servicemember can be bound by them.

Furthermore, because the contracts' arbitration clauses are unenforceable, plaintiffs cannot be compelled to arbitrate their claims. The text of the MLA evinces Congress's unequivocal intention to override the Federal Arbitration Act (FAA). It is irrelevant that Cleo delegated the arbitrability of this dispute to a private arbitrator, since the question whether the FAA applies at all is at issue. That question is for the judiciary to decide, as the district court correctly recognized.

---

*Military Lending Act and the Effects of High Interest Rates on Readiness* 7 (2021), https://perma.cc/H4M9-S6RJ [hereafter DoD 2021 Report] (finding that "the MLA . . . appears to be effective in deterring unfair credit practices").

Congress enacted the MLA based on the Pentagon's professional judgment that high-cost lending puts America's military readiness at risk. Whether made online or in a storefront, payday loans are payday loans—and that's what Cleo's products are. They are, and must remain, subject to the robust protections that Congress enacted to protect our national security.

The district court's decision should be affirmed.

## BACKGROUND

Congress passed the MLA to address the threat to military readiness posed by predatory lending practices. Servicemembers face a variety of demographic, social, and administrative circumstances that leave them particularly vulnerable to the harms of high-cost debts.[6] This financial instability in America's military not only harms servicemembers' readiness to serve—compromising their ability to perform specialized duties, rendering them non-deployable, or necessitating administrative separation—but also puts the nation's security at risk.

## I.  HIGH-COST LENDING JEOPARDIZES MILITARY READINESS.

The Department of Defense has long recognized that the economic stability of military families is a cornerstone of an effective military. The Pentagon has determined that financial readiness—defined as "[t]he state in which successful

---

[6] *See, e.g.*, G.L.A. Harris, *Charlatans on the Move: How Predatory Lenders Fleece Military Personnel*, 13 Public Integrity 353, 355-60 (2011)

management of personal financial responsibility supports a Service member's ability to perform their wartime responsibilities"—is a crucial aspect of military operational readiness.[7] As a component of military readiness, the armed forces have long required servicemembers to keep their finances in order.[8] Financial insecurity weakens servicemembers' ability to serve effectively and can jeopardize national security by undermining military readiness. Financial distress has been shown to distract servicemembers from their duties, increase disciplinary and job performance issues, and contribute to attrition.[9] Servicemembers can face disciplinary action—potentially including separation from the armed forces—for their indebtedness, since military policy requires them to pay their debts.[10]

Financial insecurity poses particular risks to the sensitive activities involved in protecting our national security. Onerous loans can burden servicemembers with

---

[7] DoD, DOD Instruction No. 1344.09: Indebtedness of Military Personnel 3 (2022), https://perma.cc/V977-YLVG; DoD, DOD Instruction 1342.22: Military Family Readiness 53 (2021); https://perma.cc/29M8-M2NG.

[8] *See, e.g.*, U.S. Dep't of Army, *Reg. 600-15, Indebtedness Of Military Personnel* § 1-5a (1986), https://perma.cc/KPK9-VCD3 ("Soldiers are required to manage their personal affairs satisfactorily and pay their debts promptly. Failure to do so damages their credit reputation and affects the Army's public image").

[9] *See* DoD Report at 39-43 (collecting case studies); *see* Scott Carrell & Jonathan Zinman, *In Harm's Way? Payday Loan Access and Military Personnel Performance*, 27 Rev. Fin. Studies 2805, 2830 (2014) (finding that access to high-cost payday loans causes "a significant decline in overall job performance" among military personnel and "a concomitant decline in retention").

[10] *Supra* note 7; DoD Report at 10, 40-43.

unmanageable and inescapable debt, which in turn jeopardizes their security clearances—security clearances that are often required for their continued service.[11] A poor credit history—or worse, a default—can thus threaten a servicemember's career.[12] In 2014, the Department estimated that 80 percent of security clearance revocations and nearly 5,000 separations each year were due to financial difficulties.[13] Indeed, the rise in predatory practices aimed at servicemembers was linked to a 1,600 percent increase in security-clearance revocations and denials for Navy and Marine Corps personnel.[14]

The nature of military life can leave members of the military especially prone to deceptive and aggressive tactics by unscrupulous lenders. For example, servicemembers are relatively young and disproportionately come from financially challenged backgrounds.[15] Military life requires frequent moves, leaving servicemembers geographically dislocated from civilian and familial support

---

[11] DoD 2021 Report at 15; DoD Report at 39-43.

[12] DoD, DOD Instruction 1344.09, at 3-4; *see* Carrell & Zinman, *supra* note 9.

[13] Cong. Rsch. Serv., No. R46983, *Military Families and Financial Readiness* 1 (2022), https://perma.cc/YWY6-Z4H5.

[14] DoD Report at 86–87 (statement of Capt. Mark D. Patton, U.S. Navy).

