No. 25-5856

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

TERRANCE MOSS, individually, on behalf of all others similarly situated, and on behalf of the general public,

*Plaintiff-Appellee*,

v.

CLEO AI INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Washington
No. 2:25-cv-00879-MLP

**BRIEF OF *AMICI CURIAE* CENTER FOR RESPONSIBLE LENDING
AND NATIONAL CONSUMER LAW CENTER
IN SUPPORT OF PLAINTIFF-APPELLEE**

Shennan Kavanagh
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA 02110
skavanagh@nclc.org
(617) 542-8010

Nadine Chabrier
Monica Burks
Katelin Kaiser
CENTER FOR RESPONSIBLE LENDING
302 West Main Street,
Durham, NC 27701
nadine.chabrier@responsiblelending.org
monica.burks@responsiblelending.org
katelin.kaiser@responsiblelending.org
(919) 313-8500

*Counsel for Amici Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, National Consumer Law Center certifies that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock. The Center for Responsible Lending is controlled by the Center for Community Self-Help ("CCSH"), a North Carolina nonprofit corporation. CCSH itself does not have a parent company. In neither case is there any stock interest in these nonprofit corporations.

Dated: March 11, 2026

*/s/ Shennan Kavanagh*
Shennan Kavanagh

*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................ii

INTEREST OF AMICI CURIAE .......................................................................1

INTRODUCTION ............................................................................................3

ARGUMENT .....................................................................................................9

   I.    PAYDAY LOAN APPS OPERATE AS PAYDAY LOANS IN
STRUCTURE, COST, AND CONSUMER IMPACT. ..........................................9

      A.   The Product Design and Business Model of Payday Loan Apps Replicate
Payday Lending.........................................................................................9

      B.   Payday Loan Apps Produce Cycles of Repeat Borrowing and Escalating
Financial Harms. ....................................................................................19

   II.   THE MLA'S TEXT AND REGULATORY HISTORY CONFIRM THAT
PAYDAY LOAN APPS ARE COVERED CONSUMER CREDIT.....................22

CONCLUSION ...............................................................................................26

CERTIFICATE OF SERVICE ........................................................................27

CERTIFICATE OF COMPLIANCE ................................................................28

i

## TABLE OF AUTHORITIES

**Cases**

*Fed. Trade Comm'n v. Cleo AI, Inc.*, No. 1:25-cv-02594-ALC (S.D.N.Y. Mar. 28, 2025). ..................................................................................................16

*Johnson v. Activehours, Inc.*, 2025 WL 2299425 (D. Md. Aug. 8, 2025) ...............18

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ...............................25

*Lowe v. MoneyLion Technologies Inc.*, 2026 WL 654719 (S.D. NY March 9, 2026) ..................................................................................................................19

*Moss v. Klover Holdings*, Inc.,  2026 WL 622653 (N.D. Ill. Mar. 5, 2026) ............19

*Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 936 (N.D. Cal. 2025) .................13

*Revell v. Grant Money*, L.L.C., 2025 WL 3167318 (N.D. Cal. Nov. 5, 2025) ........18

*Vickery v. Empower Fin., Inc.*, 2025 WL 2841686 (N.D. Cal. Oct. 7, 2025). .........18

**Statutes**

10 U.S.C. § 987 .............................................................................. 8, 13, 24
12 C.F.R. § 1005.10(c) ..............................................................................20
12 C.F.R. § 1026.2(a)(14) ............................................................................8
12. C.F.R § 226.2(a)(17).73 .......................................................................28

**Other Authorities**

"What Banks Does Cleo Support?" *Cleo* .............................................................19

Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, Ctr. For Responsible Lending

(Oct. 2024)............................................................................... passim

Christelle Bamona, Lucia Constantine, *Escalating Debt: The Real Impact of Payday Loan Apps Sold as Earned Wage Advances (EWA),* Ctr. For Responsible Lending (Sept. 2025) ................................................................ passim

Ctr. For Responsible Lending, *November 2025 EarnIn Study Shows the Harms of Payday Loan Apps ("EWA")* (Jan. 2026)............................................................22

Ctr. For Responsible Lending, *Survey Summary of Earned Wage Advance and Cash Advance Apps* (Aug. 2023)........................................................................22

Cleo AI Inc., *Terms & Conditions*....................................................................5, 12

Consumer Fin. Prot. Bureau, *Payday Loans and Deposit Advance Products: A White Paper of Initial Data* 6 (2013). ...................................................................16

How does repayment work?" Cleo Cash Advance FAQ ...........................................8

*Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 72 Fed. Reg. 50,204, No. 169 (Aug. 31, 2027) .................. 25, 26, 27

*Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 80 Fed. Reg. 43,560 (July 22, 2015) ........................................ 27, 28

Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, Ctr. Responsible Lending (Apr. 2024).................................................................. passim

Lucia Constantine, Yasmin Farahi, *Down the Drain: Payday Lenders Take $2.4 Billion in Fees from Borrowers in One Year*, Ctr. Responsible Lending (Jan. 2025) ..............................................................................................................10, 11

iii

Marshall Lux and Cherie Chung, *Earned Wage Access: An Innovation in Financial Inclusion?*, M-RCBG Associate Working Paper Series, No. 214 at 16 (June 2023) ..................................................................................................23

Monica Burks, Yasmin Farahi, Andrew Kushner, Katelin Kaiser, *Nickel and Dimed: How Payday Loan Apps Drain Workers' Pay and How to Stop Them*, Ctr. for Responsible Lending (Oct. 2025) ........................................ 6, 12, 21