[15] *See, e.g.*, *Predatory Lending Hearing* (statement of Lynn Drysdale); Steven M. Graves & Christopher L. Peterson, *Predatory Lending and the Military: The Law and Geography of "Payday" Loans in Military Towns*, 66 Oh. S. L.J. 653, 675-78 (2005).

networks.[16] Servicemembers must typically relocate every few years based on military need and deploy overseas for months at a time for combat, peacekeeping, or training missions.[17] Consequently, they may face unexpected moving costs, abrupt fluctuations in household income due to spousal unemployment or job changes, and the need to borrow money to cover expenses.[18]

Safeguarding the military's readiness to fulfill its mission is paramount. The MLA serves to shield our armed forces from fraud that can jeopardize our national security.

## II.    THE PAYDAY LOAN INDUSTRY HAS LONG TARGETED SERVICEMEMBERS AND THEIR FAMILIES.

For decades, the payday loan industry has aimed to exploit servicemembers. By the early 2000s, evidence had mounted that payday and other high-cost lenders were "heavily concentrated" around military bases and aggressively marketing to enlisted personnel.[19] For example, in 2005 there were four times as many payday lenders per capita near the McChord Air Force Base and Fort Lewis than in the rest

---

[16] *Id.* at 681–85.

[17] *See Duty Stations & Deployment*, Today's Military, https://perma.cc/45DS-7QLG.

[18] Graves & Peterson, *supra* note 15, at 681-85; Steve Tripoli & Amy Mix, Nat'l Consumer L. Ctr., *In Harm's Way—At Home: Consumer Scams and the Direct Targeting of America's Military and* Veterans 14-15 (2003), https://perma.cc/N4ZW-LGMR.

[19] DoD Report at 10; Graves & Peterson, *supra* note 15, at 659, 832.

of Washington state.[20] These businesses, clustered near base entrances, constructed "Venus fly trap[s]" for military personnel in their marketing campaigns.[21] One detailed study mapped the location of nearly 15,000 storefront payday lenders in twenty states, illustrating "an environment in which service members are literally surrounded by lenders clamoring to charge annual interest rates averaging 450%."[22] Online lenders regularly posted digital ads that used official seals and individuals in uniform to promote their loans.[23] Military pay was especially attractive to payday lenders because it provided "guaranteed continued income."[24] Plus, immediate access to cash was compelling for the lowest-ranking troops whose salaries might not cover emergency expenses.[25]

The problem had become particularly acute by the mid-2000s, with increased numbers of servicemembers falling victim to predatory schemes and needing emergency help to escape high-cost debts.[26] In 2006, for example, the

---

[20] DoD Report at 11.

[21] *Predatory Lending Hearing* (statement of Ret. Adm. Charles S. Abbot).

[22] Graves & Peterson, *supra* note 15, at 832.

[23] DoD Report at 63–64.

[24] *Id.* at 4.

[25] *See* Tripoli & Mix, *supra* note 18, at 8, 10-11.

[26] *See* Richard Buddin & D. Phuong Do, RAND Corp., *Assessing the Personal Financial Problems of Junior Enlisted Personnel* 51 (2002) (finding, prior to the MLA's enactment, that servicemembers were twice as likely as civilians to experience financial pressure from creditors).

Navy-Marine Corps Relief Society—one of several Service-related non-profit organizations that provide emergency financial relief to military families—provided more than $1.37 million to military members and their families who fell victim to predatory lenders, compared to just $5,000 to nine servicemembers five years earlier.[27]

### III. EXHAUSTIVE EVIDENCE GATHERED BY THE DEPARTMENT OF DEFENSE SPURRED THE ENACTMENT OF THE MILITARY LENDING ACT.

The growing body of evidence underscoring high-cost lending's impact on military readiness drew the attention of senior Pentagon leadership and prompted Congress to act. In May 2006, then-Chief of Naval Operations Admiral Mike Mullen warned that "[a] sailor's financial readiness directly impacts unit readiness and the Navy's ability to accomplish its mission," and expressed concern over "the number of sailors who are taken advantage of by predatory lending practices, the most common of which is the payday loan."[28] The same year, Senator Elizabeth Dole successfully sponsored an amendment to the National Defense Authorization Act requiring the Department of Defense to conduct a comprehensive study of the effects of predatory lending on servicemembers and their families. Pub. L. No. 109-163, § 579, 119 Stat. 3136, 3276 (2006). Congress's directive marked a

---

[27] Paul Kantwill & Christopher L. Peterson, *American Usury Law and the Military Lending Act*, 31 Loyola Consumer L. Rev. 498, 507-08 (2019).

[28] *Id.* at 509.

turning point: for the first time, predatory lending was formally recognized as a matter affecting military readiness.

The DoD's ensuing report documented lenders' explicit targeting of military communities with payday loans in ways that eerily mirror Cleo's cash advance scheme today. *See infra* pp. 19-24. Predatory lenders, the Department explained, "attempt to work outside of established usury limits, either by obtaining exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws" and "obfuscat[ing] the comparative cost" of credit.[29] Rather than resolving short-term financial needs, payday loans "strip[ped] earnings or savings from the borrower," left them "in worse financial shape than" before, and "trap[ped] the borrower in a cycle of debt."[30] The Department reported that nearly twenty percent of servicemembers were payday borrowers, and that payday lending cost military families over $80 million in fees every year.[31] Often unable to repay the loans, military families stood to "los[e] essential transportation [like cars] and key family assets."[32] The consequence was "enormous debt, family problems, [and] difficulty maintaining personal readiness."[33] The report also called out pre-

---

[29] DoD Report at 4.