Nakita Q. Cuttino, *The Rise of "Fringetech": Regulatory Risks in Earned-Wage Access*, 115 Nw. U. L. Rev. 1505 (2021)..................................... 4, 7, 23

Nat'l Consumer La Ctr., *Why Cap Interest Rates at 36%?* (Aug. 21).....................11

Nat'l Consumer Law Ctr., *MoneyLion's Costly "0% APR" "Earned Wage" Payday Loans* (May 2025) ...................................................................... 13, 20

Nat'l Consumer Law Ctr., *Picking Workers' Pockets: Unfair, Deceptive and Abusive Practices by Earned Wage Lenders* (Jan. 2026)................................6, 15

Nat'l Consumer Law Ctr., *The Tricks Cash Advance Apps Use to Coerce Borrowers to "Tip"* (Apr. 2025).............................................................................4

*Oversight of the Department of Defense's Implementation of Limitations on Terms of Consumer Credit Extend to Members of the Armed Forces and Their Dependents*, 110th Cong., at 179 (2007)............................................................26

U.S. Dep't of Def., *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (2006). ...................................................8

## INTEREST OF AMICI CURIAE[1]

Amici curiae are non-profit, public interest, and consumer advocacy organizations with extensive expertise in small-dollar credit markets and consumer lending law. They are dedicated to protecting consumers and the public from exploitative and abusive lending practices. *Amici* submit this brief to provide the Court with factual evidence concerning the similarities in product design, function, and consumer harms between Cleo AI, Inc.'s "Cash Advances," often marketed as "Earned Wage Access," and traditional payday loans. These products function as loans—app-based payday loans. Payday Loan Apps ("PLAs") operate as a financial technology iteration of the same high-cost, short-term lending model long associated with storefront payday lenders.

Drawing on their research and expertise, *Amici* explain how the structure and operation of these app-based payday loans, including associated fees, fit squarely within the definitions of credit under the Military Lending Act, based on the statute's text, its implementing regulations, and regulatory guidance. *Amici* also document the consumer harms associated with these loans and the public interest in protecting borrowers, particularly active-duty servicemembers and their eligible dependents,

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than *amici* and their counsel has made a monetary contribution to this brief's preparation and submission. Fed. R. App. P. 29(a)(4)(E). Both parties consented to the filing of this brief.

1

from high-cost, harmful cycles of debt. *Amici* offer this perspective to assist the Court in understanding how these products function in practice and how their design aligns with longstanding forms of high-cost, predatory lending regulated under federal law. Additional information about each amicus is provided below.

The Center for Responsible Lending ("CRL") is a non-partisan, non-profit research and policy advocacy organization dedicated to working to promote financial fairness and economic opportunity for all. CRL advocates eliminating abusive practices in the market for consumer financial services and for ensuring that consumers benefit from the full range of consumer protection laws designed to prohibit unfair and deceptive practices by financial services providers. CRL is an affiliate of Self-Help, one of the nation's largest nonprofit community development financial institutions, based in North Carolina, with retail credit union branches in California, Connecticut, Florida, Georgia, Illinois, North Carolina, South Carolina, Virginia, Washington, and Wisconsin.

Since its founding as a nonprofit in 1969, the National Consumer Law Center ("NCLC") has used its expertise in consumer law to work for consumer justice and economic security for low-income and other disadvantaged people in the United States. NCLC's expertise includes policy analysis and advocacy, consumer law, litigation, expert witness services, and training and advice for advocates. NCLC works with nonprofit and legal services organizations, private attorneys,

policymakers, and federal and state government and courts across the nation to stop exploitative practices, help financially stressed families build and retain wealth, and advance economic fairness.

NCLC has long-standing expertise in consumer lending. NCLC publishes a 21-volume consumer law treatise series, including National Consumer Law Center, Consumer Credit Regulation (4th ed. 2025), updated at www.nclc.org/library, which is a 1,248-page treatise providing in-depth explanations of the laws and regulations governing the regulation of credit at the state level. The treatise has sections devoted to so called "earned wage access" loans.

## **INTRODUCTION**

In recent years, financial technology companies, like Cleo AI, Inc. ("Cleo"), have introduced short-term loans direct to consumer through smartphone applications marketed as "Cash Advances" or "Earned Wage Advance."[2] Regardless

---

[2] Cleo AI, Inc. is one of several financial technology companies that make payday loans through smartphone applications, which have been challenged in litigation as unlawful extensions of credit under federal and state law. *Lowe v. MoneyLion Techonologies Inc.*, 2026 WL 622653 (S.D. NY March 9, 2026); *Moss v. Klover Holdings, Inc.*, 2026 WL 622653 (N.D. Ill. Mar. 5, 2026); *Burrison v. FloatMe*, Corp., 2026 WL 444638 (D. Mass. Feb. 17, 2026); *Russell v. Dave Inc.*, 2025 WL 3691977 (C.D. Cal. Dec. 12, 2025); *Revell v. Grant Money, LLC*, 2025 WL 3167318 (N.D. Cal. Nov. 5, 2025); *Vickery v. Empower Finance Inc.*, 2025 WL 2841686 (N.D. Cal. Oct. 7, 2025); *Golubiewski v. Activehours, Inc.*, 2025 WL 2484192 (M.D. Pa. Aug. 28, 2025); *Johnson v. Activehours, Inc.*, 2025 WL 2299425 (D. Md. Aug. 8, 2025); *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927 (N.D. Cal. 2025).