[30] *Id.* at 3.

[31] *Id.* at 12.

[32] *Id.* at 16.

[33] *Id.* at 39.

11

dispute waivers of rights like mandatory arbitration clauses that "eliminate[d] a borrowers' right to sue for abusive lending practices."[34] Notably, the report emphasized that "the Federal Arbitration Act limits the ability of state legislatures and regulators to restrict the application of arbitration clauses, therefore limiting their ability to protect consumers in their state."[35]

Based on the substantive evidence gathered, the DoD proposed concrete statutory recommendations to Congress to enhance military readiness by protecting servicemembers from predatory lending practices.[36]

## IV. THE MLA CODIFIED THE DEFENSE DEPARTMENT'S RECOMMENDATIONS AND ESTABLISHED ESSENTIAL SAFEGUARDS PROTECTING SERVICEMEMBERS FROM HIGH-COST LENDERS.

Congress quickly heeded the Pentagon's call to action. In 2006, a bipartisan coalition passed, and President George W. Bush signed, the MLA to shield active-duty servicemembers and their families from high-cost, short-term credit products—like Cleo's cash advance product—that inflict financial harm and directly impair the fitness of the Nation's armed forces. 10 U.S.C. § 987. During the debate over the Act, lawmakers echoed the Department's concerns about

---

[34] *Id.* at 14, 51 (noting that in adhesive lending contracts, waiver is not a matter of 'choice'").

[35] *Id.* at 21.

[36] *Id.* at 50-52.

12

"service members falling into a cycle of debt whether through inappropriate use of credit cards, payday loans, or other forms of credit."[37] As Alabama Senator Richard Shelby, the chairman of the Senate Committee on Banking, Housing, and Urban Affairs, explained, "[A]s long as certain unscrupulous lenders continue to employ predatory practices, our servicemen and women suffer and the toll on our readiness will increase."[38]

The law followed the Pentagon's recommendations in several crucial ways.

### A. The MLA Requires Apples-To-Apples Disclosure Of The Total Cost of Credit.

Urged by the Defense Department to close loopholes that had permitted high-cost lenders to advertise low nominal rates while charging triple-digit effective APR,[39] Congress mandated in the MLA that all servicemembers receive clear, standardized disclosures of the full cost of credit extended. 10 U.S.C. § 987(c). The MLA built upon the framework established by the Truth in Lending Act (TILA) and Regulation Z, which together ensure "a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available." 15 U.S.C. § 1601(a); *see* 10 U.S.C. § 987(c)(2); 12 C.F.R. § 1026. TILA's central innovation is use of the Annual Percentage Rate (APR), a

---

[37] *Predatory Lending Hearing* (statement of Sen. Johnson).

[38] *Id.* (statement of Sen. Shelby).

[39] *See* DoD Report at 13-14, 50.

calculation established by statute and regulation that is designed to permit consumers to "make the best informed decision" about credit products. *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 364 (1973); *see* 15 U.S.C. § 1606; 12 C.F.R. § 1026.14. APR encompasses all "finance charge[s]," 15 U.S.C. § 1606(a), including interest and other service fees, that are "incident to the extension of credit," *id.* § 1605(a).

In the MLA, Congress created a bespoke Military Annual Percentage Rate (MAPR) that is founded on the traditional APR formula and can be calculated for any form of credit extended to active-duty servicemembers and their dependents. 10 U.S.C. § 987(b). The Pentagon's report to Congress called for transparency to help servicemembers and their families evaluate the true cost of borrowing, recommending that "all fees, charges, insurance premiums and ancillary products sold with any extension of credit" be included in computing the APR for loans to servicemembers.[40]

Whenever consumer credit is extended to servicemembers, the MLA's all-in pricing requirements apply—a response to the Department's finding that many high-cost loans targeting servicemembers "pack excessive charges into the product" to "obfuscate" its total cost.[41] Like TILA's APR, the MAPR expresses the

---

[40] DoD Report at 6.

[41] *Id.* at 4.

total cost of credit as an annualized rate. But Congress went further: to prevent evasion, it defined "interest" and MAPR expansively to include all cost elements associated with the extension of credit, including fees, service charges, credit-related ancillary products, and other add-ons commonly used to disguise interest. 10 U.S.C. § 987(i)(3)–(4). And the Act and its interpretive regulations issued by the Department require that creditors provide both oral and written disclosures of the applicable interest rate and the borrower's payment obligations before issuing credit. *Id.* § 987(c)(1); 32 C.F.R. § 232.6(a), (d).