of the labels, these products are loans—app-based payday loans. Research and borrower experiences consistently show that these app-based payday loans replicate the fundamental characteristics of payday loans: small-dollar, short-term advances against a borrower's next paycheck, hidden and substantial fees that produce triple-digit annual percentage rates ("APRs"), and features designed to drive repeat borrowing.[3] Even for fees labeled voluntary or optional, providers structure their products such that nearly all borrowers pay for expedited access and/or subscriptions necessary to use the service as marketed, generating recurring costs and frequent cycles of debt.[4]

Cleo's "Cash Advance" product reflects the same design features, business model, and consumer harm observed across the broader payday loan app industry. Cleo states on its website that its "Cash Advance Service (an Earned Wage Access service) enables you to access advances on your anticipated income (each, a 'Cash

---

[3] Nakita Q. Cuttino, *The Rise of "Fringetech": Regulatory Risks in Earned-Wage Access*, 115 Nw. U. L. Rev. 1505 (2021) (explaining that earned wage access functions as "payday loan 2.0" because they replicate key characteristics of payday loans, including high costs, limited underwriting, credit invisibility, exposing borrowers to similar substantial risks that worsen their health and financial conditions.).

[4] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, Ctr. Responsible Lending (Apr. 2024) (hereinafter "*Not Free*"); Nat'l Consumer Law Ctr., *The Tricks Cash Advance Apps Use to Coerce Borrowers to "Tip"* (Apr. 2025), https://www.nclc.org/resources/the-tricks-cash-advance-apps-use-to-coerce-borrowers-to-tip/.

Advance')."[5] To receive an advance, borrowers must link their bank account and authorize automated repayment on a scheduled future date.

Like other PLA lenders, Cleo generates revenue through fees charged to access these loans. Borrowers must pay a monthly subscription fee of $5.99 or $14.99 to use the product, and may also incur expedite fees ranging from $3.99 to $9.99 for "instant access" to funds (depending on the amount of the advance).[6] Cleo advertises advances of up to $250, but eligibility is determined by Cleo, and most borrowers are offered significantly smaller amounts.

Transaction data confirm these advances operate as high-cost, short-term credit deliberately structured to capitalize on borrowers' immediate cash needs. A CRL analysis of anonymized financial transaction data from Cleo borrowers found an average APR of 652% with an average loan term of 10.3 days.[7] Cleo states that the free version takes three to four business days, while expedited transfers arrive within minutes, creating a strong incentive for borrowers facing cashflow gaps or urgent expenses to pay additional fees. By linking repayment directly to a borrower's bank account, limiting loan size, and charging fees for access, Cleo's "Cash Advance" shares the structural features and consumer harms common across payday

---

[5] Cleo AI Inc., *Terms & Conditions* §7 (Cash Advance Service), https://web.meetcleo.com/page/term-conditions (last updated Dec. 8, 2025).
[6] *Id.*, §6.2 (Subscription Fees for Plus, Pro & Builder).
[7] *Not Free* at 10.

loan apps. As a result, research and data examining the broader PLA market are relevant to evaluating how Cleo's loans function in practice.

PLAs require the borrower to authorize repayment directly from their bank account or link repayment through employer-integrated payroll systems. Fees—including expedited processing charges or monthly subscriptions—are integral to the business model and a condition of accessing the loan.[8] Cleo and app-based lenders also cap loan amounts per transaction, typically between $20 and $200, driving many borrowers to take out multiple loans in quick succession, sometimes on the same day. Each additional loan triggers separate fees, multiplying the financial burden and often creating greater cashflow gaps in the subsequent pay cycle. Research also shows widespread "loan stacking," in which borrowers take loans from different PLA lenders against the same paycheck, further compounding fees and depleting

---

[8] *See* Nat'l Consumer Law Ctr., *Picking Workers' Pockets: Unfair, Deceptive and Abusive Practices by Earned Wage Lenders* (Jan. 2026), https://www.nclc.org/wp-content/uploads/2026/01/2026.01_Report_EWA.pdf. (hereinafter "*Picking Workers' Pockets*") (summarizing data from federal and state enforcement actions demonstrating the business models of DailyPay, EarnIn, Brigit, FloatMe, Dave, and MoneyLion are designed to encourage repeated borrowing to cover shortfalls created by prior loans and that these lenders have employed numerous deceptive, unfair, and abusive practices to prevent borrowers from cancelling loans or subscriptions.); Monica Burks, Yasmin Farahi, Andrew Kushner, Katelin Kaiser, *Nickel and Dimed: How Payday Loan Apps Drain Workers' Pay and How to Stop Them*, Ctr. for Responsible Lending (Oct. 2025) (hereinafter "*Nickel and Dimed*").

borrowers' take-home pay.[9] The structural design features are intentional: encourage frequent reborrowing, maximize lenders' revenue, and extend consumers' exposure to high-cost, short-term credit. Harms extend beyond the price of borrowing. App-based payday loans inhibit borrowers' ability to pay essential bills and increase household difficulties covering mortgage, rent, childcare, and utilities.[10]

Federal consumer protection statutes clearly apply to app-based payday loans. Both the Truth in Lending Act ("TILA") and the Military Lending Act ("MLA") regulate extensions of consumer credit and require lenders to disclose the full cost of borrowing. Congress intended these statutes to promote transparency in lending markets and to protect borrowers from harmful and abusive lending practices. Regulation Z, which implements TILA, defines credit as the right to defer payment of debt or incur debt and defer its payment. 12 C.F.R. § 1026.2(a)(14). App-based payday loans, like those offered by Cleo, operate precisely this way.[11] To receive a loan, borrowers must authorize repayment by a later debit (on the next payday) from their bank account. Finance charges include any charge payable directly or indirectly

---

[9] Christelle Bamona, Lucia Constantine, *Escalating Debt: The Real Impact of Payday Loan Apps Sold as Earned Wage Advances (EWA)*, Ctr. for Responsible Lending (Sept. 2025) (*hereinafter* "*Escalating Debt*").