## B.  Congress Capped The Total Cost Of Credit At 36 Percent.

In addition, Congress imposed a firm MAPR ceiling of 36 percent—inclusive of all fees—in response to the Department's recommendation to cap the cost of credit provided to military borrowers at that exact rate. 10 U.S.C. § 987(b).[42] The Pentagon concluded that a firm, unambiguous cap was necessary given the impact of loans carrying triple-digit annual rates on "military readiness and troop morale."[43] By incorporating fees and ancillary products into the MAPR calculation, Congress ensured that lenders could not evade the cap through creative loan structuring.

---

[42] *Id.* at 6–7 (calling for a 36 percent rate cap).

[43] *Id.*; *see id.* at 10 (describing payday lending rates of 390–780% APR).

The MAPR's additional provisions ensure that creditors do not have incentives to evade the interest rate cap by shifting fees that are part of the cost of the credit product to other fee categories.[44] The most common types of charges—application fees and participation fees—were later specifically noted in MLA regulations as charges that generally must be included in the MAPR, even though they would not be included in the APR under Regulation Z.[45]

## C.     Congress Established Judicially Enforceable Remedies To Preserve Servicemembers' Legal Rights.

Finally, Congress paired the substantive prohibitions of the MLA with powerful remedies: any credit agreement that violates the MLA is void ab initio and may be challenged in court. 10 U.S.C. § 987(f)(3). The Act also authorizes servicemembers and their families to seek monetary damages, punitive damages, equitable relief, and attorney's fees. *Id.* § 987(f)(5). By voiding unlawful agreements and allowing for damages recovery, Congress signaled its intent to allow servicemembers the ability to unwind predatory debt contracts and restore their financial stability. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) (holding when Congress declares "that certain contracts are void, it

---

[44] Off. of the Comptroller of the Currency, *Comptroller's Handbook: Consumer Compliance, Military Lending Act* 3–4 (May 2018), https://perma.cc/N8AF-JK8Z.

[45] *Id.* The Department's implementing regulations clarify that the MAPR must include certain additional fees and charges including "any fee for a credit-related ancillary product sold in connection with the credit transaction." 34 C.F.R. § 232.4(c)(1)(ii).

16

intend[s] that the customary legal incidents of voidness would follow" including suits for rescission, injunction, and restitution); *Cox v. Cmty. Loans of Am., Inc.*, 625 F. App'x 453, 457-58 (11th Cir. 2015) (applying *Transamerica* to the MLA). These remedies reflect Congress's determination that, as the Department found, "clear enforceable limitations" are the best way to prevent predatory lending to servicemembers.[46]

The drafters of the MLA further adopted the Pentagon's recommendation that servicemembers must be able to access the courts for legal recourse and not be required to waive their rights through binding arbitration clauses.[47] The MLA flatly outlaws the provision of consumer credit to a servicemember or dependent if the creditor requires arbitration of disputes. 10 U.S.C. § 987(e)(3). Congress reinforced that mandate by rendering unenforceable any agreement to arbitrate a dispute with a covered servicemember that involves the extension of consumer credit. *Id.* § 987(f)(4).

\* \* \*

By enacting the MLA, Congress made clear that protecting servicemembers from predatory financial products was a matter of national security. Congress worked from the Pentagon's blueprint with detailed proscriptions and a firm

---

[46] DoD Report at 52.

[47] *Id.* at 51.

17

exhortation to rein in predatory lending practices. The MLA reflects Congress's unequivocal judgment, based on the military's own expertise, that targeting servicemembers with high-cost loans undermines the fitness of our troops, subverts military readiness, and warrants categorical prohibition.

## **ARGUMENT**

When Congress passed the MLA to protect servicemembers and their families against predatory lenders, it had payday cash advance products squarely in its sights. Congress's determination, based on DoD recommendations, that national security is served by affording servicemembers special protections against unscrupulous lenders merits significant deference. *See Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) (stating that courts defer to the Department's "professional judgment" on military matters).

Cleo's cash advance products epitomize the type of predatory high-cost loans that the Defense Department warned against and that Congress had in mind when it passed the MLA. Cleo markets its products as "no interest," "free" and with no mandatory fees. [48] *See also* App. Br. at 8-10. Accordingly, Defendant argues, it should not have to abide by the strictures of the MLA. App. Br. at 16-17. But the undisputed structure of the product mirrors the short-term, fee-funded

---

[48] *Cleo Cash Advance*, Cleo https://web.meetcleo.com/cash-advance (advertising "No interest" for a "Cash advance of up to $250).

18

credit Congress sought to regulate in the MLA: funds are advanced before payday, repayment is tied to incoming wages, and revenue is generated through charges imposed in connection with access to and delivery of those funds.[49] Crediting Defendant's arguments would contravene Congress's clear intent to broadly and robustly protect servicemembers and their families against all types of high cost loans that undercut financial wellbeing and military readiness. *See Cty. of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165, 180 (2020) (prohibiting statutory constructions that "open a loophole allowing easy evasion of the statutory provision's basic purposes").