[10] Cuttino, *The Rise of "Fringetech"*, supra 3 at 1551-1552.

[11] "How does repayment work?," Cleo Cash Advance FAQ, https://web.meetcleo.com/cash-advance (advertising repayment requires "authoriz[ing] auto pay, so we can automatically deduct the outstanding amount back from you.).

by the consumer and imposed directly or indirectly by the creditor, as an incident to or condition of the extension of credit. 12 C.F.R. § 1026.2(a). Fees imposed by Cleo and other PLAs are encompassed by this definition because they are integral to accessing the loan.

The MLA complements and aligns with TILA's protections. Congress enacted the MLA to protect military servicemembers and their families from high-cost, short-term credit, including payday loans, by establishing a 36% APR cap that incorporates all fees and charges.[12] 10 U.S.C. § 987. The Department of Defense's implementing regulations, revised in 2015, expanded the definition of "consumer credit" to encompass all forms of credit subject to a finance charge, consistent with regulation's broader definitions, preventing lenders from evading statutory protections, like usury caps. PLAs, including Cleo's "Cash Advances," meet these statutory definitions, and the fees associated with these loans squarely fall within the MLA's protections.

*Amici* present evidence-based analysis showing that app-based payday loans are neither "innovative" nor "consumer-friendly" products. PLAs offer high-cost loans intentionally structured to drive repeated borrowing, creating cycles of debt that produce long-term financial instability. Examination of consumer transaction

---

[12] U.S. Dep't of Def., *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (2006), https://consumerfed.org/pdfs/140429_DoD_report.pdf.

data and company data disclosed to state Attorneys General demonstrates that these loans generate recurring costs, strain borrowers' ability to cover essential expenses, and produce harms that Congress specifically intended the MLA to prevent. These facts confirm that Cleo's "Cash Advances" are unlawful extensions of credit and support affirming the district court's decision denying Defendant-Appellant Cleo's motion to dismiss.

## ARGUMENT

### I. PAYDAY LOAN APPS OPERATE AS PAYDAY LOANS IN STRUCTURE, COST, AND CONSUMER IMPACT.

#### A. The Product Design and Business Model of Payday Loan Apps Replicate Payday Lending.

Before the rise of PLA, traditional payday lending operated through storefronts or online platforms and relied on a similar short-term, high-cost model. These loans provide borrowers with access to $100 to $500, are typically repaid on the borrower's next payday, and carry fixed fees that result in extremely high annual percentage rates.[13] Repayment is scheduled to coincide with the next payday. If a borrower does not return to the store to pay, the lender initiates repayment by presenting the borrower's personal check or effecting a pre-authorized electronic

---

[13] Lucia Constantine, Yasmin Farahi, *Down the Drain: Payday Lenders Take $2.4 Billion in Fees from Borrowers in One Year*, Ctr. Responsible Lending (Jan. 2025) (hereinafter "*Down the Drain*").

debit of the borrower's bank account.[14]  This structure, requiring repayment of the full principal and fee in a single lump sum or "balloon" payment, often leaves borrowers unable to meet other expenses when the loan comes due, requiring another loan to cover the resulting cash flow short.[15]

When borrowers cannot repay in full, payday loans are frequently rolled over or replaced with new loans, creating cycles of repeat borrowing and escalating fees. Market research has shown that a substantial share of payday loans are taken out within two weeks of prior loan repayment, and many borrowers remain in debt for months due to "the pattern of repeatedly rolling over or consistently re-borrowing, resulting in the consumer incurring a high level of accumulated fees."[16] Because each new advance carries an additional fee, borrowers often pay multiple fees on successive loans even when the amount borrowed remains small, causing the total cost of credit to grow rapidly relative to the principal borrowed. Consistent with this pattern, data shows that 75% of all payday loan fees are generated by borrowers who take out more than 10 loans per year.[17] Thus, illustrating the extent to which payday lenders rely on repeat borrowing to generate profit.

---

[14] Consumer Fin. Prot. Bureau, *Payday Loans and Deposit Advance Products: A White Paper of Initial Data* 6 (2013), https://files.consumerfinance.gov/f/201304_cfpb_payday-dap-whitepaper.pdf.
[15] *Id.*, at 43-44.
[16] *Id.*, at 4, 20-22.
[17] *Down the Drain*, supra 13 at 6.

Consistent with the MLA, many states have adopted measures, such as 36% interest-rate caps, to protect consumers from the harms associated with payday lending.[18] At the same time, the small-dollar credit market has increasingly migrated online and through smartphone applications, with lenders developing digital "storefronts" in borrowers' pockets that replicate the structure, revenue model, and consumer harm of traditional payday loans.[19] The structural features of traditional payday loans—repayment tied to payday, high costs, automatic access to borrowers' bank accounts, and repeat borrowing—have long defined the payday lending model regardless of how the loan is delivered.