## I. PAYDAY CASH ADVANCE IS PRECISELY THE KIND OF PRODUCT THE MLA IS INTENDED TO ADDRESS.

The protections of the MLA apply to all forms of consumer credit with exorbitant interest rates, obscure fees, and arbitration agreements, including those offered by Defendant. It is disingenuous to try to carve out Cleo's products from the ambit of such a "broadly remedial consumer-protection statute." *Merritt v. Countrywide Fin. Corp.*, 759 F.3d 1023, 1040 (9th Cir. 2014) (interpreting TILA, upon which the MLA is largely based).

---

[49] *Compare* DoD Report at 4, 10 (describing payday lending), *with* App Br. at 8-10.

### A. Cleo Extends "Consumer Credit" Within The Meaning Of The MLA.

Cleo's cash advance products epitomize the functional structure of short-term "consumer credit," precisely what the MLA regulates. *See* 10 U.S.C. § 987(a). Cleo provides funds to consumers in advance of payday, structures repayment through access to consumers' financial accounts, and conditions continued access to its platform on the payment of fees. App. Br. at 8-9. While Cleo claims its products have "no interest,"[50] the substance of its offering still constitutes "consumer credit" within TILA—and, by extension, the MLA. *See Mourning*, 411 U.S. at 365-66 (stating that Congress intended for TILA to apply where creditors "attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish"). The MLA incorporates TILA's definition of "consumer credit." 10 U.S.C. § 987(i)(6). And "credit," under Regulation Z, has been construed to include cash advances provided in exchange for the consumer's authorization to debit their deposit account. 12 C.F.R. § 1026.2 cmt. 2(a)(14) *Credit* ¶ 2 ("Payday loans; deferred presentment"). Courts applying Regulation Z have held that payday cash advance products like Cleo's constitute "credit" because they advance funds in exchange for authorization to debit a borrower's account on a future payday. *See, e.g.*, *Orubo v. Activehours, Inc.*, 780 F.

---

[50] *See Cleo Cash Advance*, *supra* note 48.

Supp. 3d 927, 936 (N.D. Cal. 2025); *Johnson v. Activehours, Inc.*, 2025 WL

2299425, at *9 (D. Md. Aug. 8, 2025). That conclusion accords with decades of

precedent holding that deferred-presentment and payday-style transactions, where

cash is advanced today in exchange for a promise of repayment plus fees at a later

date, are extensions of credit. *See, e.g.*, *Turner v. E-Z Check Cashing, Inc.*, 35 F.

Supp. 2d 1042, 1047-48 (M.D. Tenn. 1999); *Hamilton v. York*, 987 F. Supp. 953,

958 (E.D. Ky. 1997); *Arrington v. Colleen, Inc.*, 2001 WL 34117735, at *3-5 (D.

Md. Mar. 29, 2001). Courts have applied that logic to similarly hold that app-based

payday loans like these fall within the MLA. *See, e.g.*, *Burrison v. FloatMe, Corp.*,

2026 WL 444638, at *6-7 (D. Mass. Feb. 17, 2026); *Russell v. Dave Inc.*, 2025 WL

3691977, at *8 (C.D. Cal. Dec. 12, 2025); *Revell v. Grant Money, LLC*, 808 F.

Supp. 3d 1036, 1049-52 (N.D. Cal. 2025); *Vickery v. Empower Fin., Inc.*, 2025 WL

2841686, at *5 (N.D. Cal. Oct. 7, 2025).

Cleo's products constitute consumer credit under any reasonable

interpretation of the MLA. Like TILA, the MLA defines "consumer credit" broadly

to effectuate its remedial purpose and capture all forms of credit, including

products that might not have existed at the time of the law's enactment. *Cf.*

*Mourning*, 411 U.S. at 365 (finding that "Congress determined to lay the structure

of [TILA] broadly" to "deal not only with the myriad forms in which credit

transactions then occurred, but also with those which would be devised in the

future"); *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993) (holding that courts must liberally construe TILA to protect consumers and "look[] past the form of the transactions to their economic substance").

Cleo's product entails the extension of funds with required, deferred repayment—a classic hallmark of consumer credit. Cleo advances funds to users "to cover their expenses until their next payday."[51] These advances typically range from $20 to $100 for first time users; repeat advances may reach $250.[52]  To access the cash advance, users must select a repayment date tied to their next payday or shortly thereafter.[53] Cleo then prompts users to authorize automatic repayment and attempts multiple debits if the first attempt fails. Those features all resemble the payday loans that Congress intended to address when it enacted the MLA. *See supra* pp. 12-17.

### B.     Payday Cash Advance Products Closely Resemble Earlier Predatory High-Cost Loans To Military Families.

Further, the methods by which payday cash advance apps are marketed to servicemembers are a near carbon-copy of those employed by the payday lenders that motivated Congress to enact the MLA. Efforts to distinguish Appellants' products from traditional payday loans therefore ring hollow. Payday cash advance

---

[51] *Cleo Cash Advance*, *supra* note 48 ("How does a cash advance work?").