Against this backdrop, PLAs are structured as short-term advances offered through a smartphone application and repaid by withdrawing funds in one lump sum "balloon" payment from the borrower's financial account, such as a bank account, on the next payday. Although marketed as early access to "earned wages," these products are simply loans.[20] The lender provides funds before payday and requires repayment of these funds on a future payday. The average advance amounts observed in transaction-level data ranged from approximately $40 to $120

---

[18] Nat'l Consumer La Ctr., *Why Cap Interest Rates at 36%?* (Aug. 21), https://www.nclc.org/wp-content/uploads/2022/09/IB_Why_36.pdf.
[19] *Nickle and Dimed*, *supra* 8 at 4.
[20] Cleo AI Inc., *Terms & Conditions* §7 (Cash Advance Service), https://web.meetcleo.com/page/term-conditions (last updated Dec. 8, 2025).

per transaction, with some lenders allowing higher limits for repeat users.[21]

Repayment is not optional in practice; it is scheduled in advance, as a condition of receiving the loan, and withdrawn automatically through electronic access tied directly to the borrower's financial account. As one court noted, "[i]t is entirely possible that [this] system is in fact *more* effective in guaranteeing repayment than one that depended on pursuing legal debt collection remedies."[22]

**Why APR Matters for Short-Term Credit.** APR is the standardized measure Congress adopted to reflect the full cost of credit, including fees and charges incident to borrowing. APR allows comparison across products regardless of term length. Congress incorporated a 36% Military Annual Percentage Rate cap ("MAPR") in the Military Lending Act, reflecting a policy determination that triple-digit cost credit is harmful even when short-term. 10 U.S.C. § 987(b). For short-term loans, fixed fees represent a larger share of principal and therefore produce especially high APRs. A $10 fee on a $100 advance repaid in two weeks translates to an APR exceeding 260%.[23] APR remains essential to evaluating

---

[21] *Not Free*, *supra* at 3

[22] *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 936 (N.D. Cal. 2025); *See also*, Nat'l Consumer Law Ctr., *MoneyLion's Costly "0% APR" "Earned Wage" Payday Loans* (May 2025), https://www.nclc.org/wp-content/uploads/2025/05/Issue-Brief_MoneyLionEWALoans.pdf (citing data disclosed to the New York Attorney General showing that in most circumstances PLA lender MoneyLion collected on its loans nearly 98% of the time).

[23] *Not Free*, *supra* 4 at 11.

short-term credit. CRL's analysis of PLA loans repaid within 7 to 14 days found an average APR of approximately 383% once expedited fees, tips, and subscriptions are included.[24]

**ACH authorization: Coercive Recourse.** To use PLAs, borrowers must link their bank accounts to receive advances, and lenders obtain authorization to debit the borrower's deposit account on a specified future date, typically the borrower's next paycheck.[25] If sufficient funds are unavailable, lenders initiate repeated ACH withdrawal attempts, which expose borrowers to overdraft fees that often cost approximately $35 per occurrence.[26] This repayment structure closely mirrors payday loans, which likewise rely on automatic debit or postdated repayment on an anticipated payday. The scheduled withdrawal model is intended to ensure that repayment coincides with the borrower's receipt of wages, immediately reducing take-home pay and frequently generating new cashflow gaps, resulting in extremely high rates of reborrowing. Enforcement actions by the District of Columbia, New York, the City of Baltimore, the Federal Trade Commission, and the CFPB confirm that some app-based lenders have employed numerous deceptive and unfair business practices (and likely abusive practices) to prevent borrowers from cancelling. Enforcement actions brought against FloatMe, Dave, and Brigit show

---

[24] *Escalating Debt*, *supra* 9 at 6.
[25] *Not Free, supra* 4 at 6.
[26] *Id*.

that the lenders misled borrowers and imposed unfair barriers that made it difficult to end ACH authorization.[27]

**Repeat Transactions Escalate Fee Extraction.** The PLA business model is designed to create repeat usage and fee extraction, particularly from high-frequency users. High-frequency users accounted for 38% of all borrowers but 86% of all advances.[28] For example, in transaction data from PLA lender EarnIn, 22% of borrowers paid 62% of all expedite fees and tips. This concentration of revenue among repeat borrowers demonstrates that sustained borrowing is not incidental but central to profitability.

**Artificially Low Loan Limits Reinforce Repeated Borrowing.** Individual loan amounts are capped at small amounts, sometimes as low as $20 to $25, yet lenders routinely permit multiple loans in a single day and repeatedly within the same pay period.[29] For example, Cleo offers eligible first-time users a maximum loan of $100 and repeat borrowers up to $250.00; yet the Federal Trade Commission found that "only a minuscule number" of borrowers are offered loans close to the

---

[27] *Picking Workers' Pockets*, *supra* 8 at 22-23 (describing enforcement actions, such as *FTC v Brigit, Inc.,* alleging use of friction and dark patterns designed to thwart canceling subscriptions or stopping recurring charges).

[28] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, Ctr. For Responsible Lending, 8 (Oct. 2024) (hereinafter "*Loan Shark*").

[29] *Id.*

amounts Cleo advertises.[30] This structure effectively forces borrowers who need meaningful sums to take successive loans, each carrying its own fee, thereby incurring successive fees. The artificially low loan limits are designed to increase transaction frequency and maximize fee extraction.

**"Instant Delivery" Charges are a Central Feature of PLA.** Lenders advertise loans as available "in minutes," but immediate funding requires payment of an expedite fee that typically ranges from $0.99 to $25, depending on the loan size.[31] By contrast, the no-fee option requires waiting 24 to 72 hours, rendering the promises of no-cost, "instant access" an empty offer and illusory.[32] Cleo's standard option will result in a longer delay, up to 4 days. Expedite fees are not an optional add-on, but a condition of the price borrowers must pay for timely access to the loan as advertised.