[52] *Id.*

[53] *Id.*

is structured nearly identically to the ordinary payday and internet loans that the Pentagon warned about in its 2006 report with many of the same characteristics: total cost of credit reaching triple-digit on an annualized basis, short loan terms, excessive fees, and mandatory arbitration clauses.[54] Much like those high-cost lenders, payday cash apps provide short-term liquidity in advance of a borrower's next paycheck and rely on repayment from incoming wages.[55] And much like those lenders, they incorrectly insist that the total cost of their products cannot be calculated as an APR.[56] Payday cash advance companies also target military families as a significant customer base—much as the well-documented payday lenders setting up shop outside military bases did in the mid-2000's.[57] Today at

---

[54] *See* DoD Report at 13-16; Graves & Peterson, *supra* note 15, at 660-64.

[55] DoD Report at 4.

[56] Graves & Peterson, *supra* note 15, at 661-62 (noting that "[p]ayday lenders argue that quoting an annual percentage rate for a two-week loan is misleading and unhelpful").

[57] *See* DoD Report at 4, 22; Briana Gordley & Ann Baddour, Texas Appleseed, *Skimming Fees from Texans' Paychecks* 8 (2025), https://perma.cc/GQG2-UQHM; Mike Saunders, *Service Members and Veterans: Beware of Paycheck Advance Apps and Easy "Credit,"* Military.com (Mar. 23, 2021), https://perma.cc/EA4B-W9CS ("Service members and veterans need to be wary of new forms of credit-like products that have popped up in recent years, especially 'paycheck advance' products"); *supra* pp. 8-10.

least one company offering similar cash advance products has noted publicly that the top users of their product include active-duty military members.[58]

Payday cash advance companies rely on many of the same falsehoods as traditional payday lenders did to underscore the supposed necessity of their products to members of the military and to disguise the products' true nature. Decades ago, creditors preyed on servicemembers' fears that, unless they sought payday loans to quickly pay off debts, they could end up in a debt spiral that could have significant repercussions for their military service—even though taking on such a loan might have precisely that effect.[59]

Similarly, today the industry warns that applying the MLA to cash advance products would deprive servicemembers of a vehicle for short-term liquidity. *See* Br. of Am. Fintech Council at 4, 28-29. But those fears are unwarranted. Several military-focused financial institutions offer transparent, regulated alternatives at substantially lower cost than app-based cash advance products. For example, USAA's Rate Advantage Visa Platinum permits cash advances at variable APRs between 10.40% and 24.40%, with a 5% fee that may be waived for certain

---

[58] *Hearing before the House Comm. on Pensions, Investments, & Financial Servs.*, 2025 Leg., 89th Sess. (Tex. Mar. 24, 2025) (testimony of Ben LaRocco, Senior Director, Government Relations, EarnIn) https://house.texas.gov/videos/21407, at 2:51:00-:09.

[59] Tripoli & Mix, *supra* note 18, at 12-14.

transfers.[60] Pentagon Federal Credit Union's Power Cash Rewards Visa offers cash advances with no separate advance fee at a 17.99% APR.[61] Navy Federal Credit Union's Platinum card allows branch or ATM advances up to 18% APR.[62] The claim that capping the APR for cash advance products for servicemembers will make short-term credit unavailable is thus wholly specious.

## II. PAYDAY CASH ADVANCE VIOLATES THE MLA.

Because payday cash advances constitute consumer credit extended to covered servicemembers, the MLA's substantive protections attach to the products when they are extended to active-duty servicemembers.[63] *See* 10 U.S.C. § 987(a), (i)(6). Under a plain reading of the statute, Appellants' products violate the MLA because the (1) the subscription and express fees associated with Cleo's cash advance are covered finance charges that must be calculated into the full cost of credit; (2) the products' MAPR exceeds the 36 percent statutory cap; and (3) the products require users to submit to arbitration as a condition of receiving credit.

---

[60] *Rates and* Fees, USAA, https://tinyurl.com/3y3nwbey.

[61] PenFed Credit Union, Power Cash Rewards Visa Card, https://tinyurl.com/2dfypb8s.

[62] Navy Fed. Credit Union, Credit Card Application Disclosure, https://tinyurl.com/mv2ertbr.

[63] Although the MLA excludes residential mortgage transactions and certain vehicle-secured credit, 10 U.S.C. § 987(i)(6), those exclusions do not apply to the products in this case.

The contracts are thus void, *see id.* § 987(f)(3), meaning that it is as if they never existed. *Golden Pisces, Inc. v. Fred Wahl Marine Const., Inc.*, 495 F.3d 1078, 1081 (9th Cir. 2007) (explaining that "a void contract is 'not a contract at all'" (quoting Restatement (Second), *Contracts* § 7 cmt. a (1981))).