**Subscription Fees are Imposed by Some Lenders, like Cleo, as a Requirement for PLA Use**. Some lenders, like Cleo, charge borrowers a recurring monthly subscription fee as a condition of accessing advances. These fees are imposed regardless of whether a borrower actually receives a loan during that billing period. Because a subscription is a prerequisite to obtaining the loan, it functions as

---

[30] *Fed. Trade Comm'n v. Cleo AI, Inc.*, No. 1:25-cv-02594-ALC, Compl., ECF No. 1, ¶¶ 29–36 (S.D.N.Y. Mar. 28, 2025).

[31] *Loan Shark* at 8.

[32] *See also* current, https://current.com/advance/ (describing current paycheck advance speed of deposit "3 days for free instantly for a fee.).

a charge incident to the extension of credit and increases borrowing costs, even for small loans. The subscription-based model requires borrowers to pay recurring fees merely for the possibility of accessing credit, even when no loan is ultimately provided.

**Banking Fees and Penalties Further Increase Cost Burdens.** Repayment through automatic ACH withdrawal can trigger overdraft fees if funds are insufficient at the time of debit. In a review of transaction data, the average number of overdraft fees increased from 3.0 in the three months before the first advance use to 4.7 in the three months after the first use.[33] In a larger dataset used by CRL, 67% of users who experienced overdrafts saw their overdrafts increase after beginning to use app-based loans.[34] In one documented case, a borrower incurred 58 overdrafts in three months, totaling $1,740 in overdraft fees.[35]

**"Non-Recourse" Does Not Eliminate the Obligation to Repay.** Although Cleo and other PLA lenders label loans as "non-recourse," repayment authorizations are obtained at the time the loan is made, and future access to advances is conditioned on repayment of outstanding balances. Borrowers must repay to avoid repeated debit attempts. In litigation involving PLA lender, Empower, the court similarly rejected the "non-recourse" characterization, holding that

---

[33] *Not Free*, *supra* 4 at 6.
[34] *Loan Shark*, *supra* 27 at 9.
[35] *Id.*

16

repayment authorizations and future product access together created an obligation to repay for the purposes of MLA. *Vickery v. Empower Fin., Inc.*, 2025 WL 2841686 (N.D. Cal. Oct. 7, 2025). Courts across multiple jurisdictions have consistently rejected the argument that the purported non-recourse nature of app-based payday loans precludes a finding that the product is "credit." *Revell v. Grant Money*, L.L.C., 2025 WL 3167318 (N.D. Cal. Nov. 5, 2025) ("Rebranding high interest, short term loans as 'non-recourse' does not obscure the fact that EWAs essentially offer short-term payday loans for customers who cannot afford to wait."); *Johnson v. Activehours, Inc.*, 2025 WL 2299425 (D. Md. Aug. 8, 2025) (same); *Moss v. Klover Holdings*, Inc., 2026 WL 622653 (N.D. Ill. Mar. 5, 2026) (same); *Lowe v. MoneyLion Techonologies Inc.*, 2026 WL 654719 (S.D. NY March 9, 2026) (same). A "non-recourse" label does not alter the repayment mechanics embedded in the design.

PLA lenders characterize repayment authorization as revocable, but in practice, borrowers remain obligated to repay the advance. Cleo's own product design reflects this expectation. Before receiving an advance, borrowers must demonstrate regular income sufficient to cover repayment, link their bank account through Plaid, authorize automatic debit on or around payday for the full advance

17

amount and fees, and remain current on prior advances and subscription charges.[36]
These requirements mirror traditional loan underwriting and confirm that borrowers take on an obligation as part of the transaction.

Although PLA lenders describe repayment as optional, the product design ensures repayment is expected and operationally enforced through automated debits from borrowers' bank accounts or suspending access to additional loans until repayment is made. PLA lenders also impose procedural hurdles on revocation, often requiring notice several business days before the scheduled withdrawal and navigation through multiple in-app steps. For example, company data disclosed to the New York Attorney General in litigation against PLA lender MoneyLion shows that borrowers must "navigate an unintuitive and…complex process across multiple menus" that makes stopping repayment, "needless[ly] difficult," requires three business days' notice, and renders revocation "entirely impossible" for loans with short terms.[37] Some PLA lenders do not guarantee that such efforts will succeed; they only agree to attempt to stop the authorized ACH withdrawal. Consumers have a statutory right to stop payment under 12 C.F.R. § 1005.10(c). Yet automated debit

---

[36] "What Banks Does Cleo Support?," *Cleo,* https://web.meetcleo.com/ (explaining that a borrower's bank account is "linked through Plaid, an API provider.).
[37] Nat'l Consumer Law Ctr., *MoneyLion's Costly "0% APR" "Earned Wage" Payday Loans* (May 2025), https://www.nclc.org/wp-content/uploads/2025/05/Issue-Brief_MoneyLionEWALoans.pdf.

authorization and lender-imposed procedures undermine the effective exercise of that right, making revocation more theoretical than practical.

### B. Payday Loan Apps Produce Cycles of Repeat Borrowing and Escalating Financial Harms.

Research examining transaction-level consumer data demonstrates that payday loan apps do not function as a "pro-consumer solution" with "minimal risks for workers." *See* Br. of Am. Fintech Council at 2, 5. Instead, PLAs produce patterns of repeated borrowing, escalating costs, and financial instability among borrowers, harms long associated with traditional payday lending.

**Borrowers Are Caught in Cycles of Escalating Debt.** Studies tracking borrowers over time show that reliance on these app-based payday loans increases rapidly after initial use. An analysis of anonymized bank-account transaction data conducted by CRL found that borrowers' use of advances doubled in the first year, rising from an average of two loans per month to four.[38] These findings indicate that the loans are not addressing "short-term liquidity" needs, but instead are creating the very cash shortfalls that drive continued borrowing.