1.      Much like traditional payday loans, after aggregating all the charges imposed on servicemembers to repay app-based payday cash advances, the total cost of credit exceeds the MAPR rate cap and therefore violates the MLA. Cleo imposes both "express fees" and "subscription fees" to obscure the true MAPR associated with its products, but those charges must be included in the full cost calculation. Cleo markets its product as a source of emergency funds, making speedy disbursement a defining feature.[64] Because users seeking immediate liquidity must pay the Express Fee, those charges are imposed in connection with, and thus incident to, the extension of credit. *See* 10 U.S.C. § 987(c)(1)(B); 15 U.S.C. § 1605(a) (defining finance charges under TILA). Access to Cleo's advances also requires payment of a monthly subscription fee ranging from $5.99 to $14.99.[65] Users may receive funds either through a standard delivery option

---

[64] *Cash Advance App vs Personal Loans*, Cleo, https://web.meetcleo.com/cash-advance/cash-advance-vs-personal-loans ("A cash advance app is . . . the perfect loan alternative for meeting your short-term financial needs, like covering unexpected expenses or bridging the gap until payday.").

[65] *Cleo Cash Advance*, *supra* note 48 ("What about Fees?").

26

(three to four business days) or an expedited option, with an "express fee," delivering funds "in minutes."[66] As the district court properly concluded, fees charged in connection with the timing, receipt, or availability of advances, such as "express," "expedite," or subscription fees, are finance charges—even if they are ostensibly presented as optional. *Moss v. Cleo AI, Inc.*, 799 F. Supp. 3d 1152, 1160-61 (W.D. Wash. 2025); *accord Burrison*, 2026 WL 444638, at *7; *Russell*, 2025 WL 3691977, at *8; *Revell*, 808 F. Supp at 1051-52; *Vickery*, 2025 WL 2841686, at *7.

**2.** In addition, summing Cleo's fees associated with accessing payday cash advances results in exorbitant costs well in excess of the MLA's statutory 36 percent rate cap. The products therefore violate that provision of the statute as well. *See* 10 U.S.C. § 987(b). A $20 advance accompanied by a $3.99 Express Fee over 27 days yields an effective APR of 270%. A $40 advance with a $6.99 Express Fee over 14 days yields an APR of 456%. Plus, those figures exclude the subscription fee; including it, as the MLA requires, further increases the effective annualized cost. Such pricing structures mirror the "pack[ing]" of fees the Pentagon warned against in 2006.[67]

---

[66] *Id.*

[67] DoD Report at 4.

**3.** Finally, the mere existence of a binding arbitration clause in the contracts renders them void. *See* 10 U.S.C. § 987(e)(3), (f)(4). Even if consumers can opt out of arbitration, *see* App. Br. at 27-30, the fact that the contract contains an arbitration agreement means that it cannot be enforced against servicemembers like Plaintiffs, 10 U.S.C. § 987(f)(3); *Burrison*, 2026 WL 444638, at *3.

Because Cleo's cash advance products are a form of consumer credit, impose fees incident to that credit, and are offered to servicemembers who do not fall within any statutory exception, the company's credit agreements, including any arbitration provisions, are void.

## III. BECAUSE THE MLA SUPERSEDES THE FAA, PLAINTIFFS' CLAIMS CANNOT BE COMPELLED TO ARBITRATION.

Since Cleo's cash advance products fall within the ambit of the MLA, the servicemembers' claims also cannot be forced into arbitration. The general provisions of the Federal Arbitration Act (FAA) must cede to Congress's specific intention to protect servicemembers against high-cost lenders who would them of their access to a judicial forum.

The FAA's mandate that "courts must rigorously enforce arbitration agreements," *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013), applies unless that mandate has been "overridden by a contrary congressional command." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012). Congress "knows how to override the Arbitration Act when it wishes," *Epic Sys. Corp. v.*

28

*Lewis*, 584 U.S. 497, 514 (2018), and when it does, it acts with "clarity." *Greenwood*, 565 U.S. at 103. Congress has overridden the FAA in other contexts: for example, in prohibiting arbitration of whistleblower complaints against commodities exchanges, 7 U.S.C. § 26, and in certain mortgage-related transactions. 15 U.S.C. § 1639c(e); *see also* 15 U.S.C. § 1226(a) (narrowing the availability of arbitration in motor vehicle franchise contract disputes).

That Congress meant to supersede the FAA when it adopted the MLA is abundantly clear from the statutory text and legislative history. *See Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 227 (1987) (allowing courts to consider these indicia to determine whether the FAA is displaced). As two other circuits have held, "The MLA entirely displaces the FAA." *Steines v. Westgate Palace, LLC*, 113 F.4th 1335, 1343 (11th Cir. 2024) (examining the text and legislative history); *Espin v. Citibank, N.A.*, 126 F.4th 1010, 1019 (4th Cir. 2025). The drafters of the MLA declared that arbitration in the context of the MLA is "unlawful" and voided all contracts containing arbitration clauses. 10 U.S.C. § 987(e)(3), (f)(3); *see Epic*, 584 U.S. at 514 (pointing to that provision of the MLA as an example of statutes that displace the FAA). The MLA's legislative history confirms the point: Congress included the arbitration prohibition "at the specific urging of the Department of Defense" because of the observed harms to military members. *Steines*, 113 F.4th at 1343 (citing DoD Report at 7-8).