Rapid repeat borrowing is the norm, not the exception. CRL's analysis found that nearly 75% of PLA borrowers took out at least one loan on the same day or the day after making a repayment.[39] Nearly 72% of borrowers took out more than one

---

[38] *Nickle and Dimed*, *supra* 8 at 4.
[39] *Id.*

19

loan within a two-week period, and 27% of borrowers took 25 or more loans in a single year, mimicking traditional payday loan rollover cycles.[40]

**Excessive Fees Drive Financial Strain.** In practice, borrowers overwhelmingly pay fees. In an online survey conducted by CRL, 79% of respondents reported paying expedited fees most of the time to receive funds quickly.[41] Similarly, PLA lender EarnIn reported in its own study that 86% of its borrowers paid an expedited transfer fee to receive funds immediately.[42] As one Cleo borrower from a CRL survey explained:

> "I always pay the fee to get it as soon as possible, it's usually not too big of a fee. I forget which app it was but they wanted you to pay for a subscription to the service with no guarantee you'd even get an advance which is ridiculous. I think the fees for the service should be made clear upfront because most of the apps make it seem like everything's free."[43]

**App-Based Loans Are Used to Cover Everyday Expenses.** CRL survey evidence further indicates that borrowers often rely on these loans to cover everyday expenses, including food, transportation, housing costs, and bill and utility payments, rather than unexpected emergencies.[44]

---

[40] *Loan Shark*, *supra* 27 at 7

[41] *Not Free*, *supra* 4 at 3.

[42] Ctr. For Responsible Lending, *November 2025 EarnIn Study Shows the Harms of Payday Loan Apps ("EWA")* (Jan. 2026)
, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-analysis-of-november-2025-earnin-study-jan2026.pdf.

[43] *Not Free*, *supra* 4 at 13.

[44] Ctr. For Responsible Lending, *Survey Summary of Earned Wage Advance and Cash Advance Apps* (Aug. 2023),

These outcomes are reinforced by product design. Some PLA lenders encourage repeated use for recurring expenses by allowing funds to be delivered directly for services like ride-share credits, online retail balances, or bill payments.[45] When one loan is used to cover the shortfall created by repayment of a prior loan, borrowers receive only the initial benefit from the prior loan while continuing to incur charges for each subsequent transaction, again, replicating the payday lending rollover cycle.

**Multiple Repayment Obligations Multiply Risks.** Research also shows that borrowers frequently rely on multiple PLA lenders simultaneously. CRL's transaction-level analysis found that more than half of users borrowed from more than one payday loan app during their first year of use,[46] with some borrowers using as many as eight different PLAs in a single month.[47] The prevalence of "loan stacking," borrowing from multiple PLAs against the same paycheck, increased over time, rising from 16% of borrowers in their first month of use to 42% by the end of

---

https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-ewa-research-factsheet-aug2023.pdf; *See* Cuttino, *The Rise of "Fringetech,*" *supra* 3 at 1510.

[45] Marshall Lux and Cherie Chung, *Earned Wage Access: An Innovation in Financial Inclusion?*, M-RCBG Associate Working Paper Series, No. 214 at 16 (June 2023), https://www.hks.harvard.edu/sites/default/files/centers/mrcbg/214_AWP_final_2.pdf.

[46] *Escalating Debt*, *supra* 9 at 6.

[47] *Loan Shark*, *supra* 27 at 8.

21

the first year.[48] Borrowing across multiple apps multiplies repayment obligations and fees, increasing the likelihood that borrowers will require additional loans to meet routine expenses.

Taken together, the data and borrower experience demonstrate that payday loan apps replicate the same cycle of repeat borrowing, escalating high-costs and fees, and financial instability long associated with the payday lending industry.

## II. THE MLA'S TEXT AND REGULATORY HISTORY CONFIRM THAT PAYDAY LOAN APPS ARE COVERED CONSUMER CREDIT.

Congress granted the DoD the authority to define the scope of credit under the MLA, particularly in 10 U.S.C. § 987(h), which authorizes the Secretary of Defense to "prescribe regulations" to carry out the MLA. Specifically, section 987(h)(2) (D) and (E) requires the DoD to prescribe the:

> (D) definitions of "creditor" under paragraph (5) and "consumer credit" under paragraph (6) of subsection (i), consistent with the provisions of this section, and
>
> (E) Such other criteria or limitations as the Secretary of Defense determines appropriate, consistent with the provisions of this section.

Congress delegated to the Secretary of Defense authority to issue definitions through implementing regulations, guidance, and interpretive rules. An express delegation to create definitions by an agency is situated differently than an

---

[48] *Escalating Debt*, *supra* 9 at 6.

22

interpretation of law by an agency under *Loper Bright*.[49] Implementing regulations were enacted by the DoD in 2007 pursuant to the MLA.[50] Payday loans were identified as a serious problem for servicemembers and a target for the implementing regulations. The DoD considered five products in their regulations,[51] and of the five, only payday loans exhibited all four characteristics of predatory products: lending without regard to borrower's ability to repay, excessive fees and interest, unrealistic payment schedule, and repeated rollover and refinancing.[52] The DoD specifically intended to address debt traps in its regulations:[53]

A major concern of the Department has been the debt trap some forms of credit can present for servicemembers and their families. The combination of little-to-no regard for the borrower's ability to repay the loan, unrealistic payment schedule, high fees, and interest and the opportunity to roll over the loan instead of repaying it, can create a cycle of debt for financially overburdened servicemembers

---

[49] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion. Congress has often enacted such statutes. For example, some statutes 'expressly delegate[ ]' to an agency the authority to give meaning to a particular statutory term.")