Further, the district court correctly determined that it had the authority to resolve this statutory conflict between the MLA and FAA—even though the contract purported to delegate the question of arbitrability to the arbitrator. Whether a delegation clause (itself a species of arbitration agreement subject to the FAA, *New Prime Inc. v. Oliveira*, 586 U.S. 105, 112 (2019)) is triggered in this case is secondary to the first-order question whether the MLA overrides the FAA, *id.* at 110-12 (2019) (requiring the court, not an arbitrator, to decide an "antecedent statutory inquiry" into whether a contract can be subject to the FAA); *see Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (stating that courts determine whether a contract "applies to a particular type of controversy"). Since Plaintiff's claims implicate this threshold question, the court must resolve it first. *See Steines*, 113 F.4th at 1342-43 ("the question of whether the FAA has been overridden by another act of Congress [like the MLA] cannot be delegated to an arbitrator").[68] Appellant's gotcha argument—that Congress did not "clear[ly] and manifest[ly]" bar delegation of arbitrability to an arbitrator, App. Br. at 21 (quoting *Epic*, 584 U.S. at 511)—reads the MLA too narrowly. Congress broadly forbade courts from enforcing arbitration agreements in lending contracts with servicemembers; it

---

[68] Appellant draws a meaningless distinction between *Steines* and this case. App. Br. at 26 n.2. In *Steines*, as here, the parties disputed whether the MLA applied, 113 F.4th at 1345; because the court determined that the MLA overrode the FAA, the delegation clause in the contract could not be triggered, *id.* at 1344-45.

made no arbitrability exception, and thus none can be read into the statute. 10 U.S.C. § 987(f)(4); *see Bostock v. Clayton Cty.*, 590 U.S. 644, 669 (2020) ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule.").

In addition, because Plaintiff challenged the validity of the entire contract, including the arbitration agreement, by alleging that it violated the MLA, the district court "properly ruled on the enforceability of the [a]greement instead of delegating that issue to the arbitrator." *Avery v. TEKsystems, Inc.*, 165 F.4th 1219, 1233 (9th Cir. 2026) (refusing to enforce delegation clause). "Where a challenge applies equally to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Id.* (quoting *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024)); *see also Rent-a-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010). Here, Plaintiff challenges the validity of the whole contract including the arbitration and delegation agreements. Accordingly, the fact that the contract's arbitration clause incorporates the American Arbitration Association's rules, which delegate arbitrability to the arbitrator, *see* App. Br. at 20-21, does not change the fact that the court properly addressed this challenge. *Avery*, 165 F.4th at 1233 (confirming that the court properly determined arbitrability of an agreement that incorporated JAMS Rules, including a delegation clause).

\* \* \*

31

The MLA builds on well-established principles to ensure military readiness, promote national security, and address the unique burdens of military service faced by servicemembers and their families. As Senator Dole observed, "Supporting our service members means more than providing the equipment and training necessary for [warfare] . . . We should also support their livelihood and their families, and predatory lending can seriously harm both."[69] Applying the MLA's strictures to app-based payday cash advance products ensures that Congress's warning does not go unheeded.

## CONCLUSION

The order of the district court denying the motion to compel arbitration should be affirmed.

Dated: March 11, 2026

Respectfully submitted,

*/s/ Seth E. Mermin*
Seth E. Mermin
David S. Nahmias
Iman Eslami
CENTER FOR CONSUMER LAW &
ECONOMIC JUSTICE
UC BERKELEY SCHOOL OF LAW
305 Berkeley Law
Berkeley, CA 94720-7200
tmermin@law.berkeley.edu
(510) 643-3519

*Counsel for Amici Curiae*

---

[69] *Predatory Lending Hearing*.

32

## <u>CERTIFICATE OF SERVICE</u>

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 11, 2026

/s/ Seth E. Mermin
Seth E. Mermin

*Counsel for Amici Curiae*

33

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 9th Cir. R. 32-1 because it contains 6,926 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word. The text is in 14-point Times New Roman type.

Dated: March 11, 2026                                   */s/ Seth E. Mermin*
                                                                    Seth E. Mermin

                                                                    *Counsel for Amici Curiae*

## APPENDIX

**Blue Star Families** was founded in 2009 by military spouses to strengthen and empower military and Veteran families to thrive as they serve. Blue Star Families has 15 chapters across the country and offers a variety of programs that benefit service members, veterans, military spouses, and their families. Each year, 1.5 million military family members around the world benefit from Blue Star Families' programming. In addition, Blue Star Families conducts critical research on the wellbeing of military families, including collecting data on their financial stability. The Military Lending Act is a crucial piece of legislation protecting the interests of military families and the United States of America, and Blue Star Families therefore has a strong interest in protecting it.

The **National Military Family Association** is a nonprofit organization founded in 1969. The National Military Family Association advocates on behalf of service members and their families from all branches, all ranks, and all components of the military, including active duty, National Guard, and Reserve families. It also advocates on behalf of veterans and surviving family of fallen service members. It conducts research into the experiences of military and veteran families and provides a variety of programs for military and veteran families. It is a respected voice on Capitol Hill and with the Departments of Defense and Veterans

Affairs, where it represents the best interests of families who serve. As an expert on the issues facing military families, the National Military Family Association recognizes the importance of preserving the Military Lending Act.

36