[50] *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 72 Fed. Reg. 50,204, No. 169 (Aug. 31, 2027), https://www.federalregister.gov/documents/2007/08/31/07-4264/limitations-on-terms-of-consumer-credit-extended-to-service-members-and-dependents.

[51] These five products are payday loans, rent-to-own, vehicle title, installment loans, and refund anticipation loans. *Id.* at 50,581.

[52] *Id.*

[53] *Id.* at 50,582.

23

and their families.

The DoD also gave consideration to properly tailoring its definitions to ensure credit was available: "Isolating detrimental credit products without impeding the availability of favorable installment loans was of central concern in developing the regulation."[54]

With this in mind, the 2007 original implementing regulations included a detailed description of payday loans:[55]

> *Payday loans*. Closed-end credit with a term of 91 days or fewer in which the amount financed does not exceed $2,000 and the covered borrower:
>
> (A) Receives funds from and incurs interest and/or is charged a fee by a creditor, and contemporaneously with the receipt of funds, provides a check or other payment instrument to the creditor who agrees with the covered borrower not to deposit or present the check or payment instrument for more than one day, or;
>
> (B) Receives funds from and incurs interest and/or is charged a fee by a creditor, and contemporaneously with the receipt of funds, authorizes the creditor to initiate a debit or debits to the covered borrower's deposit account (by electronic fund transfer or remotely created check) after one or more days. This provision does not apply to any right of a depository institution under statute or common law to offset indebtedness against funds on deposit in the event of the covered borrower's delinquency or default.

---

[54] *Oversight of the Department of Defense's Implementation of Limitations on Terms of Consumer Credit Extend to Members of the Armed Forces and Their Dependents*, 110th Cong., at 179 (2007), https://www.govinfo.gov/content/pkg/CHRG-110shrg39440/pdf/CHRG-110shrg39440.pdf.

[55] *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 72 Fed. Reg at 50,594.

24

App-based payday loans fit squarely under this definition, particularly under part (B), as described in Part I of this brief. Most commonly, and in the case of Cleo, a borrower authorizes the lender to debit their bank account, consistent with Part I.

The MLA was amended in 2015 by the DoD to include all types of consumer credit, using a definition that closely aligned with Regulation Z.[56] In other words, credit under the MLA is:

> offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is (i) subject to a finance charge or (ii) payable by a written agreement in more than four installments.

This amendment was intended not to narrow the definition of credit, but to expand the products covered because the existing rule did not adequately protect servicemembers, and to help prevent evasion of the law in the future.[57] Indeed, as the DoD explained:

> The Department believes that this final rule is appropriate in order to address a wider range of credit products that currently fall outside the scope of the Department's existing regulation, which, until now, has implemented the MLA.[58]

Ultimately, under either the original or the expanded definition, app-based

---

[56] *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 80 Fed. Reg. 43,560 (July 22, 2015), https://www.federalregister.gov/documents/2015/07/22/2015-17480/limitations-on-terms-of-consumer-credit-extended-to-service-members-and-dependents.
[57] *Id.*
[58] *Id.*

payday loans fit the definition of credit under the MLA.[59]

## **CONCLUSION**

The Court should affirm the district court's order denying Defendant-Appellant Cleo's motion to dismiss.

Dated: March 11, 2026          Respectfully submitted,

| | |
|---|---|
| Nadine Chabrier | */s/ Shennan Kavanagh* |
| Monica Burks | Shennan Kavanagh |
| Katelin Kaiser | NATIONAL CONSUMER LAW |
| CENTER FOR RESPONSIBLE LENDING | CENTER |
| 302 West Main Street, | 7 Winthrop Square, 4th Floor |
| Durham NC 27701 | Boston, MA 02110 |
| nadine.chabrier@responsiblelending.org | skavanagh@nclc.org |
| monica.burks@responsiblelending.org | (617) 542-8010 |
| katelin.kaiser@responsiblelending.org | |
| (919) 313-8500 | |
| | *Counsel for Amici Curiae* |

---

[59] It is important to note that TILA's implementing regulation defines "credit" as "the right to defer payment of debt or to incur debt and defer its payment." Accordingly, this definition also covers PLA loans. *See* 12. C.F.R § 226.2(a)(17).73 (Payday loans; deferred presentment) (defining "credit" as: "Credit includes a transaction in which a cash advance is made to a consumer in exchange for the consumer's personal check, or in exchange for the consumer's authorization to debit the consumer's deposit account, and where the parties agree either that the check will not be cashed or deposited, or that the consumer's deposit account will not be debited, until a designated future date. This type of transaction is often referred to as a "payday loan" or "payday advance" or "deferred presentment loan." A fee charged in connection with such a transaction may be a finance charge for purposes of § 226.4, regardless of how the fee is characterized under state law. Where the fee charged constitutes a finance charge under § 226.4 and the person advancing funds regularly extends consumer credit, that person is a creditor and is required to provide disclosures consistent with the requirements of Regulation Z.")

## **CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 11, 2026

*/s/ Shennan Kavanagh*
Shennan Kavanagh

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 9th Cir. R. 32-1 because it contains 5,925 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word. The text is in 14-point Times New Roman type.

Dated: March 11, 2026

*/s/ Shennan Kavanagh*
Shennan Kavanagh

*Counsel for Amici Curiae*

